## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION – BAY CITY

IN THE MATTER OF:

**INSPIRED CONCEPTS, LLC,**                     **Case No. 20-20034**

                                                **Chapter 11**

                    **Debtor.**                 **Hon. Daniel Opperman**

_____

### DEBTOR'S FIRST AMENDED COMBINED
### PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT

**PREPARED BY**:

WERNETTE HEILMAN PLLC
Ryan D. Heilman (P63952)
Attorneys for Debtor
40900 Woodward Ave., Suite 111
Bloomfield Hills, MI 48304
(248) 835-4745
ryan@wernetteheilman.com


      THE PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN CONNECTION WITH THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF DEBTOR'S PLAN.  ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS PLAN AND THE DISCLOSURE STATEMENT ARE NOT INTENDED TO BE AND SHOULD NOT IN ANY WAY BE CONSTRUED AS A SOLICITATION OF VOTES ON THE PLAN. NOR SHOULD THE INFORMATION CONTAINED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT BE RELIED ON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THE PROPOSED DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION.

      *DEBTOR WILL REMOVE THE ABOVE STATEMENT AFTER PRELIMINARY APPROVAL OF THE DISCLOSURE STATEMENT AND BEFORE DISSEMINATION TO CREDITORS.*

      DEBTOR EXPRESSLY RESERVES ITS RIGHT TO AMEND THIS PLAN AND THE DISCLOSURE STATEMENT AT ANY TIME.

**DEBTOR'S CHAPTER 11 PLAN**

**ARTICLE I
DEFINITIONS, RULES OF
INTERPRETATION AND COMPUTATION OF TIME**

1.1     **Scope of Definitions.**

      For purposes of this Plan, except as expressly provided otherwise or unless the context requires otherwise, all capitalized terms not otherwise defined have the meanings given them in section 1.2 of this Plan. Any term used in this Plan that is not defined herein, but is defined in the Disclosure Statement, the Bankruptcy Code, or the Bankruptcy Rules, will have the meaning given that term in the Disclosure Statement, the Bankruptcy Code, or the Bankruptcy Rules.

1.2     **Definitions.**

      1.2.1     "**Administrative Claim**" means a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code, including, but not limited to, the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estate and operating the business of Debtor, including wages, salaries, commissions for services rendered after the Petition Date, Professional Claims, taxes accruing after the Petition Date, whether or not the last payment date is before or after the Confirmation Date, and all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c) of the Bankruptcy Code, provided, however, that this term does not include any portion of Allowed Secured Claims, whether or not all or part of Allowed Secured Claim is entitled to priority under sections 503(b), 507, 363, or 364 of the Bankruptcy Code or otherwise.

      1.2.2     "**Administrative Claims Bar Date**" means the deadline for requests for payment of Administrative Claims (or proofs of claims requesting Administrative Claim status if permitted by Court order), which shall be 45 days after the Effective Date, unless the Administrative Claim is of a kind that is subject to an earlier Bar Date, in which case the earlier Bar Date shall control. Debtor shall not be required to make any payments or distributions on account of Administrative Claims not properly asserted before the Administrative Claims Bar Date unless such date is extended by Order of the Court.

      1.2.3     "**Affiliate(s)**" has the meaning given it by section 101(2) of the Bankruptcy Code.

      1.2.4     "**Allowed**" means, when used in reference to a Claim or Interest within a particular Class, an Allowed Claim or Allowed Interest of the type described in the Class

      1.2.5     "**Allowed Claim**" means a Claim or any portion of the Claim,

      a.     that has been Allowed by a Final Order of the Bankruptcy Court (or such other court or forum with jurisdiction to adjudicate the Claim and objections to it);

      b.     as to which a Proof of Claim has been timely Filed with the Bankruptcy Court pursuant to the Bankruptcy Code, but only to the extent that the Claim is identified in the Proof of Claim in a liquidated and noncontingent amount, and either (i) no

objection to its allowance has been Filed within the periods of limitation fixed by this Plan, the Bankruptcy Code, or by any order of the Bankruptcy Court, or (ii) any objection as to its allowance has been settled or withdrawn or has been denied or overruled by a Final Order;

c.     as to which no Proof of Claim has been Filed with the Bankruptcy Court and (i) which is Scheduled as liquidated in an amount other than zero and not contingent or disputed, but solely to the extent of the liquidated amount and (ii) no objection to its allowance has been Filed by Debtor, within the periods of limitation fixed by this Plan, the Bankruptcy Code, or by any order of the Bankruptcy Court; or

d.     that is expressly Allowed in a liquidated amount in this Plan.

1.2.6   "**Allowed Class . . . Claim**" or "**Allowed Class ... Interest**" means an Allowed Claim or an Allowed Interest in the specified Class.

1.2.7   "**Allowed Interest**" means an ownership Interest in Debtor, which has been or is later listed by Debtor in its books and records as liquidated in an amount and not disputed or contingent; provided, however, that to the extent an Interest is a Disputed Interest, the determination of whether the Interest will be Allowed and/or the amount of any Interest will be determined in the manner in which the Interest would have been determined if the Chapter 11 Case had not been commenced; and provided further, however, that proofs of Interest need not be Filed in the Bankruptcy Court with respect to any Interests; and provided further, however, that Debtor, in its discretion, may bring an objection or motion with respect to a Disputed Interest before the Bankruptcy Court for resolution.

1.2.8   "**Avoidance Actions**" means Causes of Action or defenses arising under any of sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, or under similar or related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation has been commenced as of the Confirmation Date to prosecute the Causes of Action.

1.2.9   "**Ballot**" means each of the ballot forms that is distributed with the Disclosure Statement to Holders of Claims and Interests included in Classes that are Impaired under this Plan and entitled to vote under the terms of this Plan.

1.2.10   "**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the Petition Date.

1.2.11   "**Bankruptcy Court**" or "**Court**" means the United States Bankruptcy Court for the Eastern District Michigan, or such other court that may have jurisdiction over the Chapter 11 Case.

1.2.12   "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Case or proceedings in the Chapter 11 Case, and the Local Rules of the Bankruptcy Court.

1.2.13   "**Bar Date**" means the deadlines set, or to be set, by the Bankruptcy Court for filing proofs of claim in the Chapter 11 Case or any other deadline for the assertion of Claims, Administrative Claims or other rights to relief as set by Order of the Bankruptcy Court (which may include the Confirmation Order), the Bankruptcy Code, the Federal Rules of

Bankruptcy Procedure or the Local Rules for the Bankruptcy Court for the Eastern District of Michigan.

1.2.14 "**Business Day**" means any day, excluding Saturdays, Sundays, and "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in Detroit, Michigan.

1.2.15 "**Cash**" means legal tender of the United States of America and equivalents thereof.

1.2.16 "**Causes of Action**" means any and all actions, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, non-contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and whether asserted or assertable directly or derivatively in law, equity, or otherwise, including Avoidance Actions, unless otherwise waived or released by Debtor to the extent the Cause of Action is a Cause of Action held by Debtor.

1.2.17 "**Chapter 11 Case**", "**Case**" or "**Bankruptcy Case**" means this chapter 11 case number 20-20034, currently pending in the United States Bankruptcy Court for the Eastern District of Michigan, Northern Division.

1.2.18 "**CharBhan**" means CharBhan Holdings, LLC, an affiliate of Debtor and which is also Debtor's landlord for Debtor's management and training center, as further discussed in the Disclosure Statement.

1.2.19 "**Claim**" means a claim against Debtor, whether or not asserted, as defined in § 101(5) of the Bankruptcy Code.

1.2.20 "**Class**" means a category of Holders of Claims or Interests as described in Article III of this Plan.

1.2.21 "**Class IV Share**" means the distributions to the Creditors Trust on behalf of General Unsecured Creditors as set forth in Section 3.4.

1.2.22 "**Committee**" means the Official Committee of Unsecured Creditors appointed in this Case by the United States Trustee's office.

1.2.23 "**Confirmation**" means the entry of a Confirmation Order on the docket of the Chapter 11 Case.

1.2.24 "**Confirmation Date**" means the date of entry of the Confirmation Order.

1.2.25 "**Confirmation Hearing**" means the hearing before the Bankruptcy Court held under section 1128 of the Bankruptcy Code to consider Confirmation of this Plan and related matters, as may be adjourned or continued from time to time.

1.2.26 "**Confirmation Order**" means the order entered by the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code.

1.2.27 "**Creditor**" means any creditor of Debtor as defined in section 101(10) of the Bankruptcy Code.

1.2.28 "**Creditors Trust**" means the trust created for the benefit of the Holders of Allowed Class IV Claims pursuant to this Plan and the Creditor Trust Agreement.

1.2.29 "**Creditors Trust Agreement**" means **Exhibit 1.2.29**.

1.2.30 "**Debtor**" means Inspired Concepts, LLC and, after the Effective Date, Reorganized Debtor.

1.2.31 "**Deficiency Claim**" means any Claim of a Creditor Holding a Claim secured by collateral to the extent that the value of the collateral is less than the Allowed amount of the Creditor's full Claim. That is, the undersecured portion of a Secured Claim is the Deficiency Claim.

1.2.32 "**Disallowed Claim**" means (a) a Claim, or any portion thereof, that has been disallowed by a Final Order or a settlement, (b) a Claim or any portion thereof that is Scheduled at zero or as contingent, disputed, or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law, or (c) a Claim or any portion thereof that is not Scheduled and as to which a Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law.

1.2.33 "**Disclosure Statement**" means the written disclosure statement, as amended, (including all attached and referenced schedules) that relates to this Plan, as such disclosure statement may be further amended, modified, or supplemented from time to time, all as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017.

1.2.34 "**Disputed Claim**" or "**Disputed Interest**" means a Claim or any portion thereof, or an Interest or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim, nor an Allowed Interest nor a Disallowed Interest.

1.2.35 "**Effective Date**" means the fifteenth day of the first month after the Confirmation Order becomes a Final Order except, if an Equity Auction is held, the Effective Date shall not occur until the fifteenth day of the first month after the date the Equity Auction has been completed and any cash consideration has been fully paid.

1.2.36 "**Entity**" has the meaning set forth at section 101(15) of the Bankruptcy Code.

1.2.37 "**Equity Auction**" means the potential auction of the Reorganized Debtor's equity interests as set forth in Article IV.

1.2.38 "**Estate**" means the bankruptcy estate of Debtor created pursuant to section 541 of the Bankruptcy Code.

1.2.39 "**Exhibit**" means any exhibit or schedule attached to this Plan, the Disclosure Statement, or incorporated into either by reference, including any amendments and supplemental exhibits or schedules that may be filed subsequent to filing of the Plan and Disclosure Statement.

1.2.40 "**Fifth Third**" means Fifth Third Bank, National Association.

1.2.41 "**Fifth Third Collateral**" means all property of the Debtor's estate that secures the Fifth Third Indebtedness.

1.2.42 "**Fifth Third Indebtedness**" means all debts and obligations owed by Debtor to Fifth Third after accounting for all payments made by Debtor to Fifth Third during the pendency of this Case and all other recoveries obtained by Fifth Third on account of Debtor's obligations to Fifth Third, including any recoveries from asset sales, co-borrowers or guarantors.

1.2.43 "**Fifth Third Secured Claim**" means that portion of the Fifth Third Indebtedness which is secured as determined under 11 U.S.C. § 506(a). To the extent the entirety of the Fifth Third Indebtedness is secured under § 506(a), the Fifth Third Secured Claim shall also include interest and reasonable fees, costs or charges arising or accruing after the Petition Date as provided under the applicable loan documents with Fifth Third.

1.2.44 "**File**" means to file with the Bankruptcy Court in the Chapter 11 Case or such other court with jurisdiction over the relevant subject matter.

1.2.45 "**Final Decree**" means the decree contemplated under Bankruptcy Rule 3022.

1.2.46 "**Final Order**" means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely Filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted.

1.2.47 "**General Unsecured Claim**" means any Claim that is not otherwise an Administrative Claim, Priority Tax Claim, Priority Claim, or Secured Claim. General Unsecured Claims include Claims of Creditors that are secured by Liens on property belonging to the Debtor (collateral) if the Secured Claims with senior priority are greater than the value of Debtor's interest in the collateral.

1.2.48 "**General Unsecured Claim Payment**" means the payments to be made to Holders of General Unsecured Claims during the Payment Period as set forth in section 3.4.

1.2.49 "**GFS**" means Gordon Food Service, Inc., a creditor of the Debtor.

1.2.50 "**GFS PACA Claim**" means all Claims that have been or may be asserted by GFS against the Debtor under the Perishable Agricultural Commodities Act ("PACA"), as further discussed in the Disclosure Statement.

1.2.51 "**Governmental Unit**" has the meaning set forth at section 101(27) of the Bankruptcy Code.

1.2.52 "**Holder**" means a Person holding a Claim, Interest, or Lien.

1.2.53 "**Impaired**" refers to any Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.2.54 "**Insider(s)**" has the meaning set forth at section 101(31) of the Bankruptcy Code.

1.2.55 "**Insider Claim**" means a Claim held by an Insider.

1.2.56 "**Interest**" means the legal, equitable, contractual, and other rights of any Person with respect to equity securities of, or ownership interests in Debtor.

1.2.57 "**Interest Rate**" means the interest rate set forth in this Plan or, if no specific rate of interest is set forth in this Plan with respect to a Claim which is entitled to be paid with interest, shall mean (a) with respect to a Claim for taxes, the interest rate applicable under non-bankruptcy law, (b) for all other Claims entitled to interest under the Bankruptcy Code and this Plan, five percent (5%), or (c) if the foregoing Interest Rate is subject to any objection, such other interest rate as may be determined by a Final Order of the Bankruptcy Court.

1.2.58 "**IRC**" means the Internal Revenue Code of 1986, as amended.

1.2.59 "**IRS**" means the Internal Revenue Service.

1.2.60 "**JPNJ**" means JPNJ Enterprises, LLC, a Michigan limited liability company.

1.2.61 "**KJE**" means KJ Endeavors, LLC, an affiliated and wholly-owned subsidiary of Debtor.

1.2.62 "**LaBelle Parties**" means LaBelle LP, Hospitality Holdings, LLC, Ladco, Inc., Ovens, LLC, Hoss, LLC, JBT, LLC, Menu Concepts, Inc., and Cindy Belle, LLC.

1.2.63 "**LaBelle Settlement**" means the settlement agreement entered into with the LaBelle Parties as attached to docket number 205 and as further discussed in the Disclosure Statement.

1.2.64 "**Lien**" has the meaning set forth at section 101(37) of the Bankruptcy Code.

1.2.65 "**Mercantile**" means Mercantile Bank.

1.2.66 "**Notice**" with respect to a notice to be provided to Debtor means a written notice delivered to and actually received by Debtor and Debtor's counsel at the addresses set forth in section 13.5 or such other address as is provided by Debtor or Debtor's counsel.

1.2.67 "**Payment Period**" means the period during which the Reorganized Debtor shall make payments to the Creditors Trust under this Plan.

1.2.68 "**Person**" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

1.2.69 "**Petition Date**" means January 10, 2020, the date Debtor Filed its petition for relief in the Bankruptcy Court.

1.2.70 "**Plan**" means this first amended plan for the resolution of outstanding Claims and Interests in the Chapter 11 Case, including all Exhibits, supplements, appendices, and schedules, either in its present form or as it may be altered, amended, or modified in accordance with the Bankruptcy Code and Bankruptcy Rules.

1.2.71 "**Plan Note**" means the promissory note to be executed by Reorganized Debtor in favor of the Creditors Trust in accordance with the provisions of this Plan. The terms and conditions of the Plan Note shall be consistent with the provisions of this Plan.

1.2.72 "**PPP Loan**" means the loan obtained by Debtor from the PPP Lender under the Paycheck Protection Program as set forth in the Coronavirus Aid, Relief, and Economic Security Act.

1.2.73 "**PPP Lender**" means National Capitol Bank, N.A.

1.2.74 "**Priority Claim**" means any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

1.2.75 "**Priority Tax Claim**" means a Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

1.2.76 "**Proof of Claim**" means a proof of Claim Filed against Debtor in the Chapter 11 Case.

1.2.77 "**Professional**" means any Person retained in the Chapter 11 Case by Bankruptcy Court order pursuant to sections 327 and 1103 of the Bankruptcy Code or otherwise.

1.2.78 "**Professional Claim**" means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges and disbursements incurred relating to services rendered or expenses incurred after the Petition Date and before and including the Effective Date.

1.2.79 "**Pro Rata**" means (a) with respect to Claims, at any time, the proportion that the Face Amount of a Claim in a particular Class or Classes bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class or Classes, unless this Plan provides otherwise and (b) with respect to Interests, at any time, the proportion that the number of Interests held by an Interest Holder in a particular Class or Classes bears to the aggregate number of all Interests (including Disputed Interests, but excluding Disallowed Interests) in such Class or Classes.

1.2.80 "**Purchaser**" means the successful purchaser at the Equity Auction, if the Equity Auction is held, as set forth in Article IV.

1.2.81 "**Reorganized Debtor**" means the Debtor after the Effective Date.

1.2.82 "**Retained Actions**" means all Claims, Causes of Action, rights of action, suits, and proceedings, whether in law or in equity, whether known or unknown, which Debtor or Debtor's Estate may hold against any Person, including, without limitation, Claims and Causes of Action brought before the Effective Date or identified in the Schedules or Disclosure Statement, other than Claims explicitly released under this Plan or by Final Order of the Bankruptcy Court before the date of this Plan.

1.2.83 "**Scheduled**" means, with respect to any Claim, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

1.2.84 "**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs Filed in the Chapter 11 Case by Debtor, as may be amended from time to time.

1.2.85 "**Secured Claim**" means a Claim secured by a security interest in or a lien on property in which Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value, as of the Effective Date or such other date as is established by the Bankruptcy Court, of such Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined by a Final Order of the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code, or as otherwise agreed upon in writing by Debtor and the Holder of such Claim.

1.2.86 "**Security**" has the meaning set forth at section 101(49) of the Bankruptcy Code.

1.2.87 "**Surrendered Property**" means all personal property secured by a first-priority perfected security interest in favor of Fifth Third that has been or will be surrendered to Fifth Third under this Plan or any Order entered by the Court.

1.2.88 "**Tolled Actions**" means all Causes of Action, including Avoidance Actions, that the Debtor or Debtor's Estate may have against any of Debtor's Insiders or Affiliates. Potential Tolled Actions are further described in the Disclosure Statement.

1.2.89 "**Unimpaired**" means, with respect to a Claim, any Claim that is not Impaired.

1.2.90 "**Valuation Hearing**" means a hearing in the Case at which the Court will determine the value of Fifth Third's interests in the Fifth Third Collateral and, thereby, establish the Allowed amount of the Fifth Third Secured Claim under 11 U.S.C. § 506(a).

1.2.91 "**Voting Deadline**" means the deadline set for the receipt of Ballots by Debtor or Debtor's agent under an applicable order entered or to be entered by the Bankruptcy Court.

1.3 **Rules Of Interpretation:** For purposes of this Plan, unless otherwise provided herein:

1.3.1 Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, include, both the singular and the plural.

1.3.2    Each pronoun stated in the masculine, feminine, or neuter includes the masculine, feminine, and neuter.

1.3.3    Any reference in this Plan to an existing document or schedule Filed or to be Filed means the document or schedule, as it may have been or may be amended, modified, or supplemented.  Except as otherwise ordered by the Bankruptcy Court, all Exhibits, as amended, modified or supplemented, are incorporated by reference into this Plan and Disclosure Statement for all purposes.

1.3.4    Any reference to an Entity or Person as a Holder of a Claim or Interest includes that Entity's or Person's successors and assigns. Any reference to Debtor includes the Reorganized Debtor for all periods after the Effective Date.

1.3.5    Any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the document shall be substantially on such terms and conditions.

1.3.6    The words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan.

1.3.7    Subject to the provisions of any contract, certificates of incorporation, by-laws, instruments, releases, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan will be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules. To the extent that reference to state law is required, the Plan is governed by the substantive law of Michigan.

1.3.8    The rules of construction in section 102 of the Bankruptcy Code apply. The Disclosure Statement may be used as an aid for interpretation of this Plan to the extent that any provision of this Plan is determined to be vague or ambiguous. However, to the extent any statement in the Disclosure Statement conflicts with any provision of this Plan, this Plan controls.

1.4    **Computation of Time.**  In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006 apply. Whenever any action is required to be performed or deadline expires on a specific date, if the date falls on a Saturday, Sunday, or legal holiday (as defined in Bankruptcy Rule 9006), the action may be performed, or the deadline will expire, on the next day that is not a Saturday, Sunday, or legal holiday.

1.5    **References to Monetary Figures**.   All references in this Plan to monetary figures refer to currency of the United States of America.

1.6    **Exhibits**.  All Exhibits, including any Exhibits referenced in this Plan, are incorporated into and are a part of this Plan and Disclosure Statement as if set forth in full herein and, to the extent not attached to this Plan, the Exhibits shall be filed with the Bankruptcy Court. Upon its filing, the Exhibit may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours or at the Bankruptcy Court's website for a fee at https://ecf.mieb.uscourts.gov. The Exhibits may also be requested in writing from Debtor's

counsel. **All Exhibits may be revised before the Confirmation Date by the filing of the revised Exhibits with the Bankruptcy Court, so long as the revised Exhibits are substantially in conformance with the terms of this Plan.** The Exhibits are an integral part of the Plan, and entry of the Confirmation Order by the Bankruptcy Court will constitute an approval of the Exhibits. Debtor intends to file all Plan Exhibits as a Plan supplement package no later than fourteen days before the Confirmation Date. The Plan supplement package will include the form of the Plan Note and security agreement with the Creditors Trust consistent with the provisions of this Plan and Disclosure Statement, and the Creditors Trust Agreement, and may include additional Exhibits.

1.7   **No Admissions; Estimates of Claims**. Unless expressly stated otherwise, nothing herein will be deemed to be an admission by Debtor or to otherwise prejudice Debtor in any Claims objection or Cause of Action. All estimates of Causes of Action and Claim amounts listed in this Plan, the Disclosure Statement, and Exhibits are current estimates only. All Claims amounts and classifications remain subject to the Claims Objection process as set forth in Article XII.

## ARTICLE II
## CLAIMANTS THAT ARE NOT SUBJECT TO
## CLASSIFICATION AND ARE NOT ENTITLED TO VOTE ON THE PLAN
## <u>ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS</u>

2.1 **Administrative Claims**.

Subject to the provisions of this Plan and upon occurrence of the Effective Date, as soon as possible after an Administrative Claim becomes an Allowed Administrative Claim or the date when an Administrative Claim becomes payable pursuant to any agreement between Debtor and the Holder of the Administrative Claim (but, in no event later than ten days thereafter), a Holder of an Allowed Administrative Claim <u>shall receive</u>, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim or such other treatment that Debtor and the Holder of the Allowed Administrative Claim shall have agreed upon in writing.

2.2 **Priority Tax Claims**.

2.2.1   The Holder of an Allowed Priority Tax Claim shall be entitled to receive, on account of its Allowed Priority Tax Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, payment of the outstanding amount of the Allowed Priority Tax Claim in equal monthly installments commencing on the date that is 60 days after the Effective Date, with interest accruing at the Interest Rate, calculated so that the last monthly payment will occur on or before January 10, 2025, the fifth anniversary of the Petition Date. Debtor may pre-pay any Priority Tax Claim. For the avoidance of doubt, all taxes of the type entitled to priority under 11 U.S.C. section 507(a) that have been assessed prior to the Petition Date are subject to this <u>section 2.2</u>.

2.2.2   Debtor reserves the right to commence or continue a challenge as to any Priority Tax Claim through the claims objection process set forth in Article XII of this Plan or through any appropriate adjudicative body with necessary jurisdiction, which challenge may include, but need not be limited to, a challenge to any penalty portion of such Claim, the amount and the value of the property which forms the basis for any assessment of taxes and the

computation of the tax. The right to challenge these claims includes, without limitation, an objection to any assessment of Debtor's real or personal property that may have been made by the respective taxing authority.

2.3 **Professional Claims.**

2.3.1 **Final Fee Applications.** All final requests for payment of Professional Claims must be Filed by any deadline set by the Court or, in any event, no later than forty-five (45) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior orders of the Bankruptcy Court, the Allowed amounts of such Professional Claims and expenses will be determined by the Bankruptcy Court and paid by Debtor promptly after they are Allowed as set forth in Section 2.1 (in no event more than seven days after entry of the Order Allowing the Professional Claims), or as otherwise agreed in writing by Debtor and the Professional for reasonable payment terms.

2.3.2 **Post-Confirmation Date Retention.** Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date or to make any disclosures pursuant to Bankruptcy Rules 2014 and 2016 will terminate, and Debtor and Reorganized Debtor, the Committee, and the Creditor Trust shall employ and pay Professionals in the ordinary course of business.

2.4 **Substantial Contribution Compensation and Expenses Bar Date.** Any Person who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Case pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must File an application with the clerk of the Bankruptcy Court on or before the Administrative Claims Bar Date and serve such application on counsel for Debtor and other parties as may be directed by the Bankruptcy Court on or before such date, or be forever barred from seeking such compensation or expense reimbursement. The Court will determine any timely filed request for compensation or expense reimbursement made under this section 2.4, and Debtor shall pay any Allowed amount within sixty days of entry of a Final Order.

2.5 **Pre-petition Administrative Claims.** All Administrative Claims incurred before the Petition Date, including (but not limited to) Administrative Claims arising under 11 U.S.C. § 503(b)(9), if any, must be Filed as a Motion or Application by the Holder of such Claims by any applicable Bar Date as set by the Federal Rules of Bankruptcy Procedures, the Bankruptcy Court's Local Rules, or by Order of the Bankruptcy Court in this Chapter 11 Case. If any Administrative Claim has not been Filed by the Applicable Bar Date, the Administrative Claim shall be disallowed without the need for Debtor to file any objection to the Administrative Claim.

2.6 **PPP Loan Administrative Claim.** Debtor shall seek to obtain the maximum forgiveness possible under the terms of the PPP Loan. Debtor shall repay the non-forgivable PPP Loan according to its terms.

2.7 **Other Administrative Claims.** All other requests for payment of an Administrative Claim (other than as specifically set forth in this Article II) must be Filed and served on Debtor's and Reorganized Debtor's counsel by the Administrative Claims Bar Date, except that any Administrative Claim not already Filed and required to have been Filed before a Bar Date is automatically disallowed. Any request for payment of an Administrative Claim pursuant to this section 2.6 that is not timely Filed and served is automatically disallowed without the need for any objection by Debtor. After the Effective Date, Debtor may settle an

Administrative Claim without further Bankruptcy Court approval. Unless Debtor objects to an Administrative Claim (unless such objection period is extended by the Bankruptcy Court) by the later of (i) 60 days after the Administrative Claims Bar Date or (ii) 30 days after the filing of the Administrative Claim, the Administrative Claim will be deemed Allowed in the amount requested. In the event that Debtor objects to an Administrative Claim, the Bankruptcy Court will determine the Allowed amount of the Administrative Claim.

2.8 **The GFS PACA Claim**. As further discussed in the Disclosure Statement, GFS has made a Claim under the Perishable Agricultural Commodities Act in the amount of $116,630.81. See DN 264. Debtor disputes the validity of the GFS PACA Claim. In addition, Debtor asserts that it is time-barred and waived due to GFS's failure to timely file a proof of claim in this Case. Nevertheless, if the GFS PACA Claim becomes an Allowed Claim, and if the Court determines that the GFS PACA Claim results in a trust on Debtor's assets with priority over all Secured Claims, the Allowed amount of the GFS PACA Trust will be paid in full through sixty (60) equal monthly payments commencing one month after the Effective Date

## ARTICLE III

## SPECIFICATION OF TREATMENT OF CLASSES OF CLAIMS OR INTERESTS NOT IMPAIRED UNDER THE PLAN AND THOSE IMPAIRED UNDER THE PLAN

The Plan divides Claims and Interests into five (5) Classes and treats them as follows:

3.1 **Class I**: Class I consists of Fifth Third Secured Claim.

3.1.1. The Secured Claim of Fifth Third shall be Allowed in the aggregate amount, at Fifth Third's election of: (i) the value of Fifth Third's rights in the Fifth Third Collateral as established by the Bankruptcy Court at or after the Valuation Hearing, or (ii) such other amount as agreed to by Fifth Third and Debtor (in consultation with the Committee or Creditors Trust, as applicable), and approved by the Bankruptcy Court. All payments made by Debtor during the course of this Chapter 11 Case shall be applied to reduce the Fifth Third Secured Claim.

3.1.2. The Secured Claim of Fifth Third may, at Fifth Third's election, be divided into two sub-claims – Class I.A, consisting of the secured portion of the Fifth Third Indebtedness resulting from a loan obtained by Debtor from Fifth Third under the Small Business Administration Section 7(a) loan program; and Class I.B, consisting of the remaining secured Fifth Third Indebtedness. Fifth Third may elect to allocate any or no amounts of the Fifth Third Secured Claim to Class I.A and Class I.B so long as the combined total does not exceed the Allowed Amount determined as set forth in Section 3.1.

3.1.3. The Allowed Class I Claim shall accrue interest from and after the Effective Date at the Interest Rate. Fifth Third may, however, elect in its Plan Ballot to apply its non-default contract rate of LIBOR plus 3.5%. Upon submission of its Plan Ballot, Fifth Third's election to apply the Interest Rate or the contract rate shall become binding and irrevocable. If the entirety of the Fifth Third Indebtedness is secured under 11 U.S.C. § 506, interest shall also accrue on the Fifth Third Indebtedness at the non-default contract rate until the Effective Date.

3.1.4. The Allowed Class I Claim shall be paid in full through (i) an initial payment due within seven days after the Effective Date of $18,400, (ii) monthly payments commencing one month after the Effective Date, of $6,695.84 each, until the Class I Claim has been satisfied in full or sixty monthly payments have been made. Each monthly payment shall be due on the first day of each month with a ten-day notice and cure period. If, after payment of the sixtieth monthly

payment, the Class I Claim has not been paid in full, Debtor shall make a balloon payment of all remaining principal and accrued interest no later than 30-days after the fifth anniversary of the Effective Date. Fifth Third may allocate each of the payments to either Class I.A or Class I.B in its discretion.

3.1.5.   The Reorganized Debtor may pre-pay all or any portion of the Class I Claim at any time without penalty. Any partial pre-payment shall not affect the amount or timing of the required monthly payments under this Section until the Class I Claim has been paid in full. If the prepayment represents proceeds of the sale of any collateral securing the Allowed Class I Claim, the proceeds shall be applied to the Class I.A Claim or Class I.B Claim in the manner set forth in Section 3.1.6 below. Any other partial pre-payment shall be applied to the principal amount of the Class I.A Claim and Class I.B Claim in proportion to the relative remaining balances of the Class I.A Claim and Class 1.B Claim.

3.1.6.   In the event Debtor or Reorganized Debtor sells its rights to any restaurant or any personal property, intellectual property, or liquor license as to which Fifth Third holds a first-priority perfected security interest or Lien, Fifth Third shall be entitled to all proceeds as a pre-payment of its Class I Claim except as otherwise agreed in writing by Fifth Third and Debtor, or as otherwise ordered by the Court. The proceeds of any such sale shall be allocated to Claim I.A if the collateral is first priority security for the Class I.A Claim, and allocated to Class I.B if it is collateral that is first priority security for the Class I.B Claim.

3.1.7.   If the value of the collateral securing the Class I Claim is less than the amount of the Class I Claim, the Class I Claim is undersecured under 11 U.S.C. § 506(b). Fifth Third's Deficiency Claim shall be treated as a General Unsecured Claim under Section 3.4.

3.1.8.   Fifth Third may dispose of the Surrendered Property in any commercially reasonable manner as permitted by and subject to the restrictions of the Uniform Commercial Code as enacted in Michigan. The proceeds of any Surrendered Property shall be applied (i) against Fifth Third's Deficiency Claim if the applicable Surrendered Property was surrendered before the Valuation Hearing and not included in the determination of the amount of the Fifth Third Secured Claim or (ii) against the Fifth Third Secured Claim if the Surrendered Property is surrendered after the Valuation Hearing or otherwise included in the determination of the amount of the Fifth Third Secured Claim.

3.1.9.   Until full satisfaction of the Class I Claim, Fifth Third will retain its Liens on all property of Debtor and Reorganized Debtor on which Fifth Third had a valid prepetition or post-petition Lien, to secure the Class I Claim. Fifth Third's Liens will maintain the same priority, validity, and enforceability as existed immediately before the Petition Date or as set forth in any order of the Bankruptcy Court. This Plan reaffirms and acknowledges the continuing priority, effectiveness, and enforceability of all security agreements and all other loan and collateral documents between Debtor and Fifth Third, any or all of which may be amended at Fifth Third's request to conform to the Plan requirements, except that such agreements and documents shall not increase Debtor's obligations beyond those explicitly set forth in this Plan and shall not be enforced against Debtor so long as Debtor is not in default under its obligations to Fifth Third under this Plan (through the applicable notice and cure period). Upon Debtor's satisfaction of Fifth Third's Class I Claim, Debtor shall have no further obligations or duties to Fifth Third this Plan or any prepetition agreements or documents.

3.1.10. So long as Reorganized Debtor is not in default under its obligations to Fifth Third under this Section, and through the applicable notice and cure period, Fifth Third shall refrain

from seeking to execute on, require the sale of, or otherwise commence any collection action against the equity Interests in Debtor.

3.1.11. In the event Reorganized Debtor defaults on any of its obligations to pay money to Fifth Third under this Plan, Reorganized Debtor shall have a 10-day opportunity to cure after Notice. If Reorganized Debtor defaults on any of its other, nonpayment obligations to Fifth Third under this Plan, Reorganized Debtor shall have a 30-day opportunity to cure after Notice. If any default is not timely cured, Fifth Third may exercise all its rights against all property subject to Fifth Third's Liens under applicable law and against any Insiders or Affiliates of Debtor without further order of the Court, including without limitation acceleration of the entire remaining balance of the Secured Claim of Fifth Third, and Fifth Third may file appropriate actions to aid in such relief in this Court or in any other court of applicable jurisdiction.

3.1.12. **This Class is Impaired**.

3.2     **Class II:** Class II consists of the Secured Claim of Mercantile.

3.2.1   The Secured Claim of Mercantile shall be Allowed in the amount of $85,000, which represents Debtor's and Mercantile's agreed estimate of the replacement value of the collateral securing the Class II Claim. The Secured Claim of Mercantile is an undersecured Claim under 11 U.S.C. § 506(b).

3.2.2   The Allowed Class II Claim shall accrue interest at the Interest Rate and shall be paid in full through (i) an initial payment in the amount of $3,050, (ii) monthly payments in the amount of $1,546.50 each, commencing one month after the Effective Date and continuing until the later of either payment of the Class II Claim in full or the fifth anniversary of the Effective Date, whichever occurs first. Each monthly payment shall be due on the first day of each month. If, on the fifth anniversary of the Effective Date, the Class II Claim has not been paid in full, Debtor shall make a balloon payment of all remaining principal and accrued interest no later than 30-days after the fifth anniversary of the Effective Date.

3.2.3   The Reorganized Debtor may pre-pay all or any portion of the Class II Claim at any time without penalty. Any partial pre-payment shall be applied to the principal amount of the Class II Claim, but shall not affect the amount or timing of the required monthly payments under this Section until the Class II Claim has been paid in full.

3.2.4   In the event Debtor or Reorganized Debtor sells its rights to the Noodles & Company restaurant in Mt. Pleasant or any personal property or intellectual property related to the Mt. Pleasant Noodles and Company restaurant and as to which Mercantile holds a first-position perfected security interest or Lien, Mercantile shall be entitled to all proceeds as a pre-payment of its Class II Claim up to the full amount of the unpaid balance of the Class II Claim, except as otherwise agreed in writing by Mercantile and Debtor.

3.2.5   Mercantile's Deficiency Claim shall be treated as a General Unsecured Claim under Section 3.4.

3.2.6   Until full satisfaction of the Class II Claim in full, Mercantile will retain its Liens on all property of Debtor and Reorganized Debtor on which Mercantile had a valid prepetition or post-petition Lien, to secure the Class II Claim. Mercantile's Liens will maintain the same priority, validity, and enforceability as existed immediately before the Petition Date or as set forth in any order of the Bankruptcy Court.

3.2.7    Unless the Reorganized Debtor is in default under its obligations to Mercantile and the default is not timely cured as set forth below, Mercantile shall refrain from seeking to execute on, require the sale of, or otherwise commence any collection action against the equity Interests in Debtor.

3.2.8    In the event Reorganized Debtor defaults on any of its obligations to pay money to Mercantile under this Plan, Reorganized Debtor shall have a 10-day opportunity to cure after Notice. If Reorganized Debtor defaults on any of its other, nonpayment obligations to Mercantile under this Plan, Reorganized Debtor shall have a 30-day opportunity to cure after Notice. If any default is not timely cured, Mercantile may exercise all its rights against all property subject to Mercantile's Liens under applicable law and against any Insiders or Affiliates of Debtor without further order of the Court, including without limitation acceleration of the entire remaining balance of the Secured Claim of Mercantile, and Mercantile may file appropriate actions to aid in such relief in this Court or in any other court of applicable jurisdiction.

3.2.9    **This Class is Impaired.**

3.3    **Class III:** This Class consists of the Allowed Secured Claims of any tax authority, including the State of Michigan and any and all cities or counties that assert personal property taxes against Debtor or Debtor's property.

3.3.1    Holders of Allowed Class III Claims shall be treated the same as Priority Tax Claims under section 2.2 (including, for the avoidance of doubt, the applicable Interest Rate), except (i) until each respective Allowed Class III Claim is satisfied in full, each Class III Claim Holder will retain its Liens on all property of Debtor and Reorganized Debtor on which it had a valid prepetition or post-petition Lien, to secure the Class III Claims, and (ii) in the event Debtor or Reorganized Debtor sells any property as two which a Class III Claim Holder has a valid, perfected and first-position Lien, the proceeds of the sale will be used to pre-pay such Class III Claim.

3.3.2    **This Class is Impaired**.

3.4    **Class IV:** This Class consists of all Allowed General Unsecured Claims. The Deficiency Claims of Allowed Class I, II and III Claims are included as General Unsecured Claims under this section 3.4.

3.4.1    Promptly upon the Effective Date, the Reorganized Debtor shall execute the Plan Note, attached as Exhibit 3.4.1, which shall memorialize the following Plan obligations by the Reorganized Debtor to the Creditors Trust:

i.      A payment obligation in the principal amount of $625,000 with a five-year term payable monthly;
ii.     Commencing on January 15, 2021, simple interest to accrue on the unpaid principal amount at 5% per year;
iii.    The initial monthly payment is due on the earlier of (i) sixty days after the Effective Date or (ii) January 15, 2021;
iv.     A total of 60 monthly payments, including the initial payment;
v.      After the initial payment, each monthly payment is due on the fifteenth (15th) day of each month;
vi.     Payments shall be in the following amounts:
        a.    The initial payment and payments for the second (2nd) through twelfth (12th) months of the Payment Period: $7,812.50 per month;

b. Payments for the thirteenth (13th) through sixtieth (60th) months of the Payment Period: equal monthly payments of principal and interest calculated so that the total balance is paid in full by December 15, 2025;

c. Notwithstanding the above, all principal and accrued interest must be paid in full no later than sixty months from the due date of the initial payment; and

d. Payments shall be applied first against accrued and unpaid interest and costs and then to the principal balance. Prepayments may be made at any time but such prepayments will not affect the Reorganized Debtor's obligations to make monthly payments or the amounts of such monthly payments until the principal balance and all accrued interest have been paid in full; and

vii. Default provisions as follows:

a. It shall be a default if any payment is not received by the due dates set forth above ("Payment Default");

b. The Creditors Trust shall provide Reorganized Debtor with notice of any Payment Default and 14 days to cure from the date of the notice;

c. If the default is not timely cured, (i) the obligation due under the Plan Note are immediately accelerated and due in full without further notice and (ii) the Creditors Trust may enforce the obligations under the Plan Note and shall have all rights and remedies available at law, equity or with regard to any security; and

d. The notice and cure period set forth in (b) above shall not apply if there are more than two Payment Defaults in any twelve-month period and, in such event, the obligations under the Plan Note are immediately accelerated an due in full without further notice and the Creditors Trust may enforce the obligations under the Plan Note, the Security Agreement (defined herein), or at law or in equity all without further notice.

3.4.2    To secured Reorganized Debtor's obligations under the Plan Note, Reorganized Debtor will, concurrently with execution of the Plan Note, execute a security agreement granting a security interest in favor of the Creditors Trust in form and substantive as set forth as Exhibit 3.4.2 (the "Security Agreement").  For the avoidance of doubt, the Reorganized Debtor hereby grants to the Creditors Trust a security interest in all of its assets including, without limitation, all classes and categories of assets defined under the Uniform Commercial Code, now owned or acquired in the future, all accessions and additions thereto, and all proceeds and products thereof.

3.4.3    To facilitate payments on the Plan Note:

a.    Insiders will contribute or forego their company vehicle allowance; and

b.    Reorganized Debtor shall cause KJE to either retain all income or distribute the income as equity distributions to Reorganized Debtor.

3.4.4    In addition to the Plan Note, the Reorganized Debtor will make a one-time payment to the Creditors Trust within 30 days after the Effective Date, but no later than January 15, 2021, in the amount of $10,000 to be use by the Creditors Trust for its fees and costs.

3.4.5    In addition to the Plan Note, the Reorganized Debtor will pay to the Creditors Trust 60% of the net proceeds received by the Reorganized Debtor, if any, arising from

any judgment or settlement in the case of Inspired Concepts, LLC et al v. Certain Underwriters of Lloyds of London and Underwriters Known as Syndicate 2623 et al, Case No. 1:2020-cv-11516 (E.D. Mich.), or any subsequent lawsuit asserting substantially similar claims.

3.4.6    The Creditors Trust shall use all proceeds from the distributions by the Reorganized Debtor first to pay the Creditors Trust's post-Effective Date costs and fees, including Professional Fees, incurred after the Effective Date and shall distribute the remainder of the distributions to the Class IV Claim Holders on a Pro Rata basis under the terms and conditions of the Creditors Trust Agreement. The Creditors Trust may develop rules and procedures for the holdback of any distributions pending resolution of any Claim objections filed by the Creditor Trust or the Reorganized Debtor.

3.4.7    The pre-Confirmation Claims of any and all Insiders and Affiliates, other than wages and benefits as disclosed in the Disclosure Statement, whether secured or unsecured, are subordinated in full to the obligations to the Creditors Trust required under this Plan. For the avoidance of doubt, no Insider or Affiliate is or will be a beneficiary of the Creditors Trust and no Insider or Affiliates will receive any distribution on account of Section 3.4 of the Plan until all Debtor's obligations to the Creditors Trust under this Plan have been fully, finally, and indefeasibly satisfied. Upon payment in full of the Plan Note and all other obligations of Reorganized Debtor to the Creditors Trust arising under this Plan, Reorganized Debtor shall pay Insiders and Affiliates an amount equal to the percentage recovery of other Class IV Claim Holders.

3.4.8    The Reorganized Debtor shall provide the Creditors Trust with all quarterly and annual financial information that it provides to Class I and Class II Claim Holders (or any refinance or replacement lenders with respect to either Class I or Class II) at the same time that the Reorganized Debtor provides such information to the Class I and Class II Claim Holders (or any refinance or replacement lenders with respect to either Class I or Class II) until Reorganized Debtor's obligations to Creditors Trust have been fully satisfied.

3.4.9    All Avoidance Actions against Class IV Claim Holders, excepting the Tolled Actions and any Avoidance Action commenced prior to the deadline to submit ballots accepting or rejecting this Plan, shall be waived and shall not survive the Effective Date. The net proceeds, after deduction of all costs and attorneys' fees, of any Avoidance Action not waived, if any, shall be aplied against Allowed Administrative Claims, which may include offsets against any amounts owed to GFS on account of the GFS PACA Claim or any Administrative Claim of GFS Allowed under 11 U.S.C. § 503(b)(9). Notwithstanding the waiver of Avoidance Actions, Debtor, Reorganized Debtor, the Committee and Creditors Trust reserve the right to assert any Avoidance Action for defensive purposes to offset or prevent recovery by any person or entity of any Claims arising under 11 U.S.C. § 503(b)(9), any other Administrative Claim, any Priority Claim, any Secured Claim, or any Claim asserting a trust against any of Debtor's or Reorganized Debtors assets.

3.4.10    The Creditors Trust shall have standing to pursue alleged Tolled Actions as an additional remedy for a Payment Default if and only if the Plan Note is accelerated under the conditions set forth above. All Tolled Actions shall be waived and released in full upon Reorganized Debtor's full, final, and indefeasible satisfaction of all its obligations under the Plan Note.

3.4.11    **This Class is Impaired.**

3.5    **Class V**: This Class consists of the Claims of Interests of Debtor.

3.5.1    The Interests of this Class will be treated in one of two alternative methods:

A.    If Class IV votes to accept the Plan:

    i.    Jeffrey Neely and Patti Neely will retain their Interests in Debtor and will hold the Interests as husband and wife by the entireties;

    ii.   Patti Neely and Jeffrey Neely shall cause CharBhan to provide a rent abatement of $2,155 per month so that monthly base rent for the CharBhan-owned headquarters and training center shall be $5,345 per month, equal to CharBhan's base rent as of 2015; until the Reorganized Debtor's obligations to Creditors Trust have been fully satisfied.

    iii.  Upon the occurrence of the Effective Date, Patti Neely and Jeffrey Neely shall not contest the contention of the Committee and/or the Creditors Trust that the equity interests of CharBhan are owned by Reorganized Debtor; and

    iv.   The Holders of the Interests in Reorganized Debtor shall take no equity distributions from Debtor, KJE, CharBhan, and/or JPNJ until all obligations under this Plan have been fulfilled by Reorganized Debtor, and Insiders and Interest Holders may be compensated only as set forth in this Plan and Disclosure Statement during the Payment Period until Debtors obligations to Creditors Trust have been fully satisfied.

**This Class will be Impaired.**

B.    If Class IV votes to reject the Plan, and the Court determines that (i) as a result of such rejection, the Plan, but for this paragraph does not comply with the absolute priority rule and (ii) the Plan should otherwise be confirmed, in order to comply with the absolute priority rule: the Interests of Debtor will be canceled and the Interests of the Reorganized Debtor will be sold at the Equity Auction set forth in Article 4. The proceeds of the Equity Auction will be paid Pro Rata first on account of Administrative Claims, next to Priority Claims, and finally to prepayment of Class I and Class II Claims. The successful Purchaser must apply all revenues of the Reorganized Debtor to satisfy all of the obligations of the Reorganized Debtor as and when set forth in this Plan (including payments of all operating expenses substantially as set forth in the projections attached as an Exhibit to the Disclosure Statement), and the Purchaser and any individual that owns or controls the Purchaser directly or indirectly ("Owner") shall take no draws or equity distributions until all obligations under this Plan have been fulfilled by Reorganized Debtor, and the Purchaser and any Owner (and all Insiders and Affiliates of the Purchaser and any Owner) may be compensated during the Payment Period only if such compensation is consistent with this Plan and, in any event, no greater than the compensation for Insiders disclosed in the Disclosure Statement.

**This Class will be Impaired.**

## ARTICLE IV
## EXECUTION AND IMPLEMENTATION OF THE PLAN

4.1    Upon the Effective Date, Debtor will become the Reorganized Debtor. Notwithstanding anything to the contrary in this Plan, the Reorganized Debtor shall continue operating Debtor's business, shall collect all revenues and income, and shall distribute such revenues and income as provided under the terms of this Plan. During the Payment Period, the Reorganized Debtor shall retain Jeffrey Neely as its Chief Executive Officer and Manager.. Jeffrey and Patti Neely shall be entitled to appoint any other officers in their sole discretion, but payments to Insiders shall be limited as set forth in the Disclosure Statement. The Reorganized Debtor may retain other employees, including Insiders, at commercially reasonable rates of compensation as more fully described in the Disclosure Statement. All Causes of Action not waived or released under this Plan, the Confirmation Order or any other Order issued by the Court shall vest with Reorganized Debtor except that the Creditors Trust shall have exclusive standing to assert alleged Tolled Actions in the Court.

4.2    **Assumption of Liability**:

4.2.1    Reorganized Debtor shall be responsible for satisfying the Allowed Class I, II, III, and IV Claims in accordance with the terms and provisions of this Plan.

4.2.2    The Reorganized Debtor will retain control of and be responsible for all of Debtor's operations after the Effective Date. Funding for the operations of Debtor's business and for distributions required under this Plan during the Payment Period shall be from the operation of Debtor's business(es), except as otherwise set forth in this Plan. Debtor may also use proceeds of the PPP Loan as necessary after the Effective Date, but only in accordance with the conditions of the PPP Loan and for the purposes as set forth in the Paycheck Protection Program.

4.2.3    Debtor reasonably believes that future operations will enable the Reorganized Debtor to satisfy its obligations under the Plan. Other sources of cash may be explored and utilized by the Reorganized Debtor to the extent that such infusions are necessary or helpful to meet the obligations of the Plan, pre-payments, or to facilitate continued operations, which may include exit financing, refinancing, subordinated financing, purchase money financing, capital contributions and/or lending from Insiders to Reorganized Debtor. Reorganized Debtor shall be entitled to enter into financing arrangements and to execute financing documents after the Effective Date without providing notice or obtaining Bankruptcy Court approval, including secured financing so long as (i) the principal amount of such financing does not exceed the principal amounts of secured Claims owing as of the Effective Date, (ii) the Creditors Trust and Holders of Class I and Class II Claims agree to such financing, or (iii) the financing will be used to pay outstanding obligations to the Creditors Trust, and Class I and Class II Claim Holders. Reorganized Debtor shall be entitled to apply for and receive any government grant or loan program or other governmental relief without further Court order so long as such program or relief does not impair the security interests of the Class I and Class II Claim Holders. Any financing that becomes effective before the Effective Date will be subject to Bankruptcy Court approval after notice and opportunity for a hearing. Notwithstanding the above, until all payments required by this Plan have been made in full, the Reorganized Debtor shall not agree to pay, and shall not pay, any interest to any Insider or Affiliate of Debtor for any loan or contribution, the Reorganized Debtor shall make no repayments to any Insider or Affiliate at any time when the Reorganized Debtor is in default under any provision of this Plan, and the Reorganized Debtor shall not provide loans or contributions to any Insider or Affiliate, except KJE. To the extent necessary and prudent, Reorganized Debtor may provide interest-free intercompany loans to fund KJE's operations, and KJE may provide interest-

free intercompany loans to fund Reorganized Debtor's operations. Nothing in this section or the Plan permits Debtor or Reorganized Debtor to grant any Liens on property that is encumbered by Liens or security interests in favor of Fifth Third, Mercantile, or the Creditors Trust, unless such Liens or security interests are expressly subordinate to the Liens or security interests in favor of Fifth Third, Mercantile, and the Creditors Trust, Fifth Third, Mercantile, and/or the Creditors Trust (as applicable) consents in writing, or unless the applicable Allowed Secured Claims or obligations to the Creditors Trust are paid in full as a result of the financing. Notwithstanding the above, nothing in this section prevents Reorganized Debtor from granting a purchase money security interest to a lender (not an Affiliate or Insider) so long as the security interest complies with all requirements under Michigan's Uniform Commercial Code and any other applicable law.

   4.2.4 KJE, as a wholly-owned subsidiary of Reorganized Debtor, agrees to provide equity distributions to Debtor as set forth in the projections attached to the Disclosure Statement.

   4.2.5 JPNJ guaranties all liabilities and obligations of Reorganized Debtor under this Plan.

   4.2.6 The settlement agreement between the Debtor, LaBelle, and others, which is attached as Exhibit 6 to the Debtor's *Motion for Approval of Settlement with Labelle Limited Partnership and Related Entities* [DN 205] is approved in all respects.

   4.2.7 The Reorganized Debtor may pre-pay any Class I, II or III Claim, or the obligations to the Creditors Trust at any time without penalty or liability for unmatured interest. The Reorganized Debtor may negotiate with the Holders of Class I, II or III Claims and/or with the Creditors Trust to receive discounts, payment modifications or other accommodations, but no modifications to Reorganized Debtor's obligations under this Plan shall be binding unless set forth in writing. Upon payment by the Reorganized Debtor to any Class I, II or III Claim Holder or the Creditors Trust in the amounts required under this Plan or as otherwise agreed by the Claim Holder or Creditors Trust, the Reorganized Debtor will have no further obligation to such Claim Holder or the Creditors Trust under this Plan, and the Claim Holder or Creditors Trust will have no further or continued rights or standing under this Plan.

   4.2.8 Upon satisfaction of all obligations to all Class I, II and III Claim Holders and to the Creditors Trust, the Reorganized Debtor will no longer be bound by the provisions of this Plan and will be entitled to conduct its business without Bankruptcy Court supervision under applicable non-bankruptcy law. Nothing in this Section shall be construed as waiving or limiting the Reorganized Debtor's rights and interests under this Plan, to enforce those rights and interests through the Bankruptcy Court, to dispute claims, to bring motions or pursue Causes of Action in the Bankruptcy Court or any other court, or to petition the Bankruptcy Court for the redress of any grievances.

  4.3 **Disbanding the Committee:** Upon the Effective Date, the Committee will disband and will have no further standing in this Case, except with respect to any appeal of the Confirmation Order or with respect of applications for or objections to Professional Fees.

  4.4 **Creditors Trust:** Upon the Effective Date, the Creditors Trust will be considered valid and enforceable under the terms and conditions of the Creditors Trust Agreement. The Creditors Trust will be controlled by a professional person appointed by the Committee. The Creditors Trust shall receive all Class IV distributions from the Reorganized Debtor and shall have the right to object to any Claims. The Creditors Trust shall abide by the terms and

conditions of the Creditors Trust Agreement, with any contradictions between the Plan and the Creditors Trust Agreement being construed and controlled by the Plan, with the exception of distributions as set forth in Section 6.2, or by the Confirmation Order.

4.5 **Professional Fees:** Any services performed or expenses incurred by any Professional on behalf of Debtor or Committee with respect to the Chapter 11 Case after the Petition Date but before the Effective Date will be Administrative Claims, will be paid by Reorganized Debtor or Committee as applicable, as set forth in Article II and will be subject to the prior review and approval of the Bankruptcy Court. Any services performed or expenses incurred by any Professional on behalf of the Reorganized Debtor, Committee, or Creditors Trust with respect to the Chapter 11 Case after the Effective Date will be an obligation of the Reorganized Debtor or Creditors Trust, as applicable, and will not be subject to the prior review and approval of the Bankruptcy Court. Notwithstanding any provision of the Bankruptcy Code or Rules, including, without limitation, Bankruptcy Rule 2016, after the Effective Date, no Professional will be required to disclose payments from Reorganized Debtor or Creditors Trust to the Bankruptcy Court or the United States Trustee. All fees and expenses of Reorganized Debtor or Creditors Trust shall be billed directly Reorganized Debtor or Creditors Trust, as applicable, and the Bankruptcy Court shall review only that portion to which Reorganized Debtor or Creditors Trust objects. Reorganized Debtor or Creditor Trust, as applicable, must pay the portion not objected to in accordance with the terms of the invoice. For the avoidance of doubt, the Creditors Trust is responsible for its own fees and expenses, which will be paid out of the Class IV Share, and such fees and expenses shall not be an obligation of Reorganized Debtor.

4.6 **Effectuating Documents**: With the exception of the Liens securing Allowed Class I, II and III Claims, Reorganized Debtor is authorized to execute, deliver, file, or record such financing statements, contracts, instruments, releases, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan without further notice to or order, action or approval of the Bankruptcy Court.

4.7 **Preservation of Rights of Action**:

4.7.1 **Vesting of Causes of Action:** In accordance with section 1123(b) of the Bankruptcy Code, except as otherwise provided in this Plan and except to the extent that they are waived or released under this Plan or other Order of the Court, all Causes of Action of Debtor and Debtor's Estate will be transferred to and vest with the Reorganized Debtor. Subject to the provisions of this Plan, the Reorganized Debtor and, the Creditors Trust (with respect to the Tolled Actions) shall retain and may (but is not required to) enforce all rights to commence, pursue, compromise and collect, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including, but not limited to, collection of trade debt and account payables, Avoidance Actions not waived or released, and any actions specifically listed in the Disclosure Statement.

4.7.2 **All Causes of Action and Avoidance Actions not waived under this Plan are Specifically Reserved, whether or not specifically listed in the Plan or Disclosure Statement:** Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan, Exhibit, or a Final Order, Reorganized Debtor specifically reserves all Causes of Action, including (but not limited to) actions to collect trade payables and other debts, actions against any person for violation of the automatic stay, Avoidance Actions for off-set or defensive purposes, and any other prepetition or post-petition action held by Debtor, for later adjudication in the Bankruptcy Court or in a state or federal court with jurisdiction. No preclusion doctrine, res judicata, estoppel (judicial, equitable or otherwise)

or laches will apply to any of the Causes of Action upon, after or as a consequence of the commencement of this Chapter 11 Case, Confirmation, entry of the Confirmation Order, or the Effective Date.

4.8 **Pandemic Clause:** In the event of a general government mandate, regulation, order, law or restriction of in-person dining in restaurants in the State of Michigan that results in (i) less than 50% seating capacity per, or (ii) a general prohibition of in-person dining:

a. Payments under this Plan shall be suspended during such restrictions or prohibition;

b. Interest shall continue to accrue;

c. Payments shall resume 30 days after dine-in service are allowed to resume at or above 50% seating capacity; and

d. All suspended payments plus all accrued and unpaid interest shall be added to the final payment due to the Claim Holder or Creditors Trust under this Plan.

4.9 **The Equity Auction:**

4.9.1 If Class IV votes to reject the Plan, the equity Interests in the Reorganized Debtor shall be sold to the highest bidder at the Equity Auction. To be qualified to bid at the Equity Auction, a bidder must show its financial ability to meet all requirements of the Reorganized Debtor under this Plan and to operate the restaurants including to become approved franchisees of each of Reorganized Debtor's and KJE's restaurants. Class V Interest Holders are automatically qualified bidders. The Purchaser will be personally bound by this Plan and all liabilities under this Plan, must operate the Reorganized Debtor as set forth in this Plan and Disclosure Statement, and must use all revenues of Debtor to make all payments required under this Plan and to perform all other obligations of the Reorganized Debtor before making any equity distribution; and any individual that owns or controls the Purchaser directly or indirectly ("Owner") may not take any draws, equity contributions or any other benefit of any kind, monetary or otherwise, from operation, transfer, closure or other disposition of the Reorganized Debtor, KJE of any of their respective restaurants. If the Owner or principals of the owner, or qualified Insiders of the Purchaser or Owner work full time for Reorganized Debtor and KJE, such persons may receive compensation strictly limited to the amounts set forth in the Disclosure Statement for similar work performed by Insiders of the Debtor. If there are no bids at the Equity Auction, the new Interests in the Reorganized Debtor will be granted as set forth in section 3.5.1(A).

4.9.2 If the Equity Auction occurs, Debtor shall sell the equity Interests in Reorganized Debtor in accordance with the following procedures:

A. Debtor shall schedule an auction sale (the "Equity Auction") at 9:00 a.m. no earlier than seven weeks and no later than ten weeks following the Confirmation Date. The Equity Auction shall be held at the office of Debtor's counsel. Details regarding the date and process of the Equity Auction shall be determined in consultation with the Committee, Fifth Third and Mercantile. Any party interested in attending and/or bidding at the Equity Auction may obtain additional details regarding the time, place and process of the Equity Auction by contacting Debtor's counsel.

B. In addition to notice provided by dissemination of this Plan to all Debtor's creditors, Debtor shall (i) on the first business day after the Confirmation Date

file a notice of the Equity Auction with the Bankruptcy Court with the case caption and indicating the date and time of the Equity Auction and (ii) cause a notice to be published as a legal notice with a paper with general distribution in the Mt. Pleasant area for three consecutive weeks commencing on the week after the Confirmation Date providing the name of the Debtor, a description of Debtor's business including a listing of Debtor's restaurants, gross revenues for the preceding six months, the Bankruptcy Case number and contact information for Debtor's counsel and Committee's counsel. Notwithstanding the forgoing, the Committee may take any additional actions to market the Debtor's equity interests as deemed advisable by the Committee and the Equity Auction shall not occur until all such actions have been completed.

C. All bidders must agree to comply with all the terms and provisions of this Plan, including (but not limited to) the provisions of this Section and Section 3.5.1(B).

D. The Equity Auction shall be conducted by counsel for Debtor, in consultation with the Committee, in a manner consistent with this Plan and reasonably calculated to obtain the highest and best sale price. Each bidder must demonstrate its ability to immediately fund the amount of the winning bid, and must pay the amount of the winning bid within twenty-four hours of submitting the winning bid. If the winning bidder fails to timely pay the amount of the winning bid, the next highest bidder will have two full Business Days after notice to pay the amount of its highest bid at the Equity Auction and to become the successful bidder.

4.9.3   The Reorganized Debtor shall pay all proceeds of the Equity Auction as set forth in <u>section 3.5.1(B)</u>.

4.9.4   In the event that the Court determines that the Equity Auction provisions or procedures under this Section are inadequate or otherwise inappropriate for any reason but determines that this Plan is otherwise confirmable, the Court may confirm this Plan but with different or additional provisions and procedures governing the Equity Auction.

4.10   After the Claims Objection Deadline under Section 12.1, Reorganized Debtor, the Committee, and the Creditors Trust shall take all actions as reasonable and appropriate to expedite the administrative closing of the case and to minimize the U.S Trustee fees to be paid by Reorganized Debtor.

### ARTICLE V
### EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

5.1    **Discharge of Indebtedness**:

5.1.1   Except as otherwise provided in this Plan, and upon the occurrence of the Effective Date, the confirmation of this Plan will, and does hereby act to discharge and release the Claims of all Creditors against Debtor and the Reorganized Debtor, the same constituting a full, total and complete settlement with the Creditors. Upon the Effective Date, Confirmation will also act as a merger and relinquishment of any and all Claims that Creditors have, or may have, against

Debtor and the Reorganized Debtor as provided in the treatment of the Creditors. Payment in full of an Allowed Secured Claim under this Plan shall also discharge such Claim Holder's claims against any joint obligor or guarantor. Partial payment of any Claim under this Plan shall also be accounted as partial payment of any Claim Holder's claim against any joint obligor or guarantor. The forgoing notwithstanding, this paragraph will not affect the rights of any taxing authority against any other entity or person who may be liable or responsible for the taxes of the Reorganized Debtor, except to the extent that it provides such other person a defense that the claims of the taxing authority have been actually paid in whole or in part.

5.2 **Subordinated Claims**. The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and confirm the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, Debtor reserves the right to re-classify (or request that the Bankruptcy Court re-classify) any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto. If a Claim is Allowed but subordinated, the Claim will be entitled to vote in its respective Class but will not be entitled to payment under this Plan until all other Claims have been paid in full or as otherwise specified by the Bankruptcy Court.

5.3 **Injunction**. Except as provided in the Plan or the Confirmation Order, as of the Confirmation Date, all individuals and entities that have held, currently hold, or may hold Claims or Interests against Debtor, or that are claiming by or through any such individual or entity, are permanently enjoined from taking any of the following actions against Reorganized Debtor or its property on account of any such Claims, debts, liabilities, or terminated Interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation, or right of recoupment of any kind against any debt, liability, or obligation due to Debtor or Reorganized Debtor, whether such debt accrued before or after the Petition Date; and (v) commencing or continuing any action in any manner, in any place that does not comply, or is inconsistent, with the provisions of this Plan.

5.4 **Protections against Discriminatory Treatment**. Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Persons, including Governmental Units, shall not discriminate against Debtor or Reorganized, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, Debtor, Reorganized Debtor, or other Person with whom Debtor has been associated, solely because Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before Debtor is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Case.

5.5 **Release of Liens**. Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Articles II and III of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate will be deemed fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests will revert to Debtor and its successors and assigns. To the extent that this

Plan provides that Creditors will retain Security Interests or Liens, such Security Interests and Liens will be deemed fully released and discharged upon full performance of all obligations under this Plan to the Holder of such Security Interest or Lien. With the exception of the Liens of Holders of Allowed Class I and II Claims, Reorganized Debtor is authorized to file any releases, waivers, financing statement terminations, or other documents appropriate to effect the provisions of this Section.

## ARTICLE VI
## PROVISIONS GOVERNING DISTRIBUTION

6.1 <u>No Interest on Unsecured Claims</u>. Except as provided in this Plan with respect to the Plan Note, interest will not accrue or be paid on any General Unsecured Claim.

6.2 <u>Delivery Of Distributions and Notices in General</u>. Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Class I, II, III, and Professional Claims, as well as any notices under this Plan, will be made by Reorganized Debtor. All distributions will be made (a) at the addresses set forth on the Proofs of Claim Filed by the Holders of Claims or Interests, (b) at the addresses set forth in any written notices of address changes delivered to Debtor after the date of any related Proof of Claim, (c) at the addresses reflected in the Schedules or the last known address if no Proof of Claim has been Filed and Debtor has not received a written notice of a change of address, or (d) at the address of any counsel that has appeared in the Chapter 11 Case on the Holder's behalf. All distributions to Class IV Creditors, other than Insiders and Affiliates, will be made by the Creditors Trust. It is the burden of Claim Holders to provide notice to Debtor, Reorganized Debtor or Creditors Trust of any change in address. Distributions under the Plan on account of Allowed Claims will not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim will have and receive the benefit of the distributions in the manner set forth in the Plan. Notwithstanding anything to the contrary contained in this Plan, all distributions from the Creditors Trust to Holders of Allowed Class IV Claims shall be made as provided by, and shall be governed by the terms of, the Creditors Trust Agreement.

6.3 **Undeliverable Distributions and Non-Negotiated Checks.** If any distribution to a Holder of a Claim or Interest is returned as undeliverable, no further distributions to such Holder of such Claim or Interest will be made unless and until Reorganized Debtor or Creditors Trust (as applicable) is notified of the then-current address of such Holder of the Claim, at which time all missed distributions will be made to the Holder of the Claim without interest. If checks issued by the Reorganized Debtor on account of Claims are not negotiated within ninety days after the issuance of the check, the check may be null and void. Amounts in respect to undeliverable distributions and non-negotiated checks will be held by the Reorganized Debtor until the earlier of (i) such distributions are claimed by the valid Holder of the Claim or (ii) ninety days after the check is returned or voided due to non-negotiation, after which date all such undistributed and non-negotiated amounts will revert to the Reorganized Debtor free of any restrictions and the Claim of any Holder or successor to such Holder with respect to the distribution will be deemed discharged and forever barred, notwithstanding federal or state escheat laws to the contrary. Nothing contained herein requires the Reorganized Debtor to attempt to locate any Holder of an Allowed Claim. The Creditors Trust may institute such rules and procedures on undeliverable distributions as it deems appropriate.

6.4 **Fractional Payments.** Notwithstanding any other provision of the Plan to the contrary, payments of fractions of dollars are not required. Payment of fractions of dollars that would otherwise be distributed under the Plan will be rounded to the lower whole number of dollars.

6.5 **Restrictions on Distributions.** Notwithstanding anything in this Plan to the contrary, Reorganized Debtor and Creditors Trust are not required to make any distribution to a Claim Holder in an amount less than $10.00.


# ARTICLE VII
# MODIFICATION OF THE PLAN

7.1 **Modification of Plan.** Except as otherwise provided in this Plan, Debtor may, from time to time, propose amendments or modifications to this Plan prior to the Confirmation Date, without leave of the Bankruptcy Court. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modification set forth in the Plan, Debtor expressly reserves its rights to revoke or withdraw, or to alter, amend or materially modify the Plan, one or more times before the Confirmation Date. After the Confirmation Date, Debtor or Reorganized Debtor may, with leave of the Bankruptcy Court and upon notice and opportunity for hearing to the affected Creditor(s), remedy any defect or omission, reconcile any inconsistencies in the Plan or in the Confirmation Order, or otherwise modify the Plan.

7.2 **Effect of Confirmation on Modifications**. Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation of the Plan are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

7.3 **Revocation or Withdrawal of the Plan.** Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent chapter 11 plans. If Debtor revokes or withdraws the Plan, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption, assignment, or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan, will be deemed null and void; and (3) nothing contained in the Plan will: (i) constitute a waiver or release of any Claims, Interests, or Causes of Action; (ii) prejudice in any manner the right of Debtor or any other Person; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by Debtor or any other Person.

# ARTICLE VIII
# JURISDICTION OF THE COURT

8.1 **Jurisdiction**. Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including without limitation, jurisdiction with respect to:

8.1.1 The classification of the Claim of any Creditor and the re-examination of Claims Allowed for purposes of voting, and the determination of such objections as may be filed to Claims of Creditors. The failure by Debtor to object to, or to examine any Claim for the purposes of voting, will not be deemed to be a waiver of any right to object to, or reexamine the Claim, in whole or in part. Furthermore, the fact that this Plan has provided a treatment for the benefit of a particular Creditor will not in any way be deemed to be a waiver of any right to object to or re-examine the

Claim or any secured interest whether by mortgage or otherwise which secures such Claim, in whole or in part.

8.1.2    The determination of all questions and disputes regarding title to the assets of the estate, and all causes of action, controversies, disputes, or conflicts, whether or not subject to action pending as of the Confirmation Date, between Debtor and any other party.

8.1.3    The correction of any defect, the curing of any omission or the reconciliation of any inconsistency in this Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of this Plan.

8.1.4    The enforcement and interpretation of the terms and conditions of this Plan and the entry of orders in aid of confirmation of this Plan.

8.1.5    The entry of any order, including injunctions, necessary to enforce the title, rights, and powers of Debtor, Reorganized Debtor or any party-in-interest, and to impose such limitations, restrictions, terms and conditions of such title, rights and powers as this Court may deem necessary.

8.1.6    The review and approval of all Professional Fee applications for services rendered before the Confirmation Date and the review of any Professional Fees for services rendered in connection with the Plan after the Confirmation Date to the extent that Debtor or Creditors Trust disputes all or a portion thereof.

8.1.7    Debtor's, Reorganized Debtor's, or Creditors Trust's right to pursue any Avoidance Actions, if any.

8.1.8    The entry of an order determining the validity of any Lien.

8.1.9    The entry of an order concluding and terminating this Case.

## ARTICLE IX
## TITLE TO PROPERTY

9.1.    **Revesting of Assets**.  Except as otherwise explicitly provided for in this Plan, on the Effective Date, all property held by the Estate (including all Causes of Action) will vest in the Reorganized Debtor free and clear of all Claims, Liens, charges, encumbrances, right, and Interests of Creditors and equity security Holders. As of and following the Effective Date, the Reorganized Debtor, as provided for under the terms of this Plan, may operate Debtor's business and use, acquire, and dispose of property and settle and compromise Claims or Interests without the supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan and the Confirmation Order. All Avoidance Actions not waived or released under this Plan or other Order of the Bankruptcy Court shall vest with Reorganized Debtor and Reorganized Debtor may pursue, settle and compromise any or all Avoidance Actions subject to notice and a hearing. Notice of any compromise need be provided only to those parties that have requested notice in the Bankruptcy Case.

## ARTICLE X
## UNITED STATES TRUSTEE FEES & REGULATORY COMPLIANCE

10.1    **Payment of U.S. Trustee Fees**.  Reorganized Debtor shall pay to the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), and shall provide the United States Trustee with appropriate reports indicating the cash disbursements for the relevant period until such time as the Chapter 11 Case is administratively closed. The Chapter 11 Case will be administratively closed upon resolution of Professional Fee applications, objections to Claims, if any, and any other appropriate or necessary matters, and closing will occur as promptly as possible after the Effective Date. The Reorganized Debtor shall continue to be responsible for any United States Trustee's fees, if any, if the Payment Period extends beyond five years and, as a result, the Creditor's Trust must be amended by any applicable section of the Internal Revenue Code.

## ARTICLE XI
## EXECUTORY CONTRACTS

11.1    **Rejection of Executory Contracts and Unexpired Leases**.  All executory contracts and unexpired leases of Debtor shall be deemed rejected except: all contracts and leases that are (i) specifically assumed in this Article XI, or (ii) subject to a separate motion to assume listed in Debtor's Schedules and Section 11.3 applies. In addition to the contracts and leases to be assumed under Section 11.2, Debtor assumes, as of the Effective Date, all executory contracts, including applicable franchise agreements, and unexpired leases, including equipment leases and leases of non-residential real estate relating to the CharBhan-owned headquarters and each of the following restaurants:

- West Bloomfield Smashburger
- Troy Smashburger
- Bennigans
- Pixie
- Big Apple Midland
- Big Apple Mt. Pleasant
- Noodles Midland
- Noodles Mt. Pleasant

11.2    **Cure Claims**.  No later than twenty-one days before the Confirmation Date, Debtor shall File and send a notice to all known executory contract and unexpired lease Holders that are counter-parties to contract or leases that Debtor or Reorganized Debtor intends to assume. The notice will include the Debtor's proposed cure amount and any proposed cure terms of payment. If the counter-party agrees to the notice or fails to File an objection within fourteen days after service, the executory contract or unexpired lease shall be assumed pursuant to the terms and cure amount stated in the notice, and the cure amount shall be paid in accordance with the notice and this Plan. If an objection is timely Filed, the objection will trigger a cure amount dispute. The parties shall confer in good faith to resolve the cure amount dispute but if the dispute is not resolved, either party may file a request for a hearing with the Court. During the pendency of a cure amount dispute the automatic stay with respect to the contract or lease will remain in effect notwithstanding the occurrence of the Effective Date. Debtor or Reorganized Debtor may, at any time before or within five days after final resolution of a cure amount dispute, reject a contract or lease by Filing an appropriate motion with the Court (and the contract or lease shall be rejected as of the Filing date). If the contract or lease is not rejected within five days after final resolution of a cure amount dispute, the contract or lease shall be deemed assumed and Reorganized shall promptly pay the cure amount except as otherwise agreed by the contract or lease counter-party.

11.3    If Debtor has not listed an executory contract or unexpired lease in Debtor's Schedules and, at any time within 60 days after the Effective Date (but before administrative closing of the Case) Reorganized Debtor determines that it would be beneficial to assume such contract or lease, Reorganized Debtor may file a motion to assume the contract or lease along with a proposed cure amount, and shall be entitled to assume the contract or lease on the terms set forth in the Motion if no objection is Filed within fourteen days after service. If an objection is timely filed, the cure amount dispute provisions of section 11.2 shall apply.

11.4    Any Creditor who has a Claim as a result of the rejection of a contract or unexpired lease shall have until the later of (i) thirty days after the Effective Date or (ii) thirty days after rejection of the contract or unexpired lease to file a Proof of Claim asserting the rejection damages relating to the contract, failing which such Claim will be disallowed in its entirety. However, if the Creditor has not been served with a copy of this Plan, the Creditor shall have thirty days from receipt of actual or constructive notice of Debtor's rejection of the contract or unexpired lease.

11.5    **Objections to Rejection Claims**.  Reorganized Debtor may file an objection to any Proof of Claim filed in accordance with this Article and in accordance with Article XII within the later of the time permitted under Article XII or sixty days after receipt of the claim.

## ARTICLE XII
## OBJECTIONS TO CLAIMS

12.1.    **Timing of Objections:**   Reorganized Debtor may object to the allowance of any Claim, whether listed on the Schedules filed by Debtor, or filed by any Creditor, on or before the later of (a) sixty days from the date of filing of any Proof of Claim or (b) six months after the Effective Date.

12.2    **Objections to Liens:**  Reorganized Debtor may object to any Lien or security interest within the time period set forth in Section 12.1 or after any attempt by a Creditor to enforce the Lien, except that Reorganized Debtor may not file an objection to any Lien that is the basis of a Class I or II Claim Allowed under the terms of this Plan.

12.3    **Claims Bar Date**:  Except as provided herein or otherwise agreed in writing by Reorganized Debtor, any and all Proofs of Claim filed after the applicable Bar Date shall be deemed disallowed and expunged as of the Effective Date (or, for a Claims Bar Date after the Effective Date, as of the applicable Claims Bar Date) without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Date such late Claim has been held timely Filed by a Final Order.

12.4    **Allowance of Clams – No Preclusion**: The allowance of any Claim, either after the Filing of an objection or as a result of no objection having been Filed, shall in no event create any estoppel argument against Reorganized Debtor or any other party, whether or not affiliated with Reorganized Debtor. This provision shall be given a broad interpretation and shall, without limitation, prohibit the use of any argument of res judicata, collateral estoppel, claim preclusion, issue preclusion, or judicial estoppel in the event of any current or future litigation between Reorganized Debtor, an Affiliate or Insider of Reorganized Debtor, or any other Person with the Clam Holder as a result of allowance of a Claim or the absence or resolution of any objection, with the sole exception that the allowance of the Claim sets the amount of the Claim as against the Reorganized Debtor for purposes of this Plan and distributions under this Plan.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

13.1 **Immediate Binding Effect**. Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon Debtor, Reorganized Debtor and any and all Holders of Claims and Interests (irrespective of whether any such Holders of Claims or Interests failed to vote to accept or reject the Plan, voted to accept or reject the Plan, or is deemed to accept or reject the Plan), and all Persons that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan.

13.2 **Additional Documents**. On or before the Effective Date, Debtor may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. Debtor, Reorganized Debtor and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

13.3 **Reservation of Rights**. Except as expressly set forth in the Plan, the Plan will have no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by Debtor with respect to the Plan or the Disclosure Statement shall be, or shall be deemed to be, an admission or waiver of any rights of Debtor with respect to the Holders of Claims or Interests before the Effective Date.

13.4 **Successors and Assigns**. The rights, benefits, and obligations of any Person named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of such Person.

13.5 **Service of Documents.** After the Effective Date, any pleading, Notice, or other document required by the Plan to be served on or delivered to Debtor or Reorganized Debtor must be sent by overnight mail, postage prepaid to:

Inspired Concepts, LLC
c/o Jeffrey Neely
555 S. Mission St.
Mt. Pleasant, MI  48858

*with a copy to:*

Ryan D. Heilman, Esq.
**WERNETTE HEILMAN PLLC**
40900 Woodward Ave., Ste. 111
Bloomfield Hills, MI  48304

Notice to Holders of Claims may be made to the addresses as set forth in Section 6.2.

13.6 **Entire Agreement.** Except as otherwise stated in this Plan, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements,

understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

13.7    **Nonseverability of Plan Provisions**. If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without Debtor's consent; and (3) nonseverable and mutually dependent.

13.8    **Closing of Chapter 11 Case**.  Reorganized Debtor shall, after the full administration of the Chapter 11 Case, File with the Bankruptcy Court, all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

13.9    **Waiver or Estoppel**. Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with Debtor, Debtor's counsel, or any other Person, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

13.10    **Conflicts and Interpretation of the Plan**. Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, or any other order (other than the Confirmation Order) referenced in the Plan (or any Exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan will govern and control.

13.11    **Termination of Liens and Encumbrances**.  Debtor and all parties-in-interest, including any Creditor, must execute any document reasonably requested by the other to memorialize and effectuate the terms and conditions of this Plan. This includes the execution by Creditors of any Uniform Commercial Code termination and mortgage releases and termination. Debtor is expressly authorized to file any termination statement to release a Lien which is either discharged or satisfied as a result of this Plan or any payments made in accordance with the Plan after ten business days' notice to the affected Creditor.

13.12    **Limitations on Operations**.  If the Reorganized Debtor has made all payments and distributions required under this Plan, all restrictions, negative covenants, and other limitations on Debtor's operations provided herein or in the Confirmation Order will terminate.

13.13    **Causes of Action; Standing**.  Except as otherwise provided in this Plan, Debtor has the right and authority to commence, continue, amend or compromise all Causes of Action available to Debtor, the Estate or the debtor-in-possession, including without limitation all Avoidance Actions whether or not those Causes of Action or Avoidance Actions were the subject of a suit as of the Confirmation Date.

<u>**DISCLOSURE STATEMENT**</u>

**I.    <u>Introduction and Overview.</u>**

A.    *Purpose of Disclosure Statement.*

All capitalized terms unless the term is defined in this Disclosure Statement have the meaning given in Debtor's Plan of Reorganization (the "<u>Plan</u>").

Debtor submits this Disclosure Statement ("<u>Disclosure Statement</u>") pursuant to § 1125 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, to all known Holders of a Claim against it. Debtor has filed the Plan with the United States Bankruptcy Court for the Eastern District of Michigan, Northern Division, a copy of which accompanies this Disclosure Statement.

Debtor provides this Disclosure Statement to its Creditors to disclose information material and necessary for Creditors to make a reasonably informed decision in exercising their right to vote to accept of the Plan.

B.    *Source of Information.*

The Disclosure Statement and the Plan have been prepared from information furnished primarily by Debtor. Debtor's professionals have not conducted an independent investigation to verify this information.

Certain materials contained in this Disclosure Statement are taken directly from other readily accessible documents or are summaries of other documents. While every effort has been made to retain the meaning of these documents or portions of documents that have been summarized, Debtor urges you to thoroughly review the contents of these documents before relying on them. In the event of a discrepancy between this Disclosure Statement and the actual terms of a document, the actual terms of the document will govern.

The statements contained in this Disclosure Statement are made as of its date, unless another time is specified. Neither the delivery of this Disclosure Statement nor any exchange of rights in connection with it will, under any circumstances, create an implication that there has been no change of the facts set forth in this Disclosure Statement since the date it was first filed.

C.    *Overview of Chapter 11.*

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and equity interest holders. In addition to permitting a rehabilitation of a debtor, another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets. The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a debtor-in-possession.

The consummation of a plan of reorganization is the principal objective in a Chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court

1

makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor. Subject to limited exceptions, the confirmation order discharges a debtor from any debt that arose before the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

After a plan of reorganization has been filed, the holders of claims against or interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, § 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. Debtor is submitting this Disclosure Statement to Holders of Claims against, and equity Interests in, Debtor to satisfy the requirements of § 1125 of the Bankruptcy Code.

D.      *Exhibits to this Disclosure Statement.*

The following Exhibits are incorporated into and are a part of this Plan and Disclosure Statement as set forth in Section 1.6 of the Plan:

A.      Liquidation Analysis;
B.      Financial Information for Three Years Before the Petition Date (2019 statement remains preliminary);
C.      Summary of Monthly Operating Reports Filed in this Chapter 11 Case;
D.      Projections for the Five-Year Payment Period Proposed in the Plan; and
E.      Letter in Support of Plan by the Committee.

## II.    Description of Debtor.[1]

A.      *Describe the Debtor.* Debtor is a Michigan limited liability company operating fast casual and casual dining restaurants primarily in the Mt. Pleasant and Midland areas, and with locations in Southeast Michigan and headquartered in Mt. Pleasant, Michigan. As of the Petition Date, Debtor operated twelve restaurants.

Since the Petition Date, as a result of the COVID-19 crisis, the Governor of Michigan issued executive orders that prevented Debtor from offering any dine-in service at its restaurants, then permitted Debtor to re-open restaurants but only permitting service at 50% of normal capacity. During the shut-down, Debtor operated some restaurants on a carry-out/delivery basis only, temporarily closed some restaurants, and permanently closed the following restaurants:

a.  Smashburger, Rochester Hills;
b.  Italian Oven, Mt. Pleasant;
c.  Cracked, an AM Addiction, Northville; and
d.  Ponderosa, Mt. Pleasant.

Debtor has reopened all its other restaurants and, contingent on Plan Confirmation and subject to evolving conditions, Debtor plans to continue operating each of its current restaurants:

---

[1] If Disclosure Statement conflicts with any Plan terms, the Plan terms govern.

a. Smashburger, West Bloomfield;
b. Smashburger, Troy;
c. Bennigans, Mt. Pleasant;
d. Big Apple Bagels, Midland;
e. Big Apple Bagels, Mt. Pleasant;
f. Pixie, Mt. Pleasant;
g. Noodles & Company, Midland; and
h. Noodles & Company, Mt. Pleasant.

Debtor also owns 100% of the shares of KJE, which in turn owns and operates four Old Chicago restaurants. KJE is not in bankruptcy and, in addition to ordinary accounts payable, has its own debts in the following approximate amounts: Chemical Bank: $683,000, American Express: $162,000, and taxes of $384,000. Under the Plan, KJE will upstream its available excess cash to Debtor to assist Debtor in making Plan payments. Based on Debtor's and KJE's projections, Debtor anticipates that Debtor will be required to make occasional short-term, interest free loans to KJE to permit KJE to continue operations. As shown in the projections, these short-term loans are more than reimbursed by equity distributions expected to be received from KJE.

Debtor is reorganizing through Chapter 11 and will continue to operate its business.

B. *Description of the principals.*

1. *Background.*

The Interests of Debtor as of the Petition Date are owned by Jeffrey Neely and Patti Neely, husband and wife. Under the Plan, if confirmed and accepted by Class IV, Jeffrey and Patti Neely will retain their Interests in Reorganized Debtor. If Class IV rejects the Plan, the Equity Auction will occur as further described in the Plan.

Jeff Neely is a seasoned restaurant executive and Certified Franchise Executive with over 40 years of proven experience with some of the most well-known and highly respected brands in the restaurant industry. His experience spans from Casual Dining to QSR and encompasses brands such as Red Robin Gourmet Burgers, Domino's Pizza, Inc., Einstein Noah Bagel Corp and American Blue-Ribbon Holdings (Max & Erma's, Village Inn). Jeff's background in the restaurant industry is well rounded and somewhat unique in the fact he's held senior executive roles in the aforementioned brands up to and including President, overseeing a variety of departments including Franchise Operations, Corporate Operations, Human Resources, Training, Recruiting and New Restaurant Development. He also has experience as a Franchisee for numerous brands such as Noodles & Company, Smashburger and Domino's Pizza. Jeff is currently the CEO and Managing Partner of Inspired Concepts, which owns, operates and manages multiple restaurant brands in Michigan.

Patti Neely is a Registered Dietitian & Nutritionist by profession specialized in Diabetes Management, Insulin Pump Therapy & Continuous Glucose Monitoring with 30+ years of experience. She is also credentialed as a Certified Diabetes Educator that went on to specialize in Clinical Research as a Certified Clinical Research Associate and worked for industry leaders such as Medtronic, Roche & Dexcom earning awards and recognition for her work in both Diabetes and Clinical Research. During her decades long career Patti has also served in the food service industry spanning from the operations of hospital food service departments to multi-unit franchise restaurants and served as VP of Marketing for 14 Domino's Pizza locations

3

in Kansas and Nevada. Patti now serves as President and Chief Marketing Officer for Inspired Concepts.

Levi Martin has a masters degree in finance, and experience as Chief Financial Officer and Interim Chief Executive Officer for a non-profit organization in Los Angeles, as an auditor at PricewaterhouseCoopers, and as a director and writer at the White House working for President George W. Bush. Mr. Martin is Debtor's Chief Financial Officer and Chief Development Officer.

Josh Neely has a masters degree in entertainment business and undergraduate degrees in both accounting and chemistry. He has 14 years in the restaurant industry and serves as Debtor's Chief Administrative Officer and Vice President of Operations Support.

Natasha Neely is a Marketing, Publicity and Social Media professional that has been in the marketing industry in various capacities for various brands since she was a teenager. Natasha got her start in the field as a local representative for various brands, including Cover Girl Cosmetics (at 13!), Chrysler, Jameson Irish Whiskey and Red Robin Gourmet Burgers. She attended the University of Colorado, Boulder and graduated with honors before landing her first post-college job – as a Presidential Writer at the White House where she was a ghost writer for the President of the United States. After a successful run as a Presidential Writer, she was promoted to a Deputy Director position at the White House, becoming one of the youngest Deputy Directors there. After leaving the White House, Natasha moved to Los Angeles, where she quickly became a marketing professional, social media savant and publicist for various international television shows, including *The Girls Next Door*, *Kendra*, *Holly's World*, *Ancient Aliens*, *The Curse Of Oak Island* and more, as well as served as a Director of Media Relations for an Emmy Award-Winning Production Company. Duties included everything from working with the press, taking Production Stills (photos), creating and compiling press kits and various marketing materials, creating Key Art and DVD Covers with Graphic Designers and Television Networks, managing the shows' social media accounts, including live events, appearing as a subject matter expert on camera for television shows and more. Now you can find Natasha in Michigan where she has been able to blend her past experiences and serves as a Director of Marketing and Strategic Communications.

Emma Neely is a Cicerone Certified Beer Trainer and a Certified Servsafe Alcohol Instructor. She has experience as a corporate trainer for Chili's and heads-up all of Debtor's bar related instruction, including Servsafe classes.

      2.    *Compensation.*

Jeffrey Neely did not received compensation from Debtor from August, 2019 to June 2020 other than health benefits and a company vehicle allowance to preserve Debtor's cash. Debtor regularly pays compensation bi-weekly, including to Insiders in the current amount of: - Patti Neely: $3846.14; Josh Neely, Jeff and Patti's son: $2884.62; Levi Martin, Jeff and Patti's son-in-law: $2884.62; Natasha Neely, Jeff and Patti's daughter currently paid at 50% of base to conserve Debtors Cash during the COVID 19 restrictions at: $1269.28 (regular payments of $2538.56); Emma Neely, Jeff and Patti's daughter-in-law: currently at $0 (regular amount of $1057.70). Each of the above Insiders receives a vehicle or travel allowance except for Emma. Jeffrey, Patti, Josh and Natasha also receive health benefits. In addition, Patti Neely deferred payment -from March 9, 2020 to June 2020 Emma Neely is not currently working due to COVID-19 restrictions, and Natasha Neely is working full time during COVID restrictions to conserve Debtors Cash for 50% of her regular income. More detailed information on compensation during this Case can be found on Debtor's monthly operating reports Filed with the Court.

Debtor anticipates that it will compensate each of the above personnel post COVID restrictions at their regular pre-filing compensation rates as described above, with healthcare but minus any bonuses, for the entirety of the Payment Period to the Creditors Trust, and resuming payments to Jeffrey Neely and Patti Neely at the bi-weekly rate of $5,000 each. Debtor anticipates that Emma Neely will remain furloughed for the foreseeable future. Each of the above as applicable have agreed to forego their vehicle allowances to contribute towards Debtor's payments to the Creditors Trust as part of the Plan agreement with the Committee.

3.     *Their legal relationships with Debtor.*

a.     Jeffrey and Patti Neely own 100% of the equity Interests in Debtor.

b.     Jeffrey and Patti Neely also own 100% of the equity Interests in CharBhan, a real estate holding company that leases to Debtor space for Debtor's headquarters and training center. CharBhan did not received rent payments for 3 months during COVID shutdowns in 2020 to conserve Debtors Cash. The Committee and Fifth Third have asserted that CharBhan is a wholly-owned subsidiary of Debtor. Jeffrey and Patti Neely assert that they own 100% of the equity interests of CharBhan. As part of the agreement with the Committee, if and only if the Plan is confirmed, Jeffrey and Patti Neely have agreed to not contest the Committee's assertions regarding Debtor's ownership of CharBhan.

c.     Debtor anticipates that the following Creditors may assert guaranties by both Jeffrey and Patti Neely: Fifth Third and Mercantile. LaBelle Limited Partnership, JBT, LLC, Hoss, LLC and Cindy Belle, LLC collectively have a judgment against Debtor and Jeffrey Neely, jointly and severally, in the original amount of $389,053.35 as allocated and further set forth in the attachments to Proof of Claims 15, 16, 17 and 19 Filed with the Court. Ovens, LLC holds a judgment in the original amount of $78,745.71 against Debtor Jeffrey Neely. Ladco, Inc. asserts a claim in the amount of $50,000 against Debtor and asserts that Jeffrey Neely is also liable for some or all of this amount. This claim is the subject of current litigation removed from the Eastern District of Michigan to the Bankruptcy Court. Debtor asserts its own claims against Ladco, Inc., among others,and other LaBelle Parties in litigation removed from the Circuit Court for the County of Isabella to the Bankruptcy Court. Additionally, various landlords or other vendors may assert that Jeffrey Neely is co-liable or a guarantor on debts asserted against Debtor.

C.     *The Debtor's business and the causes for the Chapter 11 filings.*

Debtor is a restaurant operator that owns and operates each of the restaurants disclosed in Section II.A, above. Before the Petition Date, Debtor owned and operated a substantial number of Ponderosa restaurants and another Bennigans restaurant, among others. Debtor and various LaBelle Parties commenced litigation in multiple cases – Isabella Court Case Nos. 19-15422-CB; 19-15901-CB; 19-16069-CB and Eastern District of Michigan Case No. 19-cv-10855. This litigation resulted in the judgments and on-going litigation referenced above. Tthe LaBelle-related entities began collection actions on the judgments in the cases in which they were plaintiffs, such that, without the intervention of the bankruptcy filing, Debtor's operations would have been shut down. Pending Confirmation, all claims between Debtor and the LaBelle Parties will be resolved through the LaBelle Settlement.

5

### III.    Post-petition events of significance.

A.    *Post-petition transfers outside of the ordinary course of business.*

**Status of Debtor's Restaurants**: Debtor has closed four restaurants during this Bankruptcy Case as a result of COVID-19 restrictions and has transferred much of the personal property from the Cracked – an A.M. Addiction Northville, Rochester Hills Smashburger, and Mt. Pleasant Italian Oven to other restaurants or storage locations for future use. Debtor also permanently closed its Mt. Pleasant Ponderosa restaurant and surrendered all the personal property to Fifth Third Bank. As described above, Debtor is continuing to operate its other restaurants.

Debtor received a rent reduction on its Mt. Pleasant Big Apple Bagel location, effective June 15, 2020, from its landlord Hospitality Holdings, LLC, one of the LaBelle Parties.

**Status of Plan Negotiations**:  Debtor filed its initial Combined Plan and Disclosure Statement ("Initial Plan") on May 12, 2020. Since the filing of the Initial Plan, Debtor has been in significant negotiations with various stake holders including the Committee, Fifth Third, Mercantile, GFS, and the LaBelle Parties. Debtor has reached agreements (at least in principal) regarding Plan terms (as incorporated in the attached Plan) with the Committee, Mercantile and the LaBelle Parties. Debtor continues to negotiate with Fifth Third and GFS. To facilitate these continued discussions and Debtor's modifications to the Plan and Disclosure Statement, Debtor received multiple extensions of the deadline to solicit Plan acceptance from creditors and related Plan dates and deadlines.

The Committee: Debtor and the Committee participated in a lengthy mediation process through which the Debtor and Committee reached agreement on substantial increases in the distribution to General Unsecured Creditors including post-confirmation interest, quicker payment terms on a monthly rather than quarterly basis, the establishment of a Creditors Trust with a requirement for Debtor to fund the trust with $10,000 in seed money, the execution of the Plan Note and Security Agreement, a 60% distribution of net proceeds from the Lloyd's Lawsuit, the subordination of more than $1.5 million in Insider Claims so that the Insider Claims are not paid unless and until Reorganized Debtor completes all its obligations to General Unsecured Creditors under the Plan, and, to protect General Unsecured Creditors from default under the Plan: preservation of Causes of Action, including Avoidance Actions, against Insiders, an agreement that KJE is owned by Debtor and creditors will have recourse to this equity interest in the event of default, and an agreement from Debtor's principals to not challenge that the Committee's assertions that CharBhan is owned by Debtor. The agreement also includes temporary payment suspension in the event that any regulation requires Debtor's restaurants to cease dine-in services or reduce capacity below fifty percent. Each of these agreements are incorporated in the Plan and, by voting to accept the Plan, Creditors are also voting to accept this negotiated settlement.

Mercantile: Debtor and Mercantile have reached a non-binding understanding that Mercantile will support the Plan with the treatment it provides to Mercantile under Class II, including the determination of the amount of Mercantile's Secured Claim. By voting to accept the Plan, Creditors are also voting to accept this negotiated settlement.

LaBelle Settlement: On July 6, 2020, Debtor filed a Motion for Approval of Settlement with LaBelle Limited Partnership and Related Entities (the "LaBelle Settlement") [DN 205]. A copy of the full LaBelle Settlement and the Motion is available on request from counsel

for Debtor. In summary, the Motion recounts that Debtor and various of the LaBelle Parties have been and are involved in various lawsuits. Debtor leased and leases restaurant locations from various LaBelle Parties, including the rejected Italian Oven and Ponderosa locations. Before the Petition Date, Debtor had closed a number of other restaurants and terminated the leases with LaBelle. These terminations and other relationships between the parties resulted in three lawsuits: Case No. 19-15901-CB (21st Circuit Court for the County of Isabella); Case No. 19-15422-CB (21st Circuit Court for the County of Isabella); and Case No. 1:19-cv-10855-TLL-PTM (E.D. Mich.). Debtor's principal, Jeffrey Neely, was/is a named defendant in each of the lawsuits. The LaBelle Parties obtained judgments in the first two cases and the federal case remains pending and has been removed to the Bankruptcy Court. Mr. Neely and the Debtor filed a counter-claim in the federal case and commenced their own lawsuit against two of the LaBelle Parties as well as two non-LaBelle parties, Brent Stockel and The Clark Stampede, LLC: Case No. 19-16069-CB, 21st Circuit Court for the County of Isabella. This case also remains pending and has been removed to the Bankruptcy Court. The LaBelle Parties have filed proofs of claim in the Bankruptcy Court for amounts allegedly owed under the judgments, rejection damages for lost rental income from the Italian Oven and Ponderosa restaurants, and for the LaBelle Parties' claims in the federal litigation. Additionally, the LaBelle Parties assert $31,200.44 in post-petition Administrative Claims arising from (i) unpaid rent for the Italian Oven arising before Debtor's rejection and (ii) unpaid post-petition taxes for the Ponderosa restaurant.

In Case Nos. 19-15901-CB and 19-15422-CB, the LaBelle Parties are pursing post-judgment collection against Debtor (stayed by the commencement of this Chapter 11 Case except with respect to filing proofs of claim) and against Jeffrey Neely. In Case No. 1:19-cv-10855, the LaBelle Parties are seeking damages against Debtor and Mr. Neely premised on breach of contract, trademark infringement and enforcement of a non-competition covenant. Debtor's and Mr. Neely's counter-claims in this case are premised on breach of contract, breach of indemnification obligations, intentional interference with a business relationship, and breach of a non-solicitation contract. Debtor's claims in Case No. 19-16069 are premised in intentional interference with a business relationship, breach of contracts/breach of non-solicitation agreements/breach of con-compete agreements, and civil conspiracy.

Under the Settlement Agreement, contingent on Confirmation of the Plan:

- All claims and causes of action will be dismissed and the Reorganized Debtor and Mr. Neely on one hand and the LaBelle Parties on the other will grant each other full mutual releases, including a release of all entered judgments;
- Debtor agrees to not object to any of the LaBelle Parties' proofs of claims filed in this Chapter 11 Case as of the date of the LaBelle Settlement;
- Debtor vacated and turned over possession of the Ponderosa restaurant without removing any of the furniture, fixtures or equipment ("FF&E");
- Mr. Neely will make payments to the LaBelle Parties totaling $50,000 and grants the LaBelle Parties a consent judgment in that amount in the event of any default;
- The LaBelle Parties administrative expense claim is resolved in the amount of $16,136.20, representing the rent and common area maintenance for the Italian Ovens restaurant and approximately one-third of the real estate taxes asserted by LaBelle under the Ponderosa lease; and
- The LaBelle Parties will support Confirmation of Debtor's Plan.

This is only a description of the LaBelle Settlement. A full copy is attached to the Motion [DN 205] and may be obtained from Debtor's counsel.

Debtor strongly believes the merits of its claims against some of the LaBelle entities and the two non-LaBelle parties, and that it has defenses against LaBelle's various claims, including valid defenses against the pending action and defenses against the amounts alleged as owed on the judgments. Notwithstanding the merits of these claims and defenses, Debtor believes that pursuing the Causes of Action will require a significant investment in attorney fees, expert fees, and various court costs, and, because the pending litigation remains in the early stages, a final resolution would likely not be obtained for many months, if not years., Debtor believes that the benefits of entering into the LaBelle Settlement outweigh the expense of ongoing litigation and potential recoveries (and through the potential appeals following judgment). As set forth in the Motion, Debtor believes that, due to the size of the Secured Claims in this Case, the only likely path to meaningful distributions for Priority Claim Holders and General Unsecured Claim Holders is through Confirmation of the Plan. The LaBelle Settlement significantly increases the likelihood of Confirmation by (i) obtaining the positive vote of the LaBelle Parties which collectively are one of the largest unsecured creditors in this Case; (ii) resolving two pending adversary proceedings which would otherwise have resulted in significant administrative expenses to the Chapter 11 Estate

If the Plan is not Confirmed, the Committee reserves its rights to object to the LaBelle Settlement. By voting to accept the Plan, Creditors are also voting to accept this negotiated settlement.

Fifth Third Negotiations: Although Debtor has been in negotiations with Fifth Third, Debtor and Fifth Third remain significantly far apart on the valuation of the Collateral securing the Fifth Third Indebtedness. Fifth Third has taken the position that the Fifth Third Indebtedness is fully secured because it is higher than the amount of the Fifth Third Indebtedness. Debtor has taken the position that the value of the Fifth Third Collateral is worth no more than $380,000 in light of current market conditions and the current difficulties of profitably operating restaurants with pandemic related restrictions. If a negotiated resolution is not reached, Debtor and Fifth Third will likely participate in the Valuation Hearing with the Court determining the value of the Fifth Third Collateral and the amount of the Fifth Third Indebtedness that is a Class I Secured Claim. Debtor hereby discloses that these negotiations and valuation procedures are on-going, and Debtor and Fifth Third may enter into an agreement or the Court could reach a valuation determination which could materially change the treatment of Fifth Third under the Plan. Under the Bankruptcy Code, the Plan as modified may be confirmed without further notice or re-voting after entry into an agreement with Fifth Third or resolution by the Court, unless the resolution materially alters the treatment of another Class or if the Court otherwise orders.

GFS Negotiations: GFS is the primary food supplier for Debtor's Pixie, Bennigan's and two Big Apple Bagel restaurants. Debtor and GFS have both sent termination notices to the other. The contract between Debtor and GFS with respect to the Bennigan's restaurant will expire on August 31, 2020. Debtor has made arrangements with Sysco Corporation. Sysco Corporation holds the national contract for Bennigan's and the Bennigan's franchisor has been requesting that Debtor make this switch for years. Debtor has reviewed Sysco's pricing and service and believes that both will be comparable to the pricing and service received from GFS. Debtor believes that a change in service provider with comparable pricing and service is possible as well for the Pixie and Big Apple Bagel restaurants. However, Debtor and GFS are continuing discussions regarding a possible continuation of GFS service for these locations.

On August 21, 2020, GFS filed a Motion for Allowance and Payment of Administrative Priority Claim Under 11 U.S.C. § 503(b)(9) seeking Allowance of an Administrative Claim in the amount of $60,379.02 for deliveries made within 20 days immediately before the Petition Date (the "GFS 20-Day Claim"). On the same day, GFS also filed a Motion for Order Requiring Immediate Payment or Adequate Protection of PACA Claim [DN 264], seeking immediate payment of a Claim under the Perishable Agricultural Commodities Act of 1930 in the amount of $147,389.52 (the "GFS PACA Claim"). Debtor believes that it has valid defenses to the GFS 20-Day Claim and GFS PACA Claim, and further that Debtor has affirmative Avoidance Actions Claims under 11 U.S.C. § 547 which would partly or fully setoff all Administrative Claim liabilities to GFS. Debtor and GFS are scheduled to participate in mediation of these Claims beginning August 31, 2020. The mediation will also include Debtor's and GFS' on-going supplier/customer relationship. Debtor hereby discloses that these negotiations are on-going, and Debtor and GFS may enter into an agreement or the Court could make a determination which could materially change the treatment of GFS under the Plan. Under the Bankruptcy Code, the Plan as modified may be confirmed without further notice or re-voting after entry into an agreement with GFS or resolution by the Court, unless the resolution materially alters the treatment of another Class or if the Court otherwise orders.

      B.    *Summaries of the important details of cash collateral, post-petition financing, adequate protection orders, and other filings in the bankruptcy case.*

      i.    On the Petition Date, the Debtor filed an Emergency Motion to Use Cash Collateral [DN 5]. Because the Debtor requires regular deliveries of food and the use of cash on a daily basis, Debtor required immediate use of cash collateral to keep its business open. Failure to obtain authorization to use cash collateral would have prevented Debtor from operating its restaurants. An Interim Cash Collateral Order was entered on January 15, 2020 [DN 28]. A final hearing on the use of cash collateral was scheduled for February 11, 2020 and adjourned to February 26, 2020 after which a Second Interim Cash Collateral was entered by stipulation on March 18, 2020 [DN 69]. After an objection by the Committee was heard on April 14, 2020, an Order Sustaining the Objection in Part and Overruling the Objection in Part was entered requiring Debtor, among other things, to comply with payment and document discovery provisions of the Second Interim Order [DN 109]. An agreed order was subsequently entered resolving the document production issues on May 28, 2020 [DN 182].

      ii.    Concurrently with filing the cash collateral motion, Debtor also filed a motion to pay wages, salaries and continue to make payments necessary for employee benefits [DN 7]. The Court entered an order granting Debtor's payroll motion on January 15, 2020 [DN 26].

      iii.    On January 24, 2020, Debtor filed a Motion to Continue Using its Prepetition Cash Management System [DN 33], which was granted on February 5, 2020 [DN 50].

      iv.    The Court appointed the Committee on January 27, 2020 [DN 41].

      v.    The § 341 Meeting of Creditors and Initial Status Conference were held on February 26, 2020.

      vi.    The Court granted Debtor's applications to employ Grasl PLC as its counsel [DN 39]. The Court granted the Committee's application to employ Schafer and Weiner, PLLC as its counsel on February 7, 2020 [DN 54]. The Court also granted Debtor's subsequent Motion to appoint Wernette Heilman PLLC as co-counsel and eventual replacement counsel of Grasl, PLC [DN 71, 185].

9

vii.     On March 2, 2020, Case Management Order was entered [DN 64].

viii.     On March 16, 2020, the Michigan Governor issued an executive order requiring all restaurants to cease providing dine-in services. Debtor operated its restaurants on a carry-out/delivery basis in compliance with that executive order until the Governor issued a new executive order permitting restaurants to reopen at fifty percent capacity beginning June 8, 2020. Debtor has reopened each of its remaining restaurants and has been operating its restaurants at fifty percent dine-in capacity along with delivery and carry-out service.

ix.     On March 23, 2020, LaBelle Limited Partnership and certain affiliates ("LaBelle Entities") filed a motion requesting relief from stay or an order compelling Debtor to assume reject each of the five restaurant leases Debtor holds with the LaBelle Entities [DN 77]. The Motion was denied [DN 90].

x.     On April 6, 2020, the Committee filed motions seeking 2004 Examinations of KJE and CharBhan [DN 91, 93]. The motions were resolved via stipulated orders [DN 119, 121].

xi.     On April 10, 2020, Debtor filed a motion seeking to reject the Italian Oven lease as of that date. No objections were filed, although a reservation of rights was filed by LaBelle Limited Partnership [DN 111].

xii.     On May 8, 2020, Debtor and Campus Corner Associates stipulated to the rejection of the lease for Debtor's Rochester Hills Smashburger location effective as of March 9, 2020 [DN 140, 145].

xiii.     Also on May 8, 2020, Debtor and Northville Retail Center Phase 2, LLC and Fifth Third stipulated to rejection of the lease for Cracked – an AM Addiction and partial surrender of personal property to Fifth Third [DN 142, 147].

xiv.     On June 25, 2020, Debtor and Hospitality Holdings, LLC stipulated to rejection of the lease for Debtor's Mt. Pleasant Ponderosa restaurant [DN 197, 198].

xv.     Further in connection with the lease rejections, each of the above-listed restaurants were not reopened after the State-mandated shut down, but were vacated after rejection of the leases. With respect to the Italian Oven, Cracked and Smashburger restaurants, Debtor removed some of the furniture, fixtures and equipment ("FF&E") for use in Debtor's remaining restaurants, and the remainder were abandoned to Fifth Third, and sold by Fifth Third with net proceeds to be applied against Debtor's obligations to Fifth Third. See Docket Numbers 142, 165, 177. With respect to the Ponderosa restaurant, Debtor vacated and left all FF&E, excepting computers, on-site in compliance with the LaBelle Settlement (discussed above). [DN 227, 251].

xvi.     On April 24, 2020, Debtor filed a motion seeking to extend the deadline to assume or reject real property leases by 90 days [DN 114]. No objections were filed and the motion was granted [DN 144]. On August 4, 2020, Debtor filed a second motion to further assume or reject real property leases for an additional 90 days [DN 236]. Although an objection was filed, a consensual order was entered permitting Debtor to extend the deadline but only with consent of the affected landlord [DN 245].

xvii.     On April 28, 2020, Debtor filed an emergency motion to authorize Debtor to borrow funds under the government's Paycheck Protection Program (the "PPP Loan") [DN

10

123]. Debtor has received $1,115,000 in funding from the PPP Loan at a 1% rate of interest, but with proceeds restricted to funding payroll, rent and utilities. The PPP Loan is partially forgivable. Limited objections were filed by the Committee and Fifth Third. After a hearing, the Court granted the Motion on a preliminary basis with changes to the proposed order requiring, among other things, that Debtor only use the funds to the extent forgivable pending confirmation of a Plan and that Debtor provide reporting and certification to ensure same [DN 138]. A final order was entered on May 14, 2020 [DN 164].

xviii.    On June 26, 2020, Debtor filed a motion seeking to sell a liquor license relating to one of Debtor's previous restaurants in Saginaw, Michigan [DN 199]. Fifth Third filed a limited objection and the Court entered a modified order permitting the sale free and clear of liens and encumbrances but reserving the issue of distribution of proceeds between Fifth Third and the State of Michigan [DN 231].

C.    *Explain any litigation during the case.*

On March 11, 2020, Debtor filed a complaint and sought a temporary restraining order against Gordon Food Service ("GFS") over GFS's threat to cease supply of food to Debtor's restaurants [DN 66]. Debtor obtained a temporary restraining order and ultimately resolved and dismissed the adversary proceeding.

Debtor also removed two cases to the Bankruptcy Court: Eastern District of Michigan Case No. 19-cv-10855 and Isabella Circuit Court Case No. 19-16069-CB. These cases are both still pending but will be dismissed if this Plan is confirmed under the terms of the LaBelle Settlement.

IV.    **Assets and Liabilities.**

A.    Debtor's liquidation analyses is attached as **Exhibit A**.

B.    *Risks, conditions and assumptions regarding the stated values.*

i.    All values stated in the Liquidation Analysis for assets, liabilities, costs, expenses and potential recoveries are based on good faith estimates using information currently available to Debtor. The estimates have not been audited and Debtor has not obtained appraisals. For purposes of this liquidation analysis, Debtor has used estimated forced sale values for the low-end range, and estimated replacement values are also listed for the high-end range. All valuations are necessarily estimates and actual results may result in higher or lower recoveries. The high-end value for the Pixie restaurant represents an estimated going-concern value.

ii.    Unless otherwise noted, Debtor has used the liabilities set forth in the Proofs of Claims and Schedules. These amounts are subject to adjustment and objections by Debtor.

iii.    Costs of liquidation are estimates.

iv.    The stated values of all equipment and personal property may be subject to market fluctuations due to the recent COVID-19 crisis.

11

v. Debtor is in the process of retaining a valuation expert for the purpose of negotiating with Fifth Third and, if necessary, participating in the valuation hearing. These estimates may change after further review and consultation with the valuation expert.

C. *Identify all potential claims and causes of action, including claims against insiders and avoidance actions.*

i. Debtor is not aware of any Causes of Action other than the action against Brent Stockel, the Clark Stampede, LLC, Menu Concepts, Inc. and Ladco, Inc. currently pending in the Bankruptcy Court (which can be reviewed at Adv. Pro. 20-02025, Bankr. E.D. Mich.) and Debtor's counter-claim in Case No. 1:19-cv-10855 (which can be reviewed at Adv. Pro. 20-02024, Bankr. E.D. Mich.), potential actions to recover unpaid receivables including credit card receivables, and Avoidance Actions against persons and entities that received payments from Debtor before the Petition Date to the extent not waived under the Plan. The Avoidance Actions primarily involve preference or fraudulent transfer actions against vendors, suppliers or landlords that received payments from Debtor before the Petition Date. The Committee is investigating potential causes of action against Insiders and Affiliates of Debtor and Debtor is not aware of the results of such investigation. Debtor (or Reorganized Debtor, as applicable) may institute actions at law or, if applicable, arbitrations against all customers, vendors, and suppliers that Debtor believes may owe debts to Debtor. Potential defendants include all customers, vendors, and suppliers listed in Debtors filed Schedules and Statement of Financial Affairs. Debtor is in the process of preparing a demand letter and potential adversary proceeding Complaint for Avoidance Actions (primarily or exclusively under 11 U.S.C. § 547 for transfers made by Debtor to GFS or GFS affiliates within 90 days before the Petition Date) against GFS, which Debtor believes may be used to offset the Claims of GFS against Debtor. This Avoidance Action may be filed before the Confirmation Date and pursued affirmatively.

ii. The Committee has identified potential Causes of Action that it believes the Estate may have against Insiders including what the Committee has described as significant and valuable claims against Jeffrey and Patti Neely for receipt of improper disbursements.

According to the Committee:

Mr. and Mrs. Neely received distributions of $461,461.70 (exclusive of health insurance) from the Debtor for the two-year period between January 2018 and January 2020. MCL 450.4307 and 450.4308 and section 4.3 of the debtor's operating agreement prohibits distributions when the debtor is not paying its bills in the ordinary course or when the debtor liabilities exceed its assets. The Debtor's 2018 consolidated financials and its tax return reflect that the debtor operated at loss during 2018. The internal, nonconsolidated, financial information also reflected that the Debtor was operating at loss during 2018 and 2019. The Debtor has failed to provide its non-consolidated balance sheets for 2018 or 2019. As a result, it appears that the Neelys may have received distributions from the Debtor in violation of the Michigan limited liability act and the debtor's operating agreement and are liable to the debtor for the return of the improper distributions. These facts may also provide a basis to bring a fraudulent transfer action against the Neelys.

The Committee has made a demand on the Debtor to bring this claim and any other claims that it may have against Jeffrey and Patti Neely.

12

**Debtor has not responded to the demand or made an independent investigation of these Claims but believes the Committee is referencing the bi-weekly guaranteed payments over the course of two years between January 2018 and January 2020 totaling $461,461.70 that were distributed in lieu of payroll to cover the salaries of Jeff and Patti Neely for services rendered at the advice of Debtor's outside and independent accountants.** However the demand and Claims were resolved as part of the mediation agreement between Debtor and the Committee (incorporated in Section 3.4 of the Plan). These Claims, as well as any Avoidance Actions or other Causes of Action that the Estate may have against Jeffrey and Patti Neely or other Insiders are included in the Tolled Actions which will be tolled and available to the Creditors Trust in the event of an uncured Payment Default under the Plan Note, and will be waived and released once all Reorganized Debtor's obligations to the Creditors Trust under this Plan are satisfied in full. For the avoidance of all doubt, there has been no Court determination or admission of any kind regarding any of these Tolled Actions. All rights, claims, and defenses of the Creditors Trust, Mr. and Mrs. Neely and all other Insiders are fully preserved.

        D.    *Information regarding guaranteed debt or persons co-liable with Debtor on any debt.*

        i.    See Schedule H and item 3.c, above for a list of entities that may claim that the Debtor is co-liable with certain Insiders.

## V.    Details regarding implementation of the Plan.

        A.    *Provide meaningful summaries of financial information in a consistent format for at least the following period:*

        i.    *Three years pre-Petition Date*: See **Exhibit B**. Note that Debtor's 2019 Profit and Loss statement and Balance Sheet cover some post-petition months.

        ii.    *Post-Petition Date*: See summary of monthly operating reports filed in this Chapter 11 Case attached as **Exhibit C**. The full monthly operating reports are available on the Court's docket or can be obtained at request to Debtor's counsel.

        iii.    *Projections for the five-year period of payment proposed by the Plan together with assumptions underlying those projections*: See **Exhibit D**.

        Assumptions underlying projections–

        a.    Confirmation of this Plan.

        b.    Payments to be made according to the Plan.

        c.    Debtor anticipates holding any PPP Loan funds that are not forgivable in reserve as emergency post-Confirmation funds. Debtor will repay the PPP Loan as set forth in the PPP Loan documents.

        d.    As all projections are inherently speculative, Debtor makes no representation or warranty that these projections are accurate. Actual amounts of revenues and expenses may be substantially higher or lower than projected based on any number of factors including, but not limited to, the performance of the U.S. economy as a whole and in Mid and Southeast Michigan in particular, the Debtor's ability to resume dine-in service, Debtor's

13

vendors continuing to do business with Debtor on substantially the same terms as pre-petition, the continued ability retain and obtain a competent workforce, competition, and the cost of food, repairs, maintenance and other expenses.

     e.    Costs consistent with prior history and Debtor's forecasts.

     f.    Debtor's amended projections include anticipated revenue losses as a result of the COVID-19 crisis. The projections assume that Debtor's business will continue operations with lower than usual revenues throughout fiscal years 2020 through 2022, with business slowing increasing back to historical norms throughout this period, and with normal business conditions and growth resuming in fiscal year 2023.

     g.    Debtor's fiscal year begins at the end of September, so fiscal year 2021 begins on October 1, 2020.

     h.    The projections assume that Debtor will keep the eight (8) restaurants described in Section II.A above. Debtor reserves the right to change its plan for these restaurants based on its on-going review of the business environment and projected profitability of restaurants.

     i.    The Cost of Goods Sold projections assume 1% increases in year 1, 2% for years 2-3, and 3% for years 4-5.

     j.    The Labor component assumes reductions in hourly labor as follows: year 1: 10%; year 2: 8%; year 3: 6%; year 4: 4%; year 5: 2%. The labor pay rate assumes a salary freeze for 2020 and 3% annual raises thereafter.

     k.    Labor cost projections also assume elimination of the following positions (one position for each category): bookkeeper, payroll, graphic art, with each of these roles being absorbed by additional work by continuing Insiders.

     l.    The projections assume CharBhan will decrease rent to 2015 rates of $5,345 per month, a $2,155 savings from current rent rates for Debtor's office headquarters and training center. CharBhan's agreement is contingent on acceptance of the Plan by Class IV.

    B.    *State who will be in charge and the compensation to be paid to each, including fringe benefits.*

After the Effective Date of the Plan, Jeffrey and Patti Neely will continue in their roles assisted by Josh Neely and Levi Martin. All Insiders that continue to work for Reorganized Debtor will work for the same pay as set forth in II.B.2, above

    C.    *State the tax ramifications for the continuing entity if the Plan is confirmed.*

     i.    *To Debtor*:  Debtor believes that the forgiveness of indebtedness which may result from a discharge granted by the confirmation of the Plan will not result in a significant tax consequence to Debtor. The forgiveness of indebtedness, pursuant to the Internal Revenue Code, can be applied either to Debtor's basis in its assets or to its net operating loss carry forward. Debtor cannot accurately determine the amount and extent of any forgiveness of indebtedness. First, Debtor must determine if all of the Claims that have been filed, or deemed filed in this Case, are accurate. Also, depending on whether Debtor achieves or exceeds the

14

projection in its current fiscal year, Debtor may elect to apply any forgiveness of a debt directly to its basis. Despite the fact that Debtor believes that it can either (a) apply such forgiveness of indebtedness to it net operating loss carry forward or (b) to its basis, it is not certain that the amount of forgiveness of debt will be totally offset by the foregoing. However, once these net operating losses are used by Debtor to offset forgiveness of indebtedness, they cannot be used again. Taxes paid by Debtor in future years could, therefore, be impacted as a result of confirmation of the Plan.

ii. *To Creditors*: The tax consequences to each Creditor resulting from confirmation of the Plan may vary depending upon each Creditor's particular circumstances. Debtor recommends that Creditors and Holders of Claims obtain independent tax counsel to advise them of the tax consequences of the Plan.

## VII. **Legal requirements.**

### A. *Voting procedures*

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of claims, or equity interests, that are impaired under the plan. Accordingly, classes of claims or interests that are not impaired are <u>not</u> entitled to vote on the plan.

Creditors that hold claims in more than one impaired class are entitled to vote separately in each class. Such a creditor will receive a separate ballot for all of its claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. A creditor who asserts a claim in more than one class and who has not been provided sufficient ballots may photocopy the ballot received and file multiple ballots.

Votes on the plan will be counted only with respect to claims: (a) that are listed on Debtor's Schedules of Assets and Liabilities other than as disputed, contingent, or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order). However, any vote by a holder of a claim will not be counted if the claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing the claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the plan and disclosure statement, each holder of a claim or interest should vote on the enclosed ballot to either accept or to reject the plan, and then return the ballot by mail to Debtor's attorney by the deadline previously established by the Court.

Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to Debtor's attorney.

### B. *Acceptance*

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount and more than one-half in

15

number of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the plan.

C.    *Confirmation*

Section § 1129(a)of 11 U.S.C. establishes conditions for the confirmation of a plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a plan under 11 U.S.C. § 1129(a) are:

1.    Each class of impaired creditors and interests must accept the plan, as described in paragraph VI.B., above.

2.    Either each holder of a claim or interest in a class must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

D.    *Modification*

Debtor reserves the right to modify or withdraw the Plan at any time before confirmation.

E. *Effect of confirmation*

*If the Plan is confirmed by the Court:*

1.    *Its terms will be binding on Debtor, all creditors, shareholders, and other parties in interest, regardless of whether they have accepted the Plan.*

2.    *Except as provided in the Plan:*

(a)    *In the case of a corporation that is reorganizing and continuing business, as in this case:*

(1)    *All claims and interests will be discharged.*

(2)    *Creditors and shareholders will be prohibited from asserting their claims against or interests in Debtor or its assets.*

*[Signatures on Following Page]*

16

Submitted by:                                    Prepared by:

Inspired Concepts, LLC,                          WERNETTE HEILMAN PLLC
Debtor


  /s/ Jeffrey T. Neely                           By:  /s/  Ryan D. Heilman
By: Jeffrey T. Neely                             Ryan D. Heilman (P63952)
Its: Manager                                     Michael R. Wernette (P
                                                 Attorneys for Debtor
                                                 40900 Woodward Ave., Suite 111
                                                 Bloomfield Hills, MI 48304
                                                 Telephone:  (248) 835-4745
                                                 Email:  ryan@wernetteheilman.com

17

# EXHIBIT A

## to Debtor's Disclosure Statement

# LIQUIDATION ANALYSIS

## INSPIRED CONCEPTS, LLC
## HYPOTHETICAL LIQUIDATION ANALYSIS

### A.    Introduction

The Liquidation Analysis estimates potential cash distributions to holders of Allowed Claims in a hypothetical Chapter 7 liquidation of the assets of the Debtor. The assumptions used in the Liquidation Analysis may be affected by events or conditions not presently contemplated. These assumptions are also subject to significant uncertainties, many of which are outside of the control of the Debtor. As a result, there can be no assurance that the values set forth in the Liquidation Analysis would be realized if the Debtor's Plan is not confirmed and the Debtor's Case was converted to a Chapter 7 liquidation.

### B.    Scope, Intent, and Purpose of the Liquidation Analysis

The determination of the costs of, and hypothetical proceeds from, the liquidation of the assets of the Debtor is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtor, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtor, its management, and its Professionals. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual Chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual Chapter 7 liquidation. In addition, neither management of the Debtor nor its Professionals can judge with any degree of certainty the impact of the liquidation asset sales on the recoverable value of the assets of the Debtor. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good-faith estimate of the proceeds that would be generated if the Debtor was liquidated in accordance with Chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended, and should not be used, for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. Neither the Debtor nor its Professionals make any representation or warranty that the actual results would or would not approximate the estimates and assumptions represented in the Liquidation Analysis. Actual results could vary materially.

### C.    General Notes

#### 1.    Conversion Date and Appointment of a Chapter 7 Trustee

The Liquidation Analysis assumes conversion of the Chapter 11 case of the Debtor to a Chapter 7 liquidation case. As of the Conversion Date, it is assumed that the Bankruptcy Court would appoint a Chapter 7 trustee (the "Trustee") to oversee the liquidation of the estate of the Debtor.

#### 2.    Assets to be Liquidated

The Liquidation Analysis assumes a liquidation of all of the Debtors' assets which primarily consist of cash in the bank, accounts receivable, food, and equipment. The Liquidation Analysis uses the estimated asset value from Debtor's schedules as a baseline. Debtor has not had

2

a valuation or physical inventory performed to verify the scheduled values, so the values should be understood to be Debtor's best estimates, as are the liquidation values set forth in this analysis.

3.  Estimated Costs of Liquidation

Wind-down costs consist of the costs of any Professionals the Trustee employs to assist with the liquidation process, including investment bankers, attorneys, and other advisors. Chapter 7 Trustee fees necessary to facilitate the sale of the assets of the Debtor were assumed to equal 5% of the liquidation proceeds generated. This estimate also takes into account the time that will be required for the Trustee and any Professionals to become educated with respect to the business of the Debtor and the Chapter 11 case.

Professional fees have been estimated at $30,000 to $45,000. Additional costs not included in this liquidation analysis include holding costs and rent because it is unlikely that a full liquidation could occur within the same month that the case hypothetically converts. Debtor's rent costs alone are almost $50,000 per month. Higher returns may be possible over a longer liquidation period, but a longer holding liquidation period will also entail higher costs. All returns on equipment, personal property, and investment property (KJE) are after broker or investment banker fees.

**D.  Key Assumptions**

1.  Cash and Cash Equivalents

Cash is assumed to be recovered at 100% of the stated value.

2.  Accounts Receivable

Assuming that a conversion to Chapter 7 would result in a cessation of operations and inability to complete current projects, the Liquidation Analysis assumes that the Debtor would collect 40 - 60% of the outstanding accounts receivable deemed collectible per the Debtor's current cash flow projections. Current customers would likely seek to offset amounts owed to the Debtor against charges to the Debtor for Debtor's failure to complete projects.

3.  Prepaid Expenses

The Liquidation Analysis assumes that there would be zero recovery on prepaid expenses as it assumes that all prepaid assets, including deposits, would likely be fully amortized by the completion of the liquidation and would have zero recovery. The high range does, however, provide some value for deposits.

4.  Furniture and Fixtures (Office)

Restaurant furniture, fixtures and equipment is included below. Debtor otherwise has minimal furniture and fixtures, mostly consisting of office furniture, office supplies, and older computers with no market value. Accordingly, in a liquidation, Debtor would not expect to obtain more than $2,500 even in an optimistic projection and this item is therefore not considered.

3

5.      Restaurant Furniture, Fixtures, and Equipment

In a liquidation, Debtor's restaurants could be sold as going concerns or Debtor's equipment would be sold without an operating business and in a relatively fast time frame. Given the current business environment Debtor believes it is unlikely to find a purchaser willing to pay any substantial going-concern premium for restaurants. Accordingly, the Debtor believes a liquidation would result in the closure of each of the restaurants. This would impact the value which could be generated in a liquidation sale. Debtor's estimate therefore assumes a forced sale liquidation value. Debtor has, however, also included its estimated replacement value for the high end of the range even though it is highly unlikely that this amount would be received in a liquidation. The one exception is that Debtor believes there may be a going-concern premium for the Pixie restaurant. Accordingly, the high-end value for the Pixie restaurant reflects a going concern value. All values are assumed to be depressed in the current market due to the COVID-19 pandemic and resulting restaurant closures and glut of restaurant equipment on the market. As an example of liquidation valuations, Debtor surrendered all FF&E located in its Ponderosa restaurant to Fifth Third. Fifth Third liquidated the FF&E by selling it to the landlord (a LaBelle Party) for $20,000.

6.      Avoidance Actions and Other Causes of Action

The Debtor has not undertaken a detailed review of potential Avoidance Actions or the collectability of potential defendants. However, Debtor believes that a Trustee would be able to recover some returns from Avoidance Action and other causes of action. Accordingly, the Liquidation Analysis does not include any potential value to be obtained through pursuit of any specific potential Avoidance Actions. Instead, the Liquidation Analysis assumes an ability to recover a net total of $20,000 - $75,000 from all available Causes of Action, after attorneys' fees, costs and expenses.

7.      Investment property.

The Debtor holds 100% of the equity interests in KJE. KJE owns and operates four Old Chicago restaurants in Michigan. KJE has significant secured debt to Chemical Bank in the amount of $683,000 and to American Express in the amount of $162,000, plus tax debt of $384,000 as well as ordinary trade payables. Because KJE is not itself in bankruptcy, the equity value of KJE is diminished by both its pre-petition secured and unsecured debt. The values provided are based on Debtor's best estimates for the value of the company as it exists today.

**E.      Estimated Recoveries**

In preparing the Liquidation Analysis, the Debtor estimated the amount of Allowed Claims based upon internal information and claims filed to date. However, the Claims deadline has not passed. In addition, the Liquidation Analysis includes estimates for claims not currently asserted in the Chapter 11 Cases, but which could be asserted and allowed in a Chapter 7 liquidation, including but not limited to administrative claims, wind-down costs, and trustee fees. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. The estimate of Allowed Claims set forth in the Liquidation Analysis by the Debtor should not be relied on for any other purpose including

4

determining the value of any distribution to be made on account of Allowed Claims under the Plan. Nothing contained in the Liquidation Analysis is intended to be or constitutes a concession or admission of the Debtor. The actual amount of Allowed Claims in the Chapter 11 case could materially differ from the estimated amounts set forth in the Liquidation Analysis.

1.      Pre-Petition Secured Debt

Pre-petition secured debt is based on the estimated amounts owed to Class I and Class II Creditors, in the amount of $2,441,425:

- Fifth Third: $2,036,232, secured by substantially all Debtor's assets, other than Avoidance Actions and Mercantile Bank collateral at the Noodles in Mt. Pleasant.[1]
- Mercantile: $405,193, secured by all personal property located at the Mt. Pleasant Noodles.
- Debtor believes but does not warrant or represent that Fifth Third and/or Mercantile have perfected interests in Debtor's equity interests in KJE.

2.      Administrative and Priority Claims

Administrative and priority claims are projected to approximate $720,000 to $870,000. This amount includes a State of Michigan Tax Claim in the approximate amount of $572,864, plus various personal property taxes and other taxes of approximately $50,000, plus accrued but unpaid fees for Debtor's and Committee' Professionals and U.S. Trustee Fees. Additionally, Debtor generally runs past due utilities at $25,000 per month and has other accounts payable that generally equal $40,000 or more each month. Accordingly, the very conservative numbers used in this analysis assume the Chapter 7 Trustee is able to immediately move goods to inexpensive storage, and does not account for the moving fees.

Debtor also has funds from the PPP Loan. However, the use of these funds are restricted. In a liquidation, these funds could probably be used to pay administrative claims. However, because the PPP Loan itself has administrative expense priority, use of these funds would not reduce administrative claims but would be a wash (or would increase administrative claims due to potential litigation).

3.      Trade and Other General Unsecured Claims

These claims include all claim not listed as above as secured, administrative or priority claims and are projected to total approximately $3,510,000 as of the Petition Date. The Liquidation Analysis estimates that these claims would distributions equal to receive **0%** of their value in a Chapter 7 liquidation.

4.      Claims of Equity Interests

The Liquidation Analysis estimate that there would be insufficient liquidation proceeds for any recovery related to these claims in a Chapter 7 liquidation.

---

[1] No formal determination has been made regarding priority for the personal property at the Mt. Pleasant Noodles so Fifth Third may dispute priority.

5

*INSPIRED CONCEPTS, LLC*
*HYPOTHETICAL LIQUIDATION ANALYSIS*

| Description | Book Value or Scheduled Values | Chapter 7 Liquidation Recovery | | Notes |
| --- | --- | --- | --- | --- |
| | | Low | High | |
| **STATEMENT OF ASSETS** | | | | |
| | | | | |
| Current Assets | | | | |
|   Cash | 38,228 | 38,228 | 38,228 | 100% recovery on cash – from March monthly operating report |
|   Accounts Receivable | 75,637 | 37,819 | 68,073 | Low = 50%, High = 90%; depends on timing of closure |
|   Deposits | 29,422 | 0 | 15,000 | Assumes that between half or all of deposits would be used up by rents or setoffs |
|   Personal Property and Restaurants - | 198,061 | 89,030 | 320,000 | Low range assumes a difficult market; high range assumes going concern premium for Pixie |
|   Inventory – food products | 109,000 | 10,000 | 20,000 | Much of Debtor's food as of the Petition Date could not be salvaged; most of it could not sold. |
|   MLCC Liquor Licenses | 170,000 | 40,000 | 80,000 | Low = 50%, High = 100% |
|   Causes of Action - net | Unknown | 20,000 | 75,000 | |
|   KJE | Unknown | 1,000 | 40,000 | |
| | | | | |
| Total Assets | 620,348 | 236,077 | 656,301 | |
| | | | | |
| Estimated Costs of Chapter 7 Liquidation | | | | |
|   Chapter 7 Trustee Fees | | 12,804 | 32,815 | 5% of Total Assets Administered |
|   Chapter 7 Professional Fees | | 45,000 | 30,000 | Low = $15k / month for 4 months; High = $5k / month for 3 months |
|   Other Holding Costs (rent, utilities, etc.) | | 30,000 | 10,000 | Low = $10k / month for 3 months; high = $5k / month for 2 months |
| | | | | |
| Total Estimated Costs of Liquidation | | 87,804 | 72,815 | |
| | | | | |
| **Estimated Asset Value Available for Distribution** | | 168,273 | 583,486 | |

| | | |
|---|---|---|
| **Estimated Asset Value Available for Distribution** | 168,273 | 583,486 |
| | | |
| Pre-Petition Secured Debt | | |
| Class I Claim – Fifth Third | 2,036,232 | 2,036,232 |
| Class II Claims - Mercantile | 405,193 | 405,193 |
| | | |
| Total Pre-Petition Secured Debt | 2,421,425 | 2,441,425 |
| | | |
| Excess after Pre-Petition Secured Debt | 21,000 | 115,000 |
| [Assumes Secured Creditors do not have interests in KJE and avoidance actions] | | |
| | | |
| Priority and Admin. Claims: | 870,000 | 720,000 |
| Available for Distribution to Priority and Admin. Claims | 21,000 | 115,000 |
| | | |
| Excess after Priority and Admin. Claims | 0 | 0 |
| | | |
| Estimated General Unsecured Claims | 3,510,000 | 3,510,000 |
| Available for distribution to Unsecured Claims | 0 | 0 |
| | | |
| Estimated Recovery % for General Unsecured Claims | 0 | 0 |

EXHIBIT B

to Debtor's Disclosure Statement


SUMMARY OF PRE-PETITION
FINANCIAL PERFORMANCE

| Inspired Concepts, LLC<br>FY2018 Income Statement | | |
|---|---|---|
| **Total Revenue** | $ | **24,115,503** |
| | | |
| **Total Cost of Sales** | $ | **7,076,933** |
| | | |
| **Gross Margin** | $ | **17,038,570** |
| | | |
| **Operating Expenses** | | |
| | | |
| **Employee-Related Expenses** | | |
| | | |
| **Total Hourly Payroll** | $ | **5,429,836** |
| | | |
| **Operating Margin** | $ | **11,608,734** |
| | | |
| **Management Labor** | $ | **2,405,323** |
| | | |
| **Total Employee-Related Expenses** | $ | **7,835,159** |
| | | |
| **Other Operating Expenses** | | |
| Supplies | $ | 800,233 |
| Repairs and Maintenance | $ | 706,893 |
| Utilities | $ | 1,160,978 |
| Advertising and Related Expenses | $ | 9,775 |
| Bank and Transactional Fees | $ | 522,045 |
| **Total Other Operating Expenses** | $ | **3,199,923** |
| | | |
| **Total Controllable Operating Income** | $ | **6,003,488** |
| | | |
| **Additional Expense Section** | | |
| Franchise Marketing and Marketing Overhead | $ | 1,091,675 |
| Depreciation & Amortization | $ | 541,078 |
| Rent and Lease-related Expenses | $ | 1,851,351 |
| Property Tax & Insurance | $ | 319,350 |
| Administrative Overhead | $ | 1,099,979 |
| Franchise Royalties | $ | 779,445 |
| Administrative Fees | $ | 41,858 |
| Non-COI NRO/R&M Purchases | $ | 215,423 |
| Equipment Rental | $ | 64 |
| Dues, Licenses and Subscriptions | $ | 37,558 |
| Charitable Donations | $ | 7,050 |
| Human Resources | $ | 10,513 |
| Travel, Event & Meal Expenses | $ | 257,278 |
| Consultant Expense | $ | - |
| **Total Additional Expense Section** | $ | **6,252,621** |
| | | |
| **Total Operating Expenses** | $ | **17,287,704** |
| | | |
| **Income (Loss) from Operations** | $ | **(249,133)** |
| Misc. Expenses | $ | 9,395 |
| Interest Expenses | $ | 222,746 |
| Misc. Income | $ | (47,227) |
| (Gain) Loss Disposal Of Assets | $ | (11,046) |
| | | |
| **Net Income (Loss)** | $ | **(423,001)** |

| | |
|---|---|
| **Inspired Concepts, LLC** | |
| **FY2017 Income Statement** | |
| | |
| **Total Revenue** | $24,607,082 |
| | |
| **Total Cost of Sales** | $ 7,211,912 |
| | |
| **Gross Margin** | $17,395,170 |
| | |
| **Operating Expenses** | |
| | |
| **Employee-Related Expenses** | |
| | |
| **Total Hourly Payroll** | $ 5,378,350 |
| | |
| **Operating Margin** | $12,016,820 |
| | |
| **Management Labor** | $ 2,345,858 |
| | |
| **Total Employee-Related Expenses** | $ 7,724,209 |
| | |
| **Other Operating Expenses** | |
| Supplies | $ 766,276 |
| Repairs and Maintenance | $ 624,718 |
| Utilities | $ 1,078,314 |
| Advertising and Related Expenses | $ 8,959 |
| Bank and Transactional Fees | $ 479,628 |
| **Total Other Operating Expenses** | $ 2,957,894 |
| | |
| **Total Controllable Operating Income** | $ 6,713,068 |
| | |
| **Additional Expense Section** | |
| Franchise Marketing and Marketing Overhead | $ 1,085,855 |
| Depreciation & Amortization | $ 473,068 |
| Rent and Lease-related Expenses | $ 1,673,385 |
| Property Tax & Insurance | $ 371,265 |
| Administrative Overhead | $ 1,132,678 |
| Franchise Royalties | $ 770,789 |
| Administrative Fees | $ 75,890 |
| Non-COI NRO/R&M Purchases | $ 242,477 |
| Equipment Rental | $ - |
| Dues, Licenses and Subscriptions | $ 41,224 |
| Charitable Donations | $ 3,500 |
| Human Resources | $ 37,244 |
| Travel, Event & Meal Expenses | $ 233,783 |
| Consultant Expense | $ 364 |
| **Total Additional Expense Section** | $ 6,141,523 |
| | |
| **Total Operating Expenses** | $16,823,626 |
| | |
| **Income (Loss) from Operations** | $ 571,544 |
| Misc. Expenses | $ 16,154 |
| Interest Expenses | $ 171,816 |
| | |
| **Net Income (Loss)** | $ 383,574 |
| **EBITDA** | $ 1,028,458 |

| | | |
|---|---|---:|
| **Total Revenue** | $ | 16,989,966 |
| | | |
| **Total Cost of Sales** | $ | 5,014,254 |
| | | |
| **Gross Margin** | $ | 11,975,712 |
| | | |
| **Operating Expenses** | | |
| | | |
| **Employee-Related Expenses** | | |
| | | |
| **Total Hourly Payroll** | $ | 3,960,818 |
| | | |
| **Operating Margin** | $ | 8,014,895 |
| | | |
| **Management Labor** | $ | 1,985,982 |
| | | |
| **Total Employee-Related Expenses** | $ | 5,946,800 |
| | | |
| **Other Operating Expenses** | | |
| Supplies | $ | 583,441 |
| Repairs and Maintenance | $ | 586,630 |
| Utilities | $ | 921,328 |
| Advertising and Related Expenses | $ | (2,987) |
| Bank and Transactional Fees | $ | 360,473 |
| **Total Other Operating Expenses** | $ | 2,448,886 |
| | | |
| **Total Controllable Operating Income** | $ | 3,580,026 |
| | | |
| **Additional Expense Section** | | |
| Franchise Marketing and Marketing Overhead | $ | 734,819 |
| Depreciation & Amortization | $ | 554,047 |
| Rent and Lease-related Expenses | $ | 1,484,334 |
| Property Tax & Insurance | $ | 260,670 |
| Administrative Overhead | $ | 787,352 |
| Franchise Royalties | $ | 544,405 |
| Administrative Fees | $ | 42,865 |
| Non-COI NRO/R&M Purchases | $ | 61,426 |
| Equipment Rental | $ | - |
| Dues, Licenses and Subscriptions | $ | 38,493 |
| Charitable Donations | $ | 3,983 |
| Human Resources | $ | 16,042 |
| Travel, Event & Meal Expenses | $ | 147,275 |
| Consultant / Professional Expense | $ | 319,898 |
| **Total Additional Expense Section** | $ | 4,995,610 |
| | | |
| **Total Operating Expenses** | $ | 13,391,296 |
| | | |
| **Income (Loss) from Operations** | $ | (1,415,584) |
| Goodwill Impairment | $ | 719,428 |
| Interest Expenses | $ | 173,168 |
| Misc. Expenses | $ | 9,749 |
| (Gain) Loss Disposal Of Assets | $ | 273,905 |
| | | |
| **Net Income (Loss)** | $ | (2,591,835) |

EBITDA

# EXHIBIT C

## to Debtor's Disclosure Statement

## SUMMARY OF POST-PETITION FINANCIAL PERFORMANCE

**Inspired Concepts, LLC**

Case No. 20-20034

Summary of Post-petition
Financial Performance

| | January | February | March | April |
|---|---|---|---|---|
| Cash at end of month Accounts | 85,086 | 97,615 | 38,228 | 84,064 |
| Payable | 81,972.88 | 101,427 | 22,127 | 75,134 |
| Accounts Receivable | 31,258.26 | 44,361 | 75,637 | 190,968 |
| Revenue/Sales | 448,911 | 895,441 | 726,578 | 251,865 |
| Net Income (Loss): | (17,587) | 3,017 | (23,459) | 31,443 |

| | May | June | July |
|---|---|---|---|
| Cash at end of month Accounts | 256,764 | 220,943 | 246,205 |
| Payable | 245,186 | 252,966 | 324,564 |
| Accounts Receivable | 209,595 | 415,937 | 620,333 |
| Revenue/Sales | 396,083 | 548,147 | 540,203 |
| Net Income (Loss): | 71,820 | 130,253 | 133,538 |

# EXHIBIT D

## to Debtor's Disclosure Statement

## PROJECTIONS FOR PLAN PERIOD

# Projected Cash Flow for Year 2021

| Company | Store | Category | Sum of Oct | Sum of Nov | Sum of Dec | Sum of Jan | Sum of Feb | Sum of Mar | Sum of Apr | Sum of May | Sum of June | Sum of July | Sum of Aug | Sum of Sept | Sum of Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IC | Pixie | 1. Sales | (126,232.64) | (114,572.59) | (171,022.41) | (100,301.72) | (109,452.31) | (165,065.65) | (153,456.30) | (142,832.74) | (194,988.87) | (158,449.84) | (143,583.29) | (167,853.92) | (1,747,612.28) |
| | | 2. COGS | 41,445.35 | 37,635.22 | 56,178.05 | 32,947.47 | 35,963.29 | 54,221.35 | 50,407.68 | 46,852.51 | 46,050.64 | 52,048.17 | 47,164.96 | 55,137.26 | 574,061.94 |
| | | 3. Labor | 34,169.47 | 31,923.12 | 45,052.38 | 29,173.78 | 30,936.68 | 43,904.79 | 39,414.20 | 37,329.00 | 49,669.60 | 40,376.23 | 37,512.13 | 44,441.96 | 463,303.34 |
| | | 4. Other Controllables | 15,075.55 | 14,350.86 | 17,859.30 | 13,463.90 | 14,032.63 | 17,489.08 | 16,767.55 | 16,094.84 | 15,348.86 | 17,077.90 | 16,163.92 | 17,662.38 | 195,376.77 |
| | | 5. Below COI | 10,476.24 | 10,472.76 | 10,489.62 | 10,468.50 | 10,471.23 | 10,487.84 | 10,484.38 | 10,481.14 | 10,496.78 | 10,485.87 | 10,481.43 | 10,488.68 | 125,784.47 |
| | Pixie Total | | (25,065.03) | (20,190.63) | (41,443.06) | (14,248.07) | (18,048.48) | (38,982.59) | (36,382.23) | (31,875.25) | (73,422.99) | (38,461.67) | (32,271.00) | (40,123.64) | (388,485.76) |
| | Office | 2. Labor | 32,711.00 | 32,711.00 | 40,419.85 | 32,711.00 | 32,711.00 | 40,419.85 | 32,711.00 | 32,711.00 | 40,419.85 | 32,711.00 | 32,711.00 | 40,419.85 | 423,387.40 |
| | | 4. Other Controllables | 15,770.98 | 15,669.56 | 16,355.54 | 15,497.69 | 15,550.04 | 16,060.67 | 15,818.27 | 15,777.57 | 16,131.76 | 15,741.23 | 15,816.13 | 16,122.42 | 190,311.86 |
| | | 5. Below COI | 23,785.87 | 23,500.19 | 25,432.40 | 23,016.08 | 23,163.53 | 24,601.84 | 23,919.06 | 23,804.43 | 24,802.09 | 21,702.07 | 21,913.03 | 22,775.77 | 282,416.36 |
| | | Bank Payments | 30,673.00 | 8,023.00 | 8,023.00 | 8,023.00 | 8,023.00 | 8,023.00 | 8,023.00 | 8,023.00 | 8,023.00 | 8,023.00 | 8,023.00 | 8,023.00 | 118,826.00 |
| | | PPP Interest Only | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 4,200.00 |
| | | Owner/Opr Comp | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 15,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 15,000.00 | 130,000.00 |
| | | Planned Taxes | 11,111.00 | 11,111.00 | 11,111.00 | 11,111.00 | 11,111.00 | 11,111.00 | 11,111.00 | 11,111.00 | 11,111.00 | 11,111.00 | 11,111.00 | 11,111.00 | 133,332.00 |
| | | Professional Fees | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 60,000.00 |
| | Office Total | | 129,401.85 | 106,364.75 | 116,691.79 | 105,708.77 | 105,908.57 | 120,566.86 | 116,932.33 | 106,777.00 | 125,837.70 | 104,638.30 | 104,924.16 | 118,802.04 | 1,342,473.62 |
| | Smash-WB | 1. Sales | (57,153.83) | (62,059.52) | (88,044.53) | (56,519.56) | (60,662.14) | (73,744.00) | (60,126.98) | (60,027.87) | (76,063.00) | (57,936.76) | (72,534.74) | (72,534.74) | (796,169.57) |
| | | 2. COGS | 13,491.49 | 16,002.13 | 25,280.90 | 14,573.64 | 15,641.81 | 19,014.98 | 15,503.82 | 15,478.26 | 19,612.95 | 14,939.06 | 18,708.33 | 205,293.32 | |
| | | 3. Labor | 18,991.60 | 20,072.88 | 29,446.47 | 16,851.79 | 19,764.88 | 24,090.30 | 19,646.92 | 19,825.08 | 19,164.17 | 19,900.31 | 23,628.17 | 257,984.02 | |
| | | 4. Other Controllables | 6,841.99 | 7,113.25 | 9,103.00 | 6,806.92 | 7,035.98 | 7,759.32 | 7,006.39 | 7,000.90 | 7,887.56 | 6,885.28 | 7,069.96 | 7,693.57 | 88,204.12 |
| | | 5. Below COI | 11,937.96 | 12,296.34 | 14,925.20 | 11,891.63 | 12,194.26 | 13,149.94 | 12,155.17 | 12,147.92 | 13,319.36 | 11,995.16 | 12,239.15 | 13,063.06 | 151,315.15 |
| | Smash-WB Total | | (4,645.05) | (5,574.32) | (19,288.96) | (4,395.58) | (6,025.21) | (9,729.46) | (5,814.68) | (5,775.71) | (10,641.73) | (4,053.09) | (6,266.92) | (9,261.61) | (93,322.86) |
| | Smash-Trc | 1. Sales | (49,474.29) | (50,324.89) | (88,235.24) | (53,749.47) | (53,719.00) | (51,660.77) | (47,961.22) | (47,839.36) | (57,070.09) | (43,015.82) | (44,408.03) | (57,608.30) | (659,565.77) |
| | | 2. COGS | 13,921.44 | 14,301.49 | 24,628.29 | 15,124.42 | 15,115.85 | 17,350.37 | 13,491.49 | 13,483.08 | 16,136.45 | 12,104.11 | 13,921.41 | 16,210.25 | 185,593.50 |
| | | 3. Labor | 20,520.26 | 20,520.26 | 26,983.57 | 17,787.38 | 17,754.60 | 14,984.00 | 16,454.58 | 16,464.52 | 15,184.45 | 12,550.06 | 23,400.70 | 23,417.00 | 81,246.58 |
| | | 4. Other Controllables | 6,456.23 | 6,533.57 | 8,675.59 | 6,701.02 | 6,699.27 | 7,153.96 | 5,389.59 | 6,362.62 | 6,891.15 | 6,086.44 | 6,395.18 | 6,321.96 | 81,246.58 |
| | | 5. Below COI | 10,809.92 | 10,908.41 | 13,636.42 | 11,121.67 | 11,119.45 | 11,698.52 | 10,699.59 | 10,690.70 | 11,363.82 | 10,338.96 | 10,732.17 | 11,403.07 | 134,522.70 |
| | Smash-Trc Total | | 1,788.12 | 1,345.55 | (9,289.54) | 387.78 | 397.17 | (581.06) | (2,283.94) | (2,322.88) | 320.05 | (3,804.53) | 2,037.54 | 746.68 | 1,387.04 |
| | Smash-Troy | 1. Sales | (123,057.16) | (108,959.88) | (161,189.71) | (94,947.83) | (96,516.09) | (138,484.05) | (113,119.17) | (120,312.71) | (131,460.98) | (106,351.80) | (122,375.31) | (141,381.92) | (1,458,156.61) |
| | | 2. COGS | 39,710.52 | 35,161.33 | 52,015.88 | 30,639.64 | 31,145.72 | 44,688.77 | 36,503.53 | 38,824.88 | 42,422.43 | 34,319.70 | 39,490.48 | 45,623.91 | 470,546.79 |
| | | 3. Labor | 37,835.86 | 34,743.17 | 48,644.46 | 31,669.17 | 32,013.22 | 43,663.25 | 35,655.65 | 37,233.78 | 41,989.03 | 34,171.00 | 37,886.27 | 44,298.99 | 459,737.33 |
| | | 4. Other Controllables | 15,161.31 | 14,430.42 | 17,138.32 | 13,703.96 | 13,785.27 | 15,961.12 | 14,646.07 | 15,019.01 | 15,597.02 | 14,205.20 | 15,125.96 | 16,111.37 | 180,975.03 |
| | | 5. Below COI | 18,445.56 | 17,727.29 | 14,481.55 | 12,442.54 | 17,092.93 | 19,232.28 | 17,539.32 | 18,306.04 | 18,874.36 | 17,594.33 | 18,411.19 | 19,380.11 | 220,450.75 |
| | Bennigan's Total | | (11,903.37) | (6,897.67) | (23,001.67) | (13,833.01) | (2,479.05) | (15,832.53) | (8,774.59) | (11,528.90) | (12,404.88) | (5,974.73) | (11,851.19) | (15,963.54) | (120,076.71) |
| | Nodi-Md | 1. Sales | (74,635.01) | (69,776.76) | (93,990.56) | (58,686.03) | (56,518.21) | (83,015.96) | (73,415.61) | (74,654.36) | (90,100.31) | (73,356.25) | (80,615.87) | (96,030.96) | (930,885.89) |
| | | 2. COGS | 18,568.07 | 17,359.41 | 23,383.44 | 14,600.21 | 14,060.89 | 20,653.13 | 18,264.70 | 18,572.89 | 23,908.32 | 18,259.89 | 20,056.02 | 23,903.50 | 231,590.47 |
| | | 3. Labor | 17,855.69 | 16,967.06 | 22,173.05 | 14,938.43 | 14,541.91 | 20,165.67 | 17,632.65 | 17,859.23 | 22,558.96 | 17,629.10 | 18,949.67 | 22,555.41 | 223,826.83 |
| | | 4. Other Controllables | 9,243.65 | 9,011.47 | 10,168.67 | 8,481.42 | 8,377.82 | 9,644.19 | 9,185.36 | 9,244.57 | 10,269.50 | 9,184.45 | 9,529.48 | 10,268.58 | 112,609.16 |
| | | 5. Below COI | 13,110.74 | 12,819.18 | 14,272.38 | 12,153.56 | 12,023.46 | 13,613.73 | 13,037.56 | 13,111.91 | 14,399.00 | 13,036.40 | 13,469.68 | 14,397.83 | 159,445.43 |
| | Nodi-Md Total | | (15,656.86) | (13,619.64) | (23,993.02) | (8,512.41) | (7,514.13) | (18,339.24) | (15,295.34) | (15,865.76) | (24,964.53) | (15,286.41) | (18,611.02) | (24,955.64) | (203,414.00) |
| | Nodi-MP | 1. Sales | (66,471.98) | (61,916.99) | (83,355.00) | (49,519.20) | (49,745.24) | (77,877.98) | (64,263.68) | (52,040.37) | (58,664.95) | (46,433.80) | (58,899.45) | (81,112.03) | (751,359.97) |
| | | 2. COGS | 16,983.72 | 15,819.78 | 21,297.40 | 12,662.27 | 12,710.03 | 19,898.61 | 16,419.52 | 13,296.44 | 14,989.03 | 11,879.28 | 15,304.45 | 20,724.32 | 191,974.25 |
| | | 3. Labor | 16,583.77 | 15,451.31 | 20,808.43 | 12,504.43 | 12,552.27 | 19,552.77 | 15,980.51 | 13,296.44 | 14,989.03 | 11,879.28 | 15,354.51 | 20,774.37 | 189,500.49 |
| | | 4. Other Controllables | 7,306.24 | 7,086.78 | 8,119.57 | 6,489.54 | 6,500.43 | 7,855.72 | 7,198.86 | 6,611.00 | 6,930.14 | 6,343.80 | 6,989.61 | 8,011.52 | 85,444.21 |
| | | 5. Below COI | 13,464.13 | 13,189.61 | 14,481.55 | 12,442.54 | 12,456.16 | 14,151.49 | 13,331.06 | 12,594.47 | 12,993.67 | 12,260.22 | 13,068.07 | 14,346.38 | 158,779.35 |
| | Nodi-MP Total | | (11,326.55) | (6,573.53) | (18,048.05) | (36,224.35) | (2,822.70) | (15,526.76) | (10,350.15) | (4,946.45) | (7,133.06) | (2,494.41) | (17,056.47) | (17,055.49) | (112,478.67) |
| | BABs-Md | 1. Sales | (46,849.49) | (44,288.65) | (66,424.76) | (36,224.35) | (40,522.84) | (50,905.80) | (46,274.33) | (46,879.76) | (56,344.50) | (43,438.95) | (54,508.06) | (54,508.06) | (574,847.11) |
| | | 2. COGS | 10,686.76 | 9,646.40 | 15,152.05 | 8,263.08 | 9,243.60 | 11,612.05 | 10,555.57 | 10,693.67 | 12,852.66 | 9,908.79 | 10,079.12 | 12,433.75 | 131,127.50 |
| | | 3. Labor | 15,874.49 | 14,984.22 | 21,242.54 | 13,800.49 | 14,639.55 | 18,213.27 | 15,762.22 | 15,880.40 | 19,274.90 | 15,208.77 | 18,916.43 | 199,151.79 | |
| | | 4. Other Controllables | 5,778.91 | 5,583.48 | 6,607.12 | 5,326.28 | 5,508.59 | 5,948.95 | 5,752.52 | 5,778.20 | 6,179.61 | 5,632.27 | 5,663.93 | 6,101.72 | 69,659.58 |
| | | 5. Below COI | 7,626.12 | 7,258.88 | 9,208.64 | 6,771.25 | 7,119.31 | 7,991.56 | 7,617.61 | 7,666.49 | 8,430.63 | 7,388.68 | 7,448.97 | 8,282.40 | 92,810.59 |
| | BABs-Md Total | | (6,885.20) | (4,815.67) | (14,214.41) | (2,063.25) | (4,011.79) | (7,139.97) | (6,586.41) | (6,861.00) | (9,606.65) | (5,300.44) | (5,639.10) | (8,773.76) | (81,897.65) |
| | BABs-MP | 2. COGS | 6,828.82 | 6,828.82 | 8,267.69 | 6,828.82 | 6,828.82 | 8,268.95 | 6,828.82 | 6,828.82 | 8,268.95 | 6,828.82 | 6,828.82 | 6,258.05 | 87,706.36 |
| | | 4. Other Controllables | 3,158.87 | 3,089.97 | 4,516.30 | 3,084.67 | 2,608.85 | 3,830.05 | 3,048.77 | 2,859.38 | 3,653.32 | 3,187.93 | 3,039.12 | 3,650.30 | 39,729.33 |
| | | 5. Below COI | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.64 | 90,029.64 |
| | | PPP Interest Only | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 3,000.00 |
| | BABs-MP Total | | | | | | | | | | | | | | |
| IC Total | | | | | | | | | | | | | | | 290,130.90 |

| | | | Total |
|---|---|---|---|
| **KJ** | **KJ Office** | Owner/Opr Comp | 130,000.00 |
| | | Planned Taxes | 120,000.00 |
| | | Loan Principal | 226,926.60 |
| | **KJ Office Total** | | 897,391.93 |
| | **OC-Okemos** | 1. Sales | 1,567,583.53 |
| | | 2. COGS | 483,335.05 |
| | | 3. Labor | 509,720.41 |
| | | 4. Other Controllables | 267,945.73 |
| | | 5. Below COI | 294,597.56 |
| | **OC-Okemos Total** | | (12,284.73) |
| | **OC-KW** | 1. Sales | 1,154,915.73 |
| | | 2. COGS | 308,520.13 |
| | | 3. Labor | 308,223.10 |
| | | 4. Other Controllables | 178,092.81 |
| | | 5. Below COI | 226,490.80 |
| | **OC-KW Total** | | (133,588.89) |
| | **OC-SG** | 1. Sales | 1,472,092.57 |
| | | 2. COGS | 423,098.70 |
| | | 3. Labor | 485,204.79 |
| | | 4. Other Controllables | 249,635.66 |
| | | 5. Below COI | 268,466.80 |
| | **OC-SG Total** | | (44,876.62) |
| | **OC-Md** | 1. Sales | 1,712,561.58 |
| | | 2. COGS | 472,453.41 |
| | | 3. Labor | 542,126.67 |
| | | 4. Other Controllables | 217,865.55 |
| | | 5. Below COI | 198,449.63 |
| | **OC-Md Total** | | (226,688.32) |
| **KJ Total** | | | 279,353.32 |
| **CC (Income)/Loss** | | | 529,685.62 |
| | **CC Payments** | | 70,312.50 |
| **Cash Balance** | Beginning IC | | 189,688.72 |
| | EOP IC | | 188,134.30 |
| | Beginning KJ | | 1,147,784.77 |
| | EOP KJ | | 1,160,442.67 |
| | Combined EOP | | 25,690.63 |

| CompanName | Store | Category | Sum of Oct | Sum of Nov | Sum of Dec | Sum of Jan | Sum of Feb | Sum of Mar | Sum of Apr | Sum of May | Sum of June | Sum of July | Sum of Aug | Sum of Sept | Sum of Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IC | Pixie | 1. Sales | $ (126,232.64) | $ (114,572.59) | $ (171,022.41) | $ (100,301.72) | $ (109,452.31) | $ (165,065.65) | $ (153,456.30) | $ (142,632.74) | $ (194,988.87) | $ (158,449.84) | $ (143,583.29) | $ (167,853.92) | $ (1,747,612.28) |
| | | 2. COGS | $ 41,062.77 | $ 37,269.83 | $ 55,632.64 | $ 32,627.55 | $ 35,604.33 | $ 53,694.93 | $ 49,918.48 | $ 46,397.63 | $ 63,428.79 | $ 51,342.85 | $ 46,706.84 | $ 54,601.94 | $ 568,488.52 |
| | | 3. Labor | $ 34,464.98 | $ 32,218.63 | $ 45,415.51 | $ 29,469.29 | $ 31,232.19 | $ 44,267.92 | $ 39,709.71 | $ 37,624.51 | $ 50,032.73 | $ 40,671.74 | $ 37,807.64 | $ 44,805.09 | $ 467,719.94 |
| | | 4. Other Controllables | $ 15,075.55 | $ 14,350.86 | $ 17,859.30 | $ 13,663.90 | $ 14,002.63 | $ 17,489.08 | $ 16,767.55 | $ 16,094.84 | $ 18,167.92 | $ 17,077.90 | $ 16,153.92 | $ 17,662.38 | $ 195,376.77 |
| | | 5. Below COI | $ 10,476.24 | $ 10,472.76 | $ 10,488.62 | $ 10,468.50 | $ 10,471.23 | $ 10,487.84 | $ 10,484.38 | $ 10,481.14 | $ 10,498.78 | $ 10,485.87 | $ 10,481.43 | $ 10,488.68 | $ 125,784.47 |
| | Pixie Total | | $ (25,153.10) | $ (20,260.51) | $ (41,626.34) | $ (14,272.48) | $ (18,112.03) | $ (39,125.88) | $ (36,576.18) | $ (32,034.62) | $ (51,861.71) | $ (38,871.48) | $ (32,433.46) | $ (40,295.83) | $ (390,242.55) |
| | Office | 1. Sales | $ 33,692.33 | $ 33,692.33 | $ 41,632.45 | $ 33,692.33 | $ 33,692.33 | $ 41,632.45 | $ 33,692.33 | $ 33,692.33 | $ 41,632.33 | $ 33,692.33 | $ 33,692.33 | $ 41,632.45 | $ 436,068.44 |
| | | 2. COGS | $ 15,920.29 | $ 15,810.02 | $ 16,816.10 | $ 15,920.29 | $ 15,687.58 | $ 16,233.08 | $ 15,962.99 | $ 15,821.16 | $ 16,301.91 | $ 15,873.60 | $ 15,964.52 | $ 16,301.91 | $ 192,113.80 |
| | | 3. Labor | $ 22,206.43 | $ 21,895.83 | $ 23,884.66 | $ 21,363.30 | $ 21,550.94 | $ 23,087.47 | $ 22,326.70 | $ 22,208.89 | $ 23,280.44 | $ 22,074.90 | $ 22,331.01 | $ 23,281.34 | $ 289,491.91 |
| | | 4. Other Controllables | $ 8,023.00 | $ 8,023.00 | $ 8,023.00 | $ 8,023.00 | $ 8,023.00 | $ 8,023.00 | $ 8,023.00 | $ 8,023.00 | $ 8,023.00 | $ 8,023.00 | $ 8,023.00 | $ 8,023.00 | $ 96,276.00 |
| | | 5. Below COI | $ 350.00 | $ 350.00 | $ 350.00 | $ 350.00 | $ 350.00 | $ 350.00 | $ 350.00 | $ 350.00 | $ 350.00 | $ 350.00 | $ 350.00 | $ 350.00 | $ 4,200.00 |
| | | Bank Payments | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 60,000.00 |
| | | PPP Interest Only | | | | | | | | | | | | | |
| | | Professional Fees | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 130,000.00 |
| | | Owner/Opr Comp | | | | | | | | | | | | | 60,000.00 |
| | | Planned Taxes | $ 1,111.00 | $ 1,111.00 | $ 1,111.00 | $ 1,111.00 | $ 1,111.00 | $ 1,111.00 | $ 1,111.00 | $ 1,111.00 | $ 1,111.00 | $ 1,111.00 | $ 1,111.00 | $ 1,111.00 | $ 13,332.00 |
| | Office Total | | $ 106,303.05 | $ 106,382.18 | $ 164,517.21 | $ 105,190.92 | $ 106,416.85 | $ 120,437.00 | $ 106,458.02 | $ 106,306.38 | $ 115,898.44 | $ 106,124.83 | $ 106,471.86 | $ 121,499.70 | $ 375,402.15 |
| | Smash-WB | 1. Sales | $ (64,775.00) | $ (70,334.79) | $ (108,073.95) | $ (64,061.44) | $ (68,392.33) | $ (83,585.12) | $ (68,144.57) | $ (63,008.55) | $ (86,201.49) | $ (65,657.03) | $ (82,227.38) | $ (82,237.38) | $ (698,941.40) |
| | | 2. COGS | $ 16,540.16 | $ 17,959.84 | $ 27,996.45 | $ 16,357.95 | $ 17,463.83 | $ 21,343.28 | $ 17,400.57 | $ 17,372.73 | $ 22,011.36 | $ 16,765.38 | $ 17,734.61 | $ 20,996.58 | $ 229,542.74 |
| | | 3. Labor | $ 20,863.24 | $ 22,088.69 | $ 31,892.18 | $ 20,705.96 | $ 21,660.55 | $ 26,494.51 | $ 21,605.94 | $ 21,581.91 | $ 27,071.19 | $ 21,057.65 | $ 21,894.28 | $ 26,195.24 | $ 283,111.34 |
| | | 4. Other Controllables | $ 7,263.39 | $ 7,570.82 | $ 9,657.56 | $ 7,223.94 | $ 7,463.41 | $ 8,303.48 | $ 7,449.71 | $ 7,443.68 | $ 8,448.15 | $ 7,312.17 | $ 7,522.04 | $ 8,228.41 | $ 93,886.76 |
| | | 5. Below COI | $ 12,494.72 | $ 12,900.89 | $ 15,657.89 | $ 12,442.59 | $ 12,758.98 | $ 13,868.88 | $ 12,740.88 | $ 12,732.92 | $ 14,060.02 | $ 12,559.15 | $ 12,835.45 | $ 13,769.69 | $ 158,823.06 |
| | Smash-WB Total | | $ (7,613.49) | $ (9,814.55) | $ (23,269.87) | $ (7,331.00) | $ (9,045.56) | $ (13,574.97) | $ (8,947.47) | $ (3,877.31) | $ (13,610.77) | $ (7,962.88) | $ (22,240.99) | $ (13,037.46) | $ (133,577.50) |
| | Smash-Trc | 1. Sales | $ (56,074.92) | $ (57,608.30) | $ (97,273.03) | $ (60,918.77) | $ (61,223.42) | $ (69,885.49) | $ (54,358.76) | $ (54,216.59) | $ (64,676.05) | $ (64,743.14) | $ (64,856.94) | $ (65,285.34) | $ (745,120.14) |
| | | 2. COGS | $ 15,625.59 | $ 19,484.58 | $ 21,105.60 | $ 19,155.02 | $ 21,960.24 | $ 27,873.97 | $ 15,350.17 | $ 16,586.45 | $ 20,082.94 | $ 18,082.55 | $ 21,689.02 | $ 18,196.37 | $ 231,653.82 |
| | | 3. Labor | $ 22,952.32 | $ 22,253.27 | $ 28,273.71 | $ 23,060.63 | $ 23,965.65 | $ 27,374.57 | $ 25,563.84 | $ 21,526.58 | $ 27,326.80 | $ 20,092.34 | $ 21,685.02 | $ 7,361.54 | $ 293,603.31 |
| | | 4. Other Controllables | $ 6,834.17 | $ 6,921.96 | $ 9,193.08 | $ 7,111.52 | $ 7,128.95 | $ 7,624.92 | $ 6,735.90 | $ 6,727.76 | $ 7,326.65 | $ 6,414.37 | $ 6,764.39 | $ 7,361.54 | $ 86,145.21 |
| | | 5. Below COI | $ 11,291.25 | $ 11,403.07 | $ 14,295.47 | $ 11,644.47 | $ 11,666.68 | $ 12,298.33 | $ 11,166.10 | $ 11,155.73 | $ 11,918.46 | $ 10,756.60 | $ 11,202.39 | $ 11,562.89 | $ 140,761.44 |
| | Smash-Trc Total | | $ (312.79) | $ (819.46) | $ (12,252.95) | $ (1,913.32) | $ (2,014.00) | $ (3,203.64) | $ 254.25 | $ 301.23 | $ (1,482.09) | $ (1,109.79) | $ 89.84 | $ (1,883.42) | $ (20,926.56) |
| | Smash-Troy | 1. Sales | $ (139,455.69) | $ (123,483.32) | $ (177,673.47) | $ (107,596.17) | $ (111,244.08) | $ (156,945.18) | $ (128,205.14) | $ (136,353.28) | $ (148,984.56) | $ (120,534.31) | $ (138,688.61) | $ (160,235.11) | $ (1,649,988.90) |
| | | 2. COGS | $ 44,565.40 | $ 39,461.16 | $ 56,778.54 | $ 34,384.16 | $ 35,549.91 | $ 50,154.46 | $ 40,970.10 | $ 43,573.97 | $ 47,610.52 | $ 38,518.76 | $ 44,320.27 | $ 51,205.82 | $ 527,093.07 |
| | | 3. Labor | $ 41,758.58 | $ 38,254.53 | $ 52,659.18 | $ 34,769.18 | $ 35,569.46 | $ 48,111.76 | $ 39,290.42 | $ 41,077.97 | $ 46,365.34 | $ 37,607.57 | $ 41,590.30 | $ 48,833.51 | $ 505,887.80 |
| | | 4. Other Controllables | $ 16,011.51 | $ 15,183.40 | $ 17,992.94 | $ 14,359.71 | $ 14,548.85 | $ 16,918.26 | $ 15,428.21 | $ 15,850.85 | $ 16,505.54 | $ 15,030.50 | $ 15,971.73 | $ 17,088.28 | $ 190,890.13 |
| | | 5. Below COI | $ 19,281.91 | $ 18,467.67 | $ 22,220.19 | $ 17,657.77 | $ 17,844.24 | $ 20,173.49 | $ 18,708.99 | $ 19,123.76 | $ 19,767.67 | $ 18,317.34 | $ 19,242.81 | $ 20,341.21 | $ 230,155.98 |
| | Smash-Troy Total | | $ (17,838.29) | $ (12,116.56) | $ (28,022.62) | $ (6,425.35) | $ (7,732.12) | $ (21,587.21) | $ (13,808.02) | $ (16,726.91) | $ (18,735.49) | $ (11,060.14) | $ (17,563.50) | $ (22,766.74) | $ (195,371.95) |
| | Bennigan's | 1. Sales | $ (78,339.49) | $ (79,086.78) | $ (103,590.91) | $ (66,505.67) | $ (64,957.23) | $ (94,087.34) | $ (83,190.16) | $ (84,603.12) | $ (108,913.69) | $ (83,170.80) | $ (91,358.20) | $ (108,894.33) | $ (1,052,941.99) |
| | | 2. COGS | $ 20,638.87 | $ 19,484.58 | $ 25,521.66 | $ 16,384.98 | $ 16,003.49 | $ 23,180.26 | $ 20,495.63 | $ 20,843.64 | $ 26,833.73 | $ 20,490.76 | $ 22,507.69 | $ 26,828.26 | $ 259,412.95 |
| | | 3. Labor | $ 19,801.55 | $ 18,796.10 | $ 24,078.50 | $ 16,494.86 | $ 16,211.63 | $ 22,340.18 | $ 19,546.65 | $ 19,805.10 | $ 25,052.11 | $ 19,543.11 | $ 21,040.68 | $ 25,048.57 | $ 247,759.04 |
| | | 4. Other Controllables | $ 9,719.11 | $ 9,456.40 | $ 10,627.50 | $ 8,855.13 | $ 8,781.13 | $ 10,173.30 | $ 9,652.51 | $ 9,720.04 | $ 10,881.87 | $ 9,651.59 | $ 10,042.88 | $ 10,880.95 | $ 118,442.41 |
| | | 5. Below COI | $ 13,707.82 | $ 13,377.92 | $ 14,848.55 | $ 12,147.84 | $ 12,529.93 | $ 14,278.19 | $ 13,624.19 | $ 13,708.99 | $ 15,167.99 | $ 13,622.02 | $ 14,114.39 | $ 15,166.83 | $ 166,770.68 |
| | Bennigan's Total | | $ (20,516.41) | $ (17,971.78) | $ (24,514.70) | $ (12,622.86) | $ (11,431.05) | $ (24,115.41) | $ (19,871.28) | $ (20,525.35) | $ (30,978.69) | $ (19,862.32) | $ (23,652.36) | $ (30,989.72) | $ (280,556.91) |
| | Nodi-Md | 1. Sales | $ (76,158.00) | $ (70,158.00) | $ (91,874.81) | $ (56,126.40) | $ (57,465.02) | $ (88,258.24) | $ (72,835.66) | $ (58,977.92) | $ (66,489.26) | $ (52,883.70) | $ (67,897.64) | $ (91,926.97) | $ (850,033.24) |
| | | 2. COGS | $ 19,062.51 | $ 17,751.50 | $ 23,246.34 | $ 15,201.02 | $ 14,559.75 | $ 22,531.43 | $ 18,428.49 | $ 18,157.87 | $ 18,823.67 | $ 14,330.12 | $ 17,179.38 | $ 23,239.67 | $ 215,076.89 |
| | | 3. Labor | $ 17,295.57 | $ 16,287.12 | $ 22,818.34 | $ 14,945.82 | $ 15,934.56 | $ 22,551.25 | $ 18,429.49 | $ 17,301.47 | $ 20,988.58 | $ 14,423.71 | $ 16,706.64 | $ 20,582.84 | $ 223,532.26 |
| | | 4. Other Controllables | $ 6,041.81 | $ 5,822.70 | $ 6,885.56 | $ 5,531.27 | $ 5,745.10 | $ 6,236.95 | $ 6,014.42 | $ 6,043.09 | $ 6,498.00 | $ 5,877.91 | $ 5,913.85 | $ 6,409.84 | $ 73,031.50 |
| | | 5. Below COI | $ 7,273.96 | $ 6,854.84 | $ 8,899.29 | $ 6,302.03 | $ 6,711.03 | $ 7,645.47 | $ 7,235.95 | $ 8,170.79 | $ 9,036.81 | $ 7,856.31 | $ 7,924.75 | $ 8,868.98 | $ 90,197.79 |
| | Nodi-Md Total | | $ (10,460.14) | $ (6,155.59) | $ (18,077.04) | $ (5,003.36) | $ (7,312.42) | $ (10,963.70) | $ (14,185.40) | $ (10,505.95) | $ (13,799.02) | $ (10,599.77) | $ (11,990.15) | $ (21,908.36) | $ (156,500.68) |
| | Nodi-MP | 1. Sales | $ (53,095.41) | $ (47,929.15) | $ (73,225.65) | $ (41,057.62) | $ (46,122.98) | $ (57,696.61) | $ (52,449.63) | $ (53,125.68) | $ (63,851.72) | $ (49,230.81) | $ (50,078.40) | $ (61,173.11) | $ (649,636.77) |
| | | 2. COGS | $ 11,993.89 | $ 10,826.90 | $ 16,541.22 | $ 9,274.66 | $ 10,418.90 | $ 13,033.31 | $ 11,848.05 | $ 12,000.76 | $ 14,423.71 | $ 11,120.94 | $ 11,312.40 | $ 13,654.16 | $ 146,748.94 |
| | | 3. Labor | $ 17,295.57 | $ 16,287.12 | $ 22,818.34 | $ 14,945.82 | $ 15,934.56 | $ 19,787.12 | $ 17,169.51 | $ 17,301.47 | $ 20,988.58 | $ 16,541.20 | $ 16,706.64 | $ 20,582.84 | $ 216,358.77 |
| | | 4. Other Controllables | $ 6,041.81 | $ 5,822.70 | $ 6,885.56 | $ 5,531.27 | $ 5,746.10 | $ 6,236.95 | $ 6,014.42 | $ 6,043.09 | $ 6,498.00 | $ 5,877.91 | $ 5,913.85 | $ 6,409.84 | $ 73,031.50 |
| | | 5. Below COI | $ 8,168.34 | $ 7,751.22 | $ 9,793.67 | $ 7,196.41 | $ 7,605.38 | $ 8,539.85 | $ 8,116.20 | $ 8,170.79 | $ 9,036.81 | $ 7,856.31 | $ 7,924.75 | $ 8,868.98 | $ 99,028.71 |
| | Nodi-MP Total | | $ (9,595.76) | $ (7,241.21) | $ (17,176.86) | $ (4,109.46) | $ (8,417.04) | $ (10,099.38) | $ (9,301.45) | $ (9,609.57) | $ (12,904.62) | $ (8,833.55) | $ (9,220.76) | $ (11,957.29) | $ (125,201.41) |
| | BABs-Md | 1. Sales | $ (53,095.41) | $ (47,929.15) | $ (73,225.65) | $ (41,057.62) | $ (46,122.98) | $ (57,696.61) | $ (52,449.63) | $ (53,125.68) | $ (63,851.72) | $ (49,230.81) | $ (50,078.40) | $ (61,173.11) | $ (649,636.77) |
| | | 2. COGS | $ 11,993.89 | $ 10,826.90 | $ 16,541.22 | $ 9,274.66 | $ 10,418.90 | $ 13,033.31 | $ 11,848.05 | $ 12,000.76 | $ 14,423.71 | $ 11,120.94 | $ 11,312.40 | $ 13,654.16 | $ 146,748.94 |
| | | 3. Labor | $ 17,295.57 | $ 16,287.12 | $ 22,818.34 | $ 14,945.82 | $ 15,934.56 | $ 19,787.12 | $ 17,169.51 | $ 17,301.47 | $ 20,988.58 | $ 16,541.20 | $ 16,706.64 | $ 20,582.84 | $ 216,358.77 |
| | | 4. Other Controllables | $ 6,041.81 | $ 5,822.70 | $ 6,885.56 | $ 5,531.27 | $ 5,746.10 | $ 6,236.95 | $ 6,014.42 | $ 6,043.09 | $ 6,498.00 | $ 5,877.91 | $ 5,913.85 | $ 6,409.84 | $ 73,031.50 |
| | | 5. Below COI | $ 8,168.34 | $ 7,751.22 | $ 9,793.67 | $ 7,196.41 | $ 7,605.38 | $ 8,539.85 | $ 8,116.20 | $ 8,170.79 | $ 9,036.81 | $ 7,856.31 | $ 7,924.75 | $ 8,868.98 | $ 99,028.71 |
| | BABs-Md Total | | $ (9,595.76) | $ (7,241.21) | $ (17,176.86) | $ (4,109.46) | $ (8,417.04) | $ (10,099.38) | $ (9,301.45) | $ (9,609.57) | $ (12,904.62) | $ (8,833.55) | $ (9,220.76) | $ (11,957.29) | $ (114,468.85) |
| | BABs-New | 2. COGS | $ 7,033.69 | $ 3,501.23 | $ 8,517.02 | $ 7,033.69 | $ 7,033.69 | $ 8,517.02 | $ 7,033.69 | $ 7,033.69 | $ 8,517.02 | $ 7,033.69 | $ 7,033.69 | $ 9,237.60 | $ 90,337.60 |
| | | 4. Other Controllables | $ 3,578.35 | $ 3,501.23 | $ 5,057.85 | $ 3,493.09 | $ 3,000.95 | $ 4,351.18 | $ 3,446.55 | $ 3,231.14 | $ 4,114.93 | $ 3,601.38 | $ 3,439.34 | $ 4,150.14 | $ 45,006.13 |
| | | 5. Below COI | $ 7,502.47 | $ 7,502.47 | $ 7,502.47 | $ 7,502.47 | $ 7,502.47 | $ 7,502.47 | $ 7,502.47 | $ 7,502.47 | $ 7,502.47 | $ 7,502.47 | $ 7,502.47 | $ 7,502.47 | $ 90,029.64 |
| | | PPP Interest Only | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 3,000.00 |
| IC Total | | | | | | | | | | | | | | | $ (22,364.09) |

Rotated financial spreadsheet (landscape). Best-effort transcription of visible rows and the page footer.

| KJ | KJ Office | | Col1 | Col2 | Col3 | Col4 | Col5 | Col6 | Col7 | Col8 | Col9 | Col10 | Col11 | Col12 | Col13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Owner/Opr Comp | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 15,000.00 | 15,000.00 | 10,000.00 | 10,000.00 | 130,000.00 |
| | | Planned Taxes | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 150,000.00 |
| | | Loan Principal | 18,910.55 | 40,000.00 | 18,910.55 | 18,910.55 | 18,910.55 | 18,910.55 | 18,910.55 | 18,910.55 | 18,910.55 | 18,910.55 | 18,910.55 | 18,910.55 | 18,910.55 | 226,926.60 |
| | KJ Office Total | | 57,275.09 | 90,247.88 | 57,197.04 | 57,183.09 | 57,108.05 | 56,927.85 | 59,324.37 | 56,927.85 | 57,143.26 | 64,320.18 | 64,531.22 | 57,169.80 | 57,275.09 | 725,289.97 |
| OC-Okem | 1. Sales | | (158,662.99) | (155,781.49) | (263,893.42) | (151,015.92) | (117,537.22) | (181,285.60) | (137,683.62) | (135,735.62) | (157,693.26) | (131,025.46) | (145,876.30) | (186,591.34) | (158,662.99) | (1,923,002.06) |
| | 2. COGS | | 44,883.03 | 43,871.53 | 74,318.26 | 42,529.44 | 33,099.69 | 51,054.05 | 38,226.11 | 38,226.17 | 44,409.93 | 36,899.68 | 41,082.01 | 52,657.54 | 44,883.03 | 541,568.58 |
| | 3. Labor | | 43,726.63 | 45,698.65 | 71,090.02 | 44,060.05 | 36,782.72 | 53,086.70 | 41,125.42 | 40,729.91 | 47,945.47 | 39,703.39 | 42,939.94 | 54,327.59 | 43,726.63 | 582,596.09 |
| | 4. Other Controllables | | 23,471.84 | 23,303.27 | 29,627.63 | 23,024.50 | 21,065.76 | 24,705.22 | 22,138.62 | 22,136.62 | 23,415.11 | 21,855.09 | 22,723.84 | 24,128.29 | 23,471.84 | 282,777.96 |
| | 5. Below COI | | 25,998.86 | 25,849.90 | 31,438.71 | 25,603.54 | 23,872.61 | 27,168.33 | 24,907.45 | 24,813.62 | 25,948.73 | 24,500.14 | 25,337.85 | 27,462.66 | 25,998.86 | 312,972.40 |
| | OC-Okemos Total | | (18,782.63) | (17,658.14) | (57,418.80) | (15,798.39) | (2,731.47) | (25,181.30) | (10,543.50) | (9,835.30) | (15,974.42) | (7,997.16) | (13,792.86) | (27,410.26) | (18,782.63) | (223,117.03) |
| OC-KW | 1. Sales | | (94,968.34) | (105,773.92) | (151,881.63) | (100,591.95) | (84,825.24) | (151,116.11) | (111,662.51) | (96,764.37) | (111,323.92) | (104,522.59) | (111,792.66) | (108,320.74) | (94,968.34) | (1,307,695.39) |
| | 2. COGS | | 25,123.20 | 27,981.74 | 40,179.21 | 26,610.89 | 22,439.92 | 39,976.70 | 29,339.53 | 25,598.33 | 29,449.95 | 27,650.71 | 22,735.89 | 28,655.48 | 25,123.20 | 345,941.55 |
| | 3. Labor | | 25,261.31 | 27,507.76 | 38,081.20 | 26,430.44 | 23,152.58 | 37,922.05 | 28,731.98 | 25,634.70 | 29,649.36 | 27,247.61 | 23,385.18 | 29,025.01 | 25,261.31 | 342,029.18 |
| | 4. Other Controllables | | 14,770.57 | 15,368.21 | 17,918.37 | 15,081.60 | 14,209.56 | 17,876.03 | 15,693.90 | 14,869.91 | 15,675.18 | 15,299.00 | 14,271.44 | 15,509.08 | 14,770.57 | 186,542.85 |
| | 5. Below COI | | 18,809.66 | 19,357.14 | 21,693.30 | 19,094.88 | 18,295.73 | 21,654.52 | 19,655.51 | 18,900.65 | 19,638.35 | 19,293.74 | 18,352.42 | 19,486.19 | 18,809.66 | 234,231.79 |
| | OC-KW Total | | (11,003.60) | (15,559.07) | (34,009.55) | (13,374.14) | (6,727.45) | (33,686.81) | (18,241.59) | (11,760.78) | (16,911.08) | (15,031.53) | (7,199.14) | (15,644.98) | (198,950.02) | |
| OC-SG | 1. Sales | | (135,875.31) | (129,831.53) | (217,810.25) | (143,338.58) | (109,051.46) | (155,031.02) | (117,856.18) | (111,231.91) | (134,280.22) | (133,987.55) | (122,235.10) | (156,626.17) | (135,875.31) | (1,566,415.22) |
| | 2. COGS | | 38,668.21 | 36,948.23 | 61,985.74 | 40,792.15 | 31,034.32 | 44,119.65 | 33,312.55 | 31,655.04 | 38,214.27 | 38,130.98 | 34,803.47 | 44,573.59 | 38,668.21 | 474,238.40 |
| | 3. Labor | | 42,875.28 | 41,548.04 | 63,702.07 | 44,514.25 | 36,984.65 | 49,915.49 | 38,742.50 | 37,463.48 | 45,358.52 | 42,460.72 | 39,893.01 | 50,265.77 | 42,875.28 | 533,723.80 |
| | 4. Other Controllables | | 21,339.12 | 20,940.57 | 27,742.29 | 21,831.29 | 19,570.24 | 23,602.34 | 20,098.11 | 19,714.03 | 22,233.94 | 21,214.63 | 20,443.58 | 23,707.53 | 21,339.12 | 262,437.67 |
| | 5. Below COI | | 22,311.18 | 21,996.01 | 26,583.80 | 22,700.36 | 20,912.41 | 23,310.08 | 21,329.82 | 21,026.11 | 22,228.00 | 22,212.74 | 21,603.01 | 23,393.26 | 22,311.18 | 269,606.78 |
| | OC-SG Total | | (10,681.52) | (8,398.68) | (37,796.35) | (13,500.53) | (549.64) | (14,083.46) | (3,573.18) | (1,373.25) | (6,245.49) | (9,968.48) | (5,552.03) | (14,685.96) | (126,408.57) | |
| OC-Md | 1. Sales | | (149,946.64) | (134,464.31) | (168,648.54) | (129,504.75) | (126,202.33) | (188,392.07) | (149,946.64) | (134,464.31) | (236,105.59) | (174,034.22) | (160,800.85) | (188,392.07) | (149,946.64) | (1,940,902.32) |
| | 2. COGS | | 40,963.22 | 36,733.67 | 46,072.30 | 35,378.80 | 34,476.62 | 51,465.95 | 40,963.22 | 36,733.67 | 64,500.58 | 47,343.59 | 43,928.43 | 51,465.95 | 40,963.22 | 530,226.00 |
| | 3. Labor | | 46,340.62 | 42,796.61 | 53,224.42 | 41,661.34 | 40,905.39 | 57,743.83 | 46,340.62 | 42,796.61 | 68,885.77 | 51,854.42 | 48,825.22 | 57,743.83 | 46,340.62 | 598,889.68 |
| | 4. Other Controllables | | 23,381.47 | 22,005.86 | 25,043.13 | 21,585.20 | 21,271.78 | 28,297.35 | 22,005.86 | 22,381.47 | 31,036.70 | 22,521.65 | 22,345.86 | 29,997.35 | 23,381.47 | 293,153.68 |
| | 5. Below COI | | 18,249.32 | 17,293.46 | 19,403.93 | 16,987.27 | 16,783.38 | 20,622.85 | 18,249.32 | 17,293.46 | 23,565.89 | 19,736.43 | 18,919.42 | 20,622.85 | 18,249.32 | 227,730.28 |
| | OC-Md Total | | (21,012.01) | (15,634.71) | (24,904.76) | (13,912.14) | (12,765.16) | (31,762.09) | (21,012.01) | (15,634.71) | (48,333.95) | (29,578.13) | (24,781.92) | (31,762.09) | (290,993.68) | |
| KJ Total | | | (4,204.70) | (52.66) | 604.10 | 33,923.84 | (40,182.44) | (62,722.91) | (2,192.38) | 18,323.81 | 28,139.97 | (5,077.21) | 5,810.32 | (25,168.11) | (104,086.33) | |
| Cash (Income)/Loss | | | (4,720.11) | 16,474.83 | 89,173.15 | 69,921.27 | 69,921.27 | (2,192.38) | 18,601.92 | 67,283.63 | 3,810.89 | (68.74) | (59,535.93) | (129,433.42) | | |
| | | CC Payments | 7,812.50 | 7,812.50 | 12,828.07 | 12,828.07 | 12,828.07 | 12,828.07 | 12,828.07 | 12,828.07 | 12,828.07 | 12,828.07 | 12,828.07 | 12,828.07 | 138,890.13 | |
| Cash Balance | Beginning IC | | 186,134.30 | 180,837.21 | 156,497.22 | 173,978.30 | 113,948.01 | 65,122.61 | 74,835.01 | 68,172.30 | 55,066.12 | 81,331.71 | 59,615.54 | 52,666.51 | | |
| | EOP IC w/ Creditors | | 180,837.21 | 156,497.22 | 173,978.30 | 113,948.01 | 65,122.61 | 74,835.01 | 68,172.30 | 55,066.12 | 81,331.71 | 59,615.54 | 52,666.51 | 74,608.26 | | |
| | Beginning KJ | | (162,443.67) | (158,239.97) | (158,186.31) | (94,304.74) | (94,969.04) | (28,832.96) | (88,550.54) | (92,623.52) | (110,047.32) | (77,730.15) | (82,907.36) | (85,340.45) | | |
| | EOP KJ w/ Creditors | | (158,238.97) | (158,186.31) | (94,304.74) | (94,969.04) | (128,832.96) | (88,550.54) | (92,623.52) | (110,047.32) | (82,607.30) | (77,730.15) | (83,040.45) | (58,374.34) | | |
| | Combined EOP w/ Cre | | 22,598.24 | (1,689.09) | 79,671.56 | 19,038.97 | (63,710.37) | (13,315.53) | (24,451.22) | (55,861.21) | (1,475.60) | (18,114.61) | (30,873.94) | 16,233.92 | | |

Projected Cash Flow for Year 2023

| Company | Store | Category | Sum of Oct | Sum of Nov | Sum of Dec | Sum of Jan | Sum of Feb | Sum of Mar | Sum of Apr | Sum of May | Sum of June | Sum of July | Sum of Aug | Sum of Sept | Sum of Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IC | Pixie | 1. Sales | $ (126,232.64) | $ (114,572.59) | $ (171,022.64) | $ (100,301.72) | $ 109,452.31 | $ (165,065.65) | $ (153,456.30) | $ (142,522.74) | $ (94,988.87) | $ (158,449.84) | $ 143,583.29 | $ (167,563.92) | $ (1,747,512.28) |
| | | 2. COGS | 41,455.35 | 37,635.22 | 56,178.05 | 32,847.47 | 35,963.29 | 54,221.35 | 50,407.88 | 46,632.51 | 64,050.04 | 52,048.17 | 47,164.75 | 55,137.26 | 574,061.94 |
| | | 3. Labor | 35,553.49 | 33,233.89 | 46,853.03 | 30,394.90 | 32,215.29 | 45,568.01 | 46,767.55 | 38,816.06 | 51,620.80 | 41,962.65 | 39,005.16 | 46,222.69 | 482,515.22 |
| | | 4. Other Controllables | 15,075.55 | 14,350.86 | 17,859.30 | 13,463.90 | 14,032.63 | 17,489.08 | 16,767.55 | 16,094.84 | 16,348.86 | 17,077.90 | 16,153.92 | 17,662.88 | 195,376.77 |
| | | 5. Below COI | 10,472.76 | 10,472.76 | 10,488.62 | 10,488.50 | 10,471.23 | 10,487.84 | 10,484.38 | 10,481.14 | 10,496.78 | 10,485.87 | 10,481.43 | 10,488.58 | 125,784.47 |
| | | Bank Payments | | | | | | | | | | | | | |
| | | PPP Interest Only | | | | | | | | | | | | | |
| | | Professional Fees | | | | | | | | | | | | | |
| | | Owner/Opr Comp | | | | | | | | | | | | | |
| | | Planned Taxes | | | | | | | | | | | | | |
| | Pixie Total | | $ (23,662.07) | $ (18,879.86) | $ (39,644.41) | $ (13,026.55) | $ (18,779.87) | $ (37,199.37) | $ (34,927.24) | $ (30,388.19) | $ (49,471.79) | $ (35,875.25) | $ (30,770.03) | $ (38,042.91) | $ (369,673.38) |
| | Office | 3. Labor | 34,673.65 | 34,673.65 | 42,845.03 | 34,673.65 | 34,673.65 | 42,845.03 | 34,673.65 | 34,673.65 | 42,845.03 | 34,673.65 | 34,673.65 | 42,845.03 | 448,769.32 |
| | | 4. Other Controllables | 15,974.55 | 15,861.09 | 16,674.56 | 15,665.77 | 15,737.85 | 16,295.71 | 16,015.60 | 15,973.34 | 16,383.42 | 15,921.84 | 16,018.49 | 16,367.23 | 192,769.25 |
| | | 5. Below COI | 22,359.26 | 22,039.69 | 24,049.32 | 21,489.53 | 21,691.99 | 23,263.90 | 22,474.89 | 22,355.86 | 23,454.59 | 22,210.79 | 22,483.05 | 23,465.34 | 271,338.19 |
| | | PPP Interest Only | 8,023.00 | 8,023.00 | 8,023.00 | | 8,023.00 | 8,023.00 | | 8,023.00 | | 8,023.00 | 8,023.00 | | 96,276.00 |
| | | Professional Fees | | | | | | | | | | | | | |
| | | Owner/Opr Comp | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 60,000.00 |
| | | Planned Taxes | 10,000.00 | 10,000.00 | 10,000.00 | 11,000.00 | 10,000.00 | 15,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 15,000.00 | 130,000.00 |
| | | | 11,111.00 | 61,111.00 | | 11,111.00 | 11,111.00 | 1,111.00 | 11,111.00 | 11,111.00 | 1,111.00 | 1,111.00 | 11,111.00 | 11,111.00 | 132,332.00 |
| | Office Total | | $ 107,141.46 | $ 106,708.43 | $ 157,602.91 | $ 108,237.29 | $ 106,237.34 | $ 121,538.64 | $ 107,288.14 | $ 107,136.34 | $ 119,797.04 | $ 106,940.28 | $ 107,309.17 | $ 121,811.50 | $ 1,390,404.76 |
| | Smash-WB | 1. Sales | $ (67,540.03) | $ (73,337.67) | $ (111,721.02) | $ (66,796.74) | $ (71,206.91) | $ (87,152.90) | $ (71,058.25) | $ (70,939.33) | $ (89,888.19) | $ (125,099.33) | $ (72,425.90) | $ (85,745.61) | $ (936,284.16) |
| | | 2. COGS | 17,415.28 | 18,910.21 | 28,807.40 | 17,223.62 | 18,360.79 | 22,472.48 | 18,322.46 | 18,291.79 | 23,177.78 | 17,655.49 | 18,675.11 | 22,109.61 | 241,422.02 |
| | | 3. Labor | 22,149.93 | 23,469.48 | 33,734.09 | 21,980.77 | 22,984.53 | 28,142.36 | 22,950.69 | 22,923.62 | 28,784.92 | 22,361.96 | 23,261.96 | 27,822.06 | 300,546.37 |
| | | 4. Other Controllables | 7,416.29 | 7,736.85 | 9,859.22 | 7,375.19 | 7,619.04 | 8,500.78 | 7,610.82 | 7,604.24 | 8,652.01 | 7,457.80 | 7,886.44 | 8,422.94 | 95,551.60 |
| | | 5. Below COI | 12,696.71 | 13,120.26 | 15,924.32 | 12,642.41 | 12,964.60 | 14,129.52 | 12,953.74 | 12,945.05 | 14,329.34 | 12,764.78 | 13,053.65 | 14,026.71 | 161,551.09 |
| | Smash-WB Total | | $ (7,861.82) | $ (10,100.87) | $ (23,395.99) | $ (7,574.75) | $ (9,277.95) | $ (13,907.78) | $ (9,220.54) | $ (9,174.63) | $ (14,964.14) | $ (8,221.58) | $ (9,748.74) | $ (13,364.29) | $ (136,813.08) |
| | Smash-Trd | 1. Sales | $ (58,471.45) | $ (60,065.77) | $ (100,533.04) | $ (63,526.56) | $ (63,955.06) | $ (72,870.99) | $ (56,884.21) | $ (56,531.89) | $ (67,448.32) | $ (50,835.03) | $ (57,712.26) | $ (68,077.92) | $ (776,224.51) |
| | | 2. COGS | 17,419.89 | 18,371.83 | 26,765.15 | 17,279.43 | 17,394.58 | 21,096.94 | 16,902.42 | 16,778.40 | 20,173.58 | 15,322.47 | 17,155.37 | 20,197.66 | 225,102.62 |
| | | 3. Labor | 23,348.40 | 23,977.65 | 36,400.02 | 23,166.72 | 24,824.82 | 28,946.81 | 22,867.19 | 22,826.18 | 27,486.79 | 21,292.34 | 23,009.36 | 27,050.30 | 307,145.84 |
| | | 4. Other Controllables | 6,971.39 | 7,062.88 | 9,380.88 | 7,260.95 | 7,285.37 | 7,795.87 | 6,889.05 | 6,860.33 | 7,485.38 | 6,534.14 | 6,899.29 | 7,521.43 | 87,596.76 |
| | | 5. Below COI | 11,466.60 | 11,582.26 | 14,534.65 | 11,834.78 | 11,865.88 | 12,516.05 | 11,335.68 | 11,324.57 | 12,120.62 | 10,909.15 | 11,374.19 | 12,166.52 | 143,030.35 |
| | Smash-Trd Total | | $ (232.56) | $ (741.43) | $ (11,943.13) | $ (1,846.71) | $ (1,982.84) | $ (3,107.28) | $ 337.93 | $ 366.55 | $ (1,378.42) | $ 2,204.94 | $ 169.39 | $ (1,377.40) | $ (19,708.94) |
| | Smash-Troy | 1. Sales | $ (145,421.89) | $ (128,767.67) | $ (183,673.76) | $ (112,198.67) | $ (116,613.06) | $ (163,661.42) | $ (133,694.04) | $ (142,183.09) | $ (155,359.88) | $ (125,099.33) | $ (144,620.71) | $ (167,087.72) | $ (1,718,981.84) |
| | | 2. COGS | 46,927.61 | 41,553.30 | 59,271.48 | 36,206.49 | 37,631.20 | 52,813.50 | 43,143.04 | 45,882.45 | 50,134.60 | 40,563.15 | 46,669.07 | 53,919.17 | 554,715.06 |
| | | 3. Labor | 44,432.95 | 40,680.18 | 55,687.96 | 36,906.70 | 37,906.86 | 51,154.45 | 41,776.18 | 43,699.25 | 49,273.85 | 39,965.09 | 44,251.45 | 51,930.63 | 537,645.56 |
| | | 4. Other Controllables | 15,320.83 | 15,457.38 | 18,304.35 | 15,490.10 | 16,838.38 | 14,827.24 | 15,712.76 | 16,152.91 | 16,836.07 | 15,398.29 | 14,279.28 | 17,444.11 | 194,467.72 |
| | | 5. Below COI | 15,586.66 | 18,737.06 | 21,536.07 | 17,892.40 | 18,117.47 | 20,515.88 | 18,988.20 | 19,420.96 | 20,092.68 | 18,880.64 | 19,546.22 | 20,393.54 | 239,703.58 |
| | Smash-Troy Total | | $ (18,154.44) | $ (12,336.75) | $ (28,874.23) | $ (6,594.74) | $ (8,130.89) | $ (21,911.12) | $ (14,073.84) | $ 17,007.52 | $ (19,022.68) | $ (11,292.16) | $ (17,875.66) | $ (23,009.32) | $ (188,420.32) |
| | Bennigan's | 1. Sales | $ (83,203.25) | $ (82,474.00) | $ (107,094.27) | $ (69,350.94) | $ (66,034.76) | $ (89,113.29) | $ (85,751.58) | $ (88,222.60) | $ (113,573.38) | $ (66,732.23) | $ (55,268.02) | $ (113,559.06) | $ (1,097,382.34) |
| | | 2. COGS | 21,943.66 | 20,518.30 | 26,643.45 | 17,253.48 | 16,926.03 | 24,409.12 | 21,582.50 | 21,948.46 | 26,732.20 | 21,577.68 | 23,701.26 | 28,251.79 | 273,012.32 |
| | | 3. Labor | 21,115.81 | 20,033.69 | 25,507.50 | 17,555.05 | 17,306.46 | 23,811.21 | 20,841.63 | 21,119.47 | 24,732.40 | 20,837.98 | 22,450.19 | 26,728.55 | 264,039.74 |
| | | 4. Other Controllables | 9,892.09 | 9,618.28 | 10,794.92 | 8,991.12 | 8,928.21 | 10,365.71 | 9,822.71 | 9,853.02 | 11,104.81 | 9,821.78 | 10,229.73 | 11,110.88 | 120,566.26 |
| | | 5. Below COI | 13,925.04 | 13,581.20 | 15,008.79 | 12,793.62 | 12,714.63 | 14,519.80 | 13,837.93 | 13,926.21 | 15,447.95 | 13,836.76 | 14,349.04 | 15,446.78 | 169,437.75 |
| | Bennigan's Total | | $ (21,326.66) | $ (18,722.53) | $ (29,089.61) | $ (12,757.67) | $ (12,159.43) | $ (25,007.45) | $ (20,966.81) | $ (21,375.44) | $ (35,556.02) | $ (20,658.03) | $ (24,537.80) | $ (32,028.02) | $ (270,326.27) |
| | Nodi-Md | 1. Sales | $ (58,556.09) | $ (73,166.01) | $ (94,987.15) | $ (58,525.85) | $ (60,284.69) | $ (92,031.29) | $ (75,947.99) | $ (55,395.01) | $ (69,340.79) | $ (54,944.08) | $ (70,861.93) | $ (55,873.90) | $ (885,938.14) |
| | | 2. COGS | 12,629.39 | 11,400.09 | 17,287.31 | 9,766.09 | 10,985.98 | 13,722.70 | 12,475.18 | 12,630.38 | 12,636.30 | 15,188.43 | 11,911.27 | 14,694.01 | 154,388.42 |
| | | 3. Labor | 18,293.02 | 17,206.99 | 24,031.03 | 15,762.93 | 16,840.87 | 20,898.92 | 18,156.76 | 18,299.13 | 22,194.47 | 17,481.52 | 17,658.47 | 21,757.20 | 228,381.28 |
| | | 4. Other Controllables | 6,138.09 | 5,909.57 | 7,000.41 | 5,605.73 | 5,832.55 | 5,341.37 | 6,109.43 | 6,139.38 | 6,613.97 | 5,967.34 | 6,004.57 | 6,521.97 | 74,184.38 |
| | | 5. Below COI | 7,447.97 | 7,022.22 | 9,993.27 | 6,443.79 | 6,875.58 | 8,738.63 | 7,402.66 | 8,354.09 | 9,257.59 | 8,026.58 | 7,203.08 | 9,082.44 | 100,490.94 |
| | Nodi-Md Total | | $ (10,647.57) | $ (19,522.14) | $ (18,300.15) | $ (17,173.32) | $ (19,426.25) | $ (45,329.67) | $ (30,987.17) | $ (15,471.63) | $ (11,990.96) | $ (8,047.61) | $ (26,580.54) | $ (12,250.14) | $ (152,853.03) |
| | Nodi-MP | 1. Sales | $ (55,365.74) | $ (49,977.49) | $ (75,697.79) | $ (42,813.35) | $ (48,161.23) | $ (60,158.65) | $ (54,899.68) | $ (55,396.01) | $ (66,586.20) | $ (51,339.69) | $ (52,217.55) | $ (64,416.78) | $ (676,820.16) |
| | | 2. COGS | 12,629.39 | 11,400.09 | 17,287.31 | 9,766.09 | 10,985.98 | 13,722.70 | 12,475.18 | 12,636.30 | 15,188.43 | 11,711.02 | 11,911.27 | 14,694.01 | 154,388.42 |
| | | 3. Labor | 18,293.02 | 17,206.99 | 24,031.03 | 15,762.93 | 16,840.87 | 20,898.92 | 18,156.76 | 18,299.13 | 22,194.47 | 17,481.52 | 17,658.47 | 21,757.20 | 228,381.28 |
| | | 4. Other Controllables | 6,138.09 | 5,909.57 | 7,000.41 | 5,605.73 | 5,832.55 | 6,341.37 | 6,109.43 | 6,139.38 | 6,613.97 | 5,967.34 | 6,004.57 | 6,521.97 | 74,184.38 |
| | | 5. Below COI | 8,351.65 | 7,916.60 | 9,993.27 | 7,338.17 | 7,769.96 | 8,738.63 | 8,297.06 | 8,354.09 | 9,257.59 | 8,026.58 | 8,097.46 | 9,082.44 | 101,223.50 |
| | Nodi-MP Total | | $ (15,901.80) | $ (13,555.08) | $ (22,725.21) | $ (7,172.52) | $ (7,625.25) | $ (11,351.41) | $ (11,645.03) | $ (10,565.49) | $ (14,225.57) | $ (9,047.61) | $ (9,440.16) | $ (13,255.54) | $ (125,175.14) |
| | BABs-Md | Sales | | | | | | | | | | | | | |
| | BABs-Md Total | | | | | | | | | | | | | | |
| | BABs-New | 2. COGS | $ (9,563.59) | $ 7,544.07 | $ 17,405.77 | $ 47,412.57 | $ 35,616.54 | $ 22,389.97 | $ 6,114.55 | $ 299.90 | $ 38,731.43 | $ 9,253.61 | $ 5,970.27 | $ 34,882.58 | $ (23,326.49) |
| | | 2. COGS | 7,238.54 | 7,238.54 | 8,765.08 | 7,238.54 | 7,238.54 | 8,765.08 | 7,238.54 | 7,238.54 | 8,765.08 | 7,238.54 | 7,238.54 | 8,765.08 | 92,988.64 |
| | | 4. Other Controllables | 3,709.23 | 3,628.82 | 5,229.95 | 3,620.27 | 3,127.61 | 4,515.14 | 3,571.69 | 3,347.05 | 4,300.11 | 3,733.17 | 3,564.21 | 4,305.27 | 46,652.52 |
| | | 5. Below COI | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 90,029.64 |
| | | PPP Interest Only | | | | | | | | | | | | | |
| | BABs-New Total | | | | | | | | | | | | | | |
| | KJ Office | | | | | | | | | | | | | | |
| | IC Total | | | | | | | | | | | | | | |

Rotated landscape financial spreadsheet. Row labels (left) with final grand-total column (rightmost) transcribed; intermediate period columns are too dense/low-resolution to reproduce reliably.

| KJ | | Total |
|---|---|---|
| KJ Office | Owner/Opr Comp | 130,000.00 |
| | Planned Taxes | 150,000.00 |
| | Loan Principal | 226,926.60 |
| KJ Office Total | | 796,377.40 |
| OC-Okemos | 1. Sales | (2,004,282.25) |
| | 2. COGS | 569,984.27 |
| | 3. Labor | 598,726.81 |
| | 4. Other Controllables | 287,530.93 |
| | 5. Below COI | 317,172.59 |
| OC-Okemos Total | | (230,887.65) |
| OC-KW | 1. Sales | (1,363,269.00) |
| | 2. COGS | 364,778.89 |
| | 3. Labor | 364,888.34 |
| | 4. Other Controllables | 189,616.61 |
| | 5. Below COI | 237,047.55 |
| OC-KW Total | | (207,557.61) |
| OC-SG | 1. Sales | (1,737,038.21) |
| | 2. COGS | 499,183.13 |
| | 3. Labor | 566,558.49 |
| | 4. Other Controllables | 267,094.86 |
| | 5. Below COI | 273,289.52 |
| OC-SG Total | | (130,812.21) |
| OC-Md | 1. Sales | (2,023,624.56) |
| | 2. COGS | 558,327.11 |
| | 3. Labor | 637,513.53 |
| | 4. Other Controllables | 232,530.19 |
| | 5. Below COI | 232,855.93 |
| OC-Md Total | | (294,697.80) |
| KJ Total | | (127,457.87) |
| Cash (Income)/Loss | | (150,886.35) |
| CC Payments | | |
| Cash Balance | Beginning IC | |
| | EOP IC w/ Creditors | |
| | Beginning KJ | |
| | EOP KJ w/ Creditors | |
| Combined EOP w/ Cre | | 153,935.84 |

# Projected Cash Flow for Year 2024

| Company | Store | Category | Sum of Oct | Sum of Nov | Sum of Dec | Sum of Jan | Sum of Feb | Sum of Mar | Sum of Apr | Sum of May | Sum of June | Sum of July | Sum of Aug | Sum of Sept | Sum of Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IC | Pixie | 1. Sales | $ (126,232.64) | $ (114,732.59) | $ (171,022.41) | $ (100,301.72) | $ (109,452.31) | $ (165,065.65) | $ (153,456.30) | $ (142,632.74) | $ (194,988.87) | $ (158,449.84) | $ (143,583.29) | $ (167,853.92) | $ (1,747,612.28) |
| | | 2. COGS | $ 41,867.92 | $ 38,000.00 | $ 56,723.47 | $ 31,267.34 | $ 36,302.35 | $ 54,747.78 | $ 50,897.27 | $ 47,307.39 | $ 64,672.49 | $ 52,553.49 | $ 47,622.66 | $ 55,072.67 | $ 579,935.34 |
| | | 3. Labor | $ 36,642.03 | $ 34,249.17 | $ 48,290.55 | $ 31,320.53 | $ 33,198.40 | $ 47,068.12 | $ 42,228.81 | $ 40,007.62 | $ 53,208.91 | $ 43,263.58 | $ 40,202.70 | $ 47,640.33 | $ 497,310.75 |
| | | 4. Other Controllables | $ 15,075.55 | $ 14,350.86 | $ 17,859.30 | $ 13,049.93 | $ 14,032.63 | $ 17,489.08 | $ 16,094.84 | $ 16,094.84 | $ 16,094.84 | $ 17,077.90 | $ 16,153.92 | $ 17,662.38 | $ 195,376.77 |
| | | 5. Below COI | $ 10,476.24 | $ 10,472.76 | $ 10,489.62 | $ 10,468.50 | $ 10,471.23 | $ 10,487.84 | $ 10,484.38 | $ 10,481.84 | $ 10,496.78 | $ 10,485.87 | $ 10,481.43 | $ 10,488.68 | $ 125,784.47 |
| | Pixie Total | | $ (22,170.90) | $ (17,659.19) | $ (37,659.47) | $ (11,781.42) | $ (15,447.70) | $ (35,272.83) | $ (33,076.29) | $ (28,741.75) | $ (49,261.83) | $ (35,079.00) | $ (29,122.58) | $ (36,389.86) | $ (349,504.55) |
| | Office | 1. Sales | $ 35,654.98 | $ 35,654.98 | $ 44,057.63 | $ 35,654.98 | $ 35,654.98 | $ 44,057.63 | $ 35,654.98 | $ 35,654.98 | $ 44,057.63 | $ 35,654.98 | $ 35,654.98 | $ 44,057.63 | $ 461,470.36 |
| | | 2. COGS | $ 16,008.54 | $ 15,893.04 | $ 16,611.04 | $ 15,693.80 | $ 15,788.89 | $ 16,334.91 | $ 16,048.49 | $ 16,006.03 | $ 16,048.49 | $ 15,951.91 | $ 16,052.20 | $ 16,407.99 | $ 193,178.84 |
| | | 3. Labor | $ 22,454.99 | $ 22,129.66 | $ 24,152.09 | $ 21,568.46 | $ 21,779.96 | $ 23,374.31 | $ 22,567.54 | $ 22,447.94 | $ 23,563.26 | $ 22,295.49 | $ 22,577.98 | $ 23,580.14 | $ 272,491.82 |
| | | 4. Other Controllables | | | | | | | | | | | | | |
| | | 5. Below COI | $ 8,023.00 | $ 8,023.00 | $ 8,023.00 | $ 8,023.00 | $ 8,023.00 | $ 8,023.00 | $ 8,023.00 | $ 8,023.00 | $ 8,023.00 | $ 8,023.00 | $ 8,023.00 | $ 8,023.00 | $ 96,276.00 |
| | | Bank Payments | | | | | | | | | | | | | $ - |
| | | PPP Interest Only | | | | | | | | | | | | | |
| | | Professional Fees | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 60,000.00 |
| | | Owner/Opr Comp | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 130,000.00 |
| | | Planned Taxes | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 130,000.00 |
| | Office Total | | $ 107,141.51 | $ 106,700.68 | $ 117,843.76 | $ 105,940.24 | $ 106,226.83 | $ 121,789.85 | $ 107,294.01 | $ 107,131.95 | $ 117,045.89 | $ 106,925.38 | $ 107,108.16 | $ 117,068.76 | $ 1,333,117.09 |
| | Smash-Wil | 1. Sales | $ (69,274.90) | $ (75,220.60) | $ (114,000.43) | $ (68,511.28) | $ (72,961.07) | $ (89,392.67) | $ (72,881.78) | $ (72,762.86) | $ (92,197.34) | $ (70,225.77) | $ (74,279.16) | $ (87,945.74) | $ (959,653.10) |
| | | 2. COGS | $ 18,035.90 | $ 19,584.05 | $ 29,680.54 | $ 17,837.22 | $ 18,995.75 | $ 23,273.80 | $ 18,975.11 | $ 18,944.15 | $ 24,000.41 | $ 18,283.61 | $ 19,338.93 | $ 22,897.08 | $ 249,850.15 |
| | | 3. Labor | $ 23,334.41 | $ 24,530.53 | $ 35,307.34 | $ 23,055.24 | $ 24,100.00 | $ 29,529.73 | $ 24,081.39 | $ 24,053.47 | $ 30,188.24 | $ 23,457.78 | $ 24,409.48 | $ 29,190.01 | $ 315,237.62 |
| | | 4. Other Controllables | $ 7,512.19 | $ 7,840.97 | $ 9,985.26 | $ 7,489.99 | $ 7,716.03 | $ 8,624.60 | $ 7,711.65 | $ 7,705.08 | $ 8,779.63 | $ 7,564.79 | $ 7,788.92 | $ 8,544.60 | $ 97,243.76 |
| | | 5. Below COI | $ 12,823.42 | $ 13,257.82 | $ 16,090.84 | $ 12,767.67 | $ 13,092.75 | $ 14,293.15 | $ 13,066.95 | $ 13,078.27 | $ 14,498.03 | $ 12,892.33 | $ 13,189.04 | $ 14,187.44 | $ 163,258.31 |
| | Smash-Wil Total | | $ (7,568.44) | $ (9,907.29) | $ (22,936.45) | $ (7,361.16) | $ (9,056.54) | $ (13,671.39) | $ (9,026.68) | $ (8,981.89) | $ (14,727.38) | $ (8,026.88) | $ (9,552.79) | $ (13,126.61) | $ (134,103.26) |
| | Smash-Tint | 1. Sales | $ (59,974.37) | $ (61,609.30) | $ (102,604.31) | $ (65,153.33) | $ (65,661.07) | $ (74,739.48) | $ (58,138.35) | $ (57,984.03) | $ (69,174.64) | $ (52,134.85) | $ (58,674.56) | $ (69,824.55) | $ (795,870.84) |
| | | 2. COGS | $ 17,519.68 | $ 17,953.49 | $ 31,256.05 | $ 16,611.93 | $ 16,758.58 | $ 16,316.67 | $ 12,939.28 | $ 12,938.42 | $ 16,132.48 | $ 12,244.20 | $ 16,970.58 | $ 16,000.47 | $ 226,065.46 |
| | | 3. Labor | $ 24,478.82 | $ 24,932.31 | $ 38,088.66 | $ 37,353.39 | $ 26,557.58 | $ 31,345.33 | $ 23,845.38 | $ 23,925.49 | $ 28,803.57 | $ 24,802.52 | $ 16,970.58 | $ 28,884.33 | $ 326,066.46 |
| | | 4. Other Controllables | $ 7,057.44 | $ 7,151.05 | $ 9,498.33 | $ 7,353.97 | $ 7,383.04 | $ 7,902.88 | $ 6,952.19 | $ 6,943.48 | $ 7,584.22 | $ 6,908.57 | $ 6,983.01 | $ 7,621.44 | $ 89,039.60 |
| | | 5. Below COI | $ 11,575.61 | $ 11,694.82 | $ 14,684.23 | $ 11,953.26 | $ 11,990.28 | $ 12,652.29 | $ 11,441.57 | $ 11,430.46 | $ 12,246.49 | $ 11,003.93 | $ 11,480.82 | $ 12,293.89 | $ 144,447.65 |
| | Smash-Tint Total | | $ 176.72 | $ (326.77) | $ (11,181.22) | $ (1,418.13) | $ (1,574.49) | $ (2,600.07) | $ 743.79 | $ 788.70 | $ (886.37) | $ 2,590.99 | $ 577.06 | $ (1,086.49) | $ (14,196.18) |
| | Smash-Troy | 1. Sales | $ (149,155.03) | $ (132,014.63) | $ (187,423.05) | $ (115,079.05) | $ (119,554.73) | $ (167,854.81) | $ (137,120.35) | $ (145,831.00) | $ (159,348.71) | $ (128,921.08) | $ (148,336.80) | $ (171,366.34) | $ (1,752,466.95) |
| | | 2. COGS | $ 48,599.60 | $ 43,034.25 | $ 61,068.87 | $ 37,496.67 | $ 39,085.18 | $ 54,692.60 | $ 44,678.30 | $ 47,516.52 | $ 51,921.03 | $ 42,006.72 | $ 48,332.99 | $ 55,836.77 | $ 574,269.50 |
| | | 3. Labor | $ 46,670.84 | $ 42,679.33 | $ 58,276.76 | $ 38,707.74 | $ 39,947.03 | $ 53,703.65 | $ 43,858.46 | $ 45,894.05 | $ 51,715.86 | $ 41,942.37 | $ 46,479.63 | $ 54,524.26 | $ 564,299.98 |
| | | 4. Other Controllables | $ 16,514.39 | $ 15,628.82 | $ 18,488.46 | $ 14,747.69 | $ 15,000.80 | $ 17,483.88 | $ 15,880.42 | $ 16,542.07 | $ 15,042.87 | $ 15,465.32 | $ 16,471.95 | $ 17,665.84 | $ 190,752.22 |
| | | 5. Below COI | $ 19,776.37 | $ 19,806.65 | $ 21,722.25 | $ 18,039.26 | $ 18,288.79 | $ 20,729.03 | $ 19,599.61 | $ 19,608.80 | $ 20,226.02 | $ 18,744.88 | $ 19,734.66 | $ 20,906.67 | $ 236,919.35 |
| | Smash-Troy Total | | $ (17,593.85) | $ (11,866.60) | $ (27,552.21) | $ (7,089.35) | $ (7,734.27) | $ (21,245.03) | $ (13,530.51) | $ (16,471.48) | $ (18,372.93) | $ (10,761.79) | $ (17,317.57) | $ (22,430.70) | $ (191,225.28) |
| | Bennigan's | 1. Sales | $ (90,467.85) | $ (84,583.76) | $ (109,281.44) | $ (77,131.65) | $ (69,950.96) | $ (100,629.51) | $ (88,977.47) | $ (90,487.20) | $ (116,481.71) | $ (89,958.11) | $ (97,706.82) | $ (116,462.35) | $ (1,125,118.83) |
| | | 2. COGS | $ 21,288.50 | $ 21,247.48 | $ 27,451.95 | $ 17,868.30 | $ 17,571.71 | $ 25,278.18 | $ 29,260.25 | $ 22,730.42 | $ 22,346.32 | $ 22,346.32 | $ 24,544.00 | $ 29,255.39 | $ 282,630.34 |
| | | 3. Labor | $ 22,209.27 | $ 21,062.80 | $ 26,721.86 | $ 18,441.78 | $ 18,211.73 | $ 25,036.10 | $ 21,918.88 | $ 22,213.04 | $ 28,124.77 | $ 21,915.10 | $ 23,619.71 | $ 28,121.00 | $ 277,596.04 |
| | | 4. Other Controllables | $ 10,000.32 | $ 9,719.11 | $ 10,899.45 | $ 9,076.21 | $ 9,019.78 | $ 10,485.97 | $ 9,981.42 | $ 10,001.25 | $ 11,243.57 | $ 9,928.17 | $ 10,346.28 | $ 11,242.64 | $ 121,881.84 |
| | | 5. Below COI | $ 14,060.96 | $ 13,707.82 | $ 15,190.06 | $ 12,900.49 | $ 12,829.63 | $ 14,670.82 | $ 13,971.51 | $ 14,062.12 | $ 15,622.19 | $ 13,970.36 | $ 14,495.41 | $ 15,621.03 | $ 171,102.40 |
| | Bennigan's Total | | $ (21,471.74) | $ (18,846.55) | $ (29,018.52) | $ (12,318.11) | $ (12,316.11) | $ (25,158.44) | $ (20,305.81) | $ (21,480.37) | $ (33,233.93) | $ (20,798.16) | $ (24,701.42) | $ (32,222.29) | $ (271,980.21) |
| | Nodi-Md | 1. Sales | $ (60,573.02) | $ (75,043.84) | $ (96,917.14) | $ (60,021.17) | $ (62,020.71) | $ (94,395.98) | $ (77,886.37) | $ (63,081.34) | $ (88,291.47) | $ (56,352.43) | $ (72,809.61) | $ (98,328.52) | $ (908,320.43) |
| | | 2. COGS | $ 21,255.96 | $ 21,289.05 | $ 25,481.57 | $ 17,344.20 | $ 17,300.68 | $ 20,215.88 | $ 20,097.57 | $ 17,530.53 | $ 20,446.46 | $ 16,537.97 | $ 19,935.36 | $ 20,155.89 | $ 234,338.94 |
| | | 4. Other Controllables | $ 7,985.59 | $ 7,719.18 | $ 8,772.93 | $ 6,995.48 | $ 7,091.80 | $ 8,551.48 | $ 7,856.56 | $ 7,142.90 | $ 7,528.88 | $ 6,818.73 | $ 7,601.92 | $ 8,840.78 | $ 93,007.20 |
| | | 5. Below COI | $ 14,313.90 | $ 13,980.70 | $ 15,298.84 | $ 13,075.40 | $ 13,195.90 | $ 15,146.90 | $ 14,152.54 | $ 13,259.82 | $ 13,743.90 | $ 12,854.32 | $ 13,834.01 | $ 15,383.70 | $ 168,239.93 |
| | Nodi-Md Total | | $ (15,936.23) | $ (13,575.57) | $ (22,100.56) | $ (7,161.65) | $ (8,015.35) | $ (21,029.17) | $ (14,793.02) | $ (8,468.18) | $ (11,089.08) | $ (5,695.28) | $ (12,536.28) | $ (22,706.88) | $ (163,012.25) |
| | Nodi-MP | 1. Sales | $ (56,788.48) | $ (51,258.97) | $ (77,241.61) | $ (43,913.19) | $ (49,432.61) | $ (61,702.48) | $ (56,092.24) | $ (56,818.75) | $ (68,291.47) | $ (52,851.43) | $ (53,559.57) | $ (66,071.60) | $ (693,822.40) |
| | | 2. COGS | $ 13,079.70 | $ 11,806.13 | $ 17,790.53 | $ 10,114.22 | $ 11,385.47 | $ 14,211.51 | $ 12,919.34 | $ 13,086.67 | $ 15,729.11 | $ 12,126.84 | $ 12,336.01 | $ 15,217.82 | $ 159,803.35 |
| | | 3. Labor | $ 19,143.15 | $ 17,993.41 | $ 25,082.15 | $ 16,466.01 | $ 17,613.65 | $ 21,851.13 | $ 18,898.38 | $ 19,149.44 | $ 23,221.17 | $ 18,282.93 | $ 18,471.76 | $ 22,759.60 | $ 239,032.78 |
| | | 4. Other Controllables | $ 6,198.44 | $ 5,963.92 | $ 7,065.89 | $ 5,652.38 | $ 5,886.46 | $ 6,406.84 | $ 6,168.91 | $ 6,199.72 | $ 6,686.29 | $ 6,022.98 | $ 6,061.49 | $ 6,592.15 | $ 74,905.47 |
| | | 5. Below COI | $ 8,572.14 | $ 8,020.07 | $ 9,223.53 | $ 6,532.99 | $ 7,872.61 | $ 8,863.28 | $ 8,410.31 | $ 8,468.97 | $ 9,395.28 | $ 8,132.50 | $ 8,205.82 | $ 9,216.04 | $ 102,996.28 |
| | Nodi-MP Total | | $ (10,795.05) | $ (6,369.82) | $ (18,079.51) | $ (5,147.59) | $ (7,268.80) | $ (10,369.72) | $ (9,695.30) | $ (9,913.35) | $ (13,259.62) | $ (8,286.18) | $ (8,484.49) | $ (12,285.99) | $ (117,484.52) |
| | BABs-Md | 1. Sales | $ (56,788.48) | $ (51,258.97) | $ (77,241.61) | $ (43,913.19) | $ (49,432.61) | $ (61,702.48) | $ (56,092.24) | $ (56,818.75) | $ (68,291.47) | $ (52,851.43) | $ (53,559.57) | $ (66,071.60) | $ (693,822.40) |
| | | 2. COGS | $ 13,079.70 | $ 11,806.13 | $ 17,790.53 | $ 10,114.22 | $ 11,385.47 | $ 14,211.51 | $ 12,919.34 | $ 13,086.67 | $ 15,729.11 | $ 12,126.84 | $ 12,336.01 | $ 15,217.82 | $ 159,803.35 |
| | | 3. Labor | $ 19,143.15 | $ 17,993.41 | $ 25,082.15 | $ 16,466.01 | $ 17,613.65 | $ 21,851.13 | $ 18,898.38 | $ 19,149.44 | $ 23,221.17 | $ 18,282.93 | $ 18,471.76 | $ 22,759.60 | $ 239,032.78 |
| | | 4. Other Controllables | $ 6,198.44 | $ 5,963.92 | $ 7,065.89 | $ 5,652.38 | $ 5,886.46 | $ 6,406.84 | $ 6,168.91 | $ 6,199.72 | $ 6,686.29 | $ 6,022.98 | $ 6,061.49 | $ 6,592.15 | $ 74,905.47 |
| | | 5. Below COI | $ 8,466.52 | $ 8,020.07 | $ 10,117.91 | $ 7,426.97 | $ 7,872.61 | $ 8,863.28 | $ 8,410.31 | $ 8,468.97 | $ 9,395.28 | $ 8,132.50 | $ 8,205.82 | $ 9,216.04 | $ 102,996.28 |
| | BABs-Md Total | | $ (9,900.67) | $ (7,475.44) | $ (17,185.13) | $ (4,253.61) | $ (6,674.42) | $ (10,369.72) | $ (9,695.30) | $ (9,913.35) | $ (13,259.62) | $ (8,286.18) | $ (8,484.49) | $ (12,286.99) | $ (126,171.03) |
| | BABs-New | 1. Sales | $ 7,443.42 | $ 7,443.42 | $ 9,013.16 | $ 7,443.42 | $ 7,443.42 | $ 9,013.16 | $ 7,443.42 | $ 7,443.42 | $ 9,013.16 | $ 7,443.42 | $ 7,443.42 | $ 9,013.16 | $ 95,600.00 |
| | | 2. COGS | $ 3,790.93 | $ 3,708.53 | $ 5,331.32 | $ 3,699.77 | $ 3,206.76 | $ 4,617.54 | $ 3,649.93 | $ 3,419.55 | $ 4,306.92 | $ 3,815.57 | $ 3,642.23 | $ 4,402.36 | $ 47,881.41 |
| | | 4. Other Controllables | $ 7,502.47 | $ 7,502.47 | $ 7,502.47 | $ 7,502.47 | $ 7,502.47 | $ 7,502.47 | $ 7,502.47 | $ 7,502.47 | $ 7,502.47 | $ 7,502.47 | $ 7,502.47 | $ 7,502.47 | $ 90,029.64 |
| | | 5. Below COI | | | | | | | | | | | | | |
| | | PPP Interest Only | | | | | | | | | | | | | |
| | BABs-New Total | | | | | | | | | | | | | | |
| | KJ Office | 2. COGS | | | | | | | | | | | | | |
| | | 4. Other Controllables | | | | | | | | | | | | | |
| | | 5. Below COI | | | | | | | | | | | | | |
| | IC Total | | | | | | | | | | | | | | |

Financial projection worksheet (rotated 90°). The table's row labels, reading down the left edge:

| KJ | | |
|---|---|---|
| KJ Office | Owner/Opr Comp | |
| | Planned Taxes | |
| | Loan Principal | |
| KJ Office Total | | |
| OC-Okemos | 1. Sales | |
| | 2. COGS | |
| | 3. Labor | |
| | 4. Other Controllables | |
| | 5. Below COI | |
| OC-Okemos Total | | |
| OC-KW | 1. Sales | |
| | 2. COGS | |
| | 3. Labor | |
| | 4. Other Controllables | |
| | 5. Below COI | |
| OC-KW Total | | |
| OC-SG | 1. Sales | |
| | 2. COGS | |
| | 3. Labor | |
| | 4. Other Controllables | |
| | 5. Below COI | |
| OC-SG Total | | |
| OC-Md | 1. Sales | |
| | 2. COGS | |
| | 3. Labor | |
| | 4. Other Controllables | |
| | 5. Below COI | |
| OC-Md Total | | |
| KJ Total | | |
| Cash (Income)/Loss | | |
| | | |
| Cash Balance | | |
| Beginning KJ | | |
| EOP KJ w/ Creditors | | |
| Beginning KJ | | |
| EOP KJ w/ Creditors | | |
| Combined EOP w/ Cre | | |

| CompanyStore | Store | Category | Sum of Oct | Sum of Nov | Sum of Dec | Sum of Jan | Sum of Feb | Sum of Mar | Sum of Apr | Sum of May | Sum of June | Sum of July | Sum of Aug | Sum of Sept | Sum of Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IC | Pixie | 1. Sales | 127,458.20 | 115,684.95 | 172,622.82 | 101,275.52 | 110,514.96 | 166,668.23 | 159,946.17 | 144,017.52 | 196,881.96 | 159,988.19 | 144,977.30 | 169,483.57 | (477,579.39) |
| | | 2. COGS | 41,867.92 | 38,000.61 | 56,723.47 | 33,478.52 | 36,302.35 | 54,747.78 | 50,897.27 | 47,307.39 | 64,672.49 | 52,553.49 | 47,700.90 | 55,672.57 | 579,635.34 |
| | | 3. Labor | 37,994.89 | 35,504.38 | 50,086.21 | 32,456.19 | 34,410.71 | 43,809.72 | 43,899.72 | 41,497.86 | 55,205.31 | 44,876.50 | 41,700.90 | 49,409.44 | 515,765.79 |
| | | 4. Other Controllables | 15,093.95 | 14,367.56 | 17,884.23 | 13,478.52 | 14,048.58 | 17,513.14 | 16,789.91 | 16,115.63 | 16,191.63 | 17,100.99 | 16,174.85 | 17,686.84 | 195,631.48 |
| | | 5. Below COI | 10,476.61 | 14,357.58 | 16,205.52 | 11,408.79 | 10,471.15 | 10,488.52 | 10,484.82 | 10,481.58 | 10,497.33 | 10,488.33 | 10,481.84 | 10,489.16 | 125,789.54 |
| | Pixie Total | | (22,004.83) | (17,539.31) | (37,498.78) | (11,504.68) | (15,238.77) | (35,105.11) | (32,364.45) | (28,615.08) | (47,129.53) | (34,971.08) | (20,757.05) | (36,225.58) | (647,757.24) |
| | Office | Bank Payments | 36,636.31 | 36,636.31 | 45,270.23 | 36,636.31 | 36,636.31 | 36,636.31 | 36,636.31 | 36,636.31 | 45,270.23 | 36,636.31 | 36,636.31 | 45,270.23 | 474,171.40 |
| | | PPP Interest Only | 16,032.24 | 15,915.24 | 16,641.14 | 15,713.26 | 15,789.71 | 16,362.86 | 16,072.38 | 16,029.46 | 16,430.48 | 15,974.30 | 16,076.32 | 16,436.93 | 193,474.32 |
| | | Professional Fees | 22,521.77 | 22,192.21 | 24,236.86 | 21,623.27 | 21,838.63 | 22,634.82 | 22,634.82 | 22,513.92 | 23,643.48 | 22,358.55 | 22,645.92 | 23,661.66 | 273,324.11 |
| | | Owner/Opr Comp | 8,023.00 | 8,023.00 | 8,023.00 | 8,023.00 | 8,023.00 | 8,023.00 | 8,023.00 | 8,023.00 | 8,023.00 | 8,023.00 | 8,023.00 | 8,023.00 | 96,276.00 |
| | | Planned Taxes | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 60,000.00 |
| | | | 10,000.00 | | | | | | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 15,000.00 | 130,000.00 |
| | | | 11,111.00 | 11,111.00 | 11,111.00 | 11,111.00 | | | | | | | | | 44,444.00 |
| | Office Total | | 109,324.32 | 108,877.76 | 120,282.23 | 97,106.84 | 97,287.65 | 113,108.11 | 98,366.59 | 98,202.89 | 108,367.19 | 97,992.16 | 113,391.55 | 113,391.82 | 1,271,689.83 |
| | Smash-WF | 1. Sales | 120,297.17 | 76,331.21 | 115,567.54 | 69,526.65 | 74,019.66 | 90,710.66 | 73,959.62 | 73,839.54 | 93,562.78 | 71,257.81 | 75,370.57 | 69,239.87 | (973,683.28) |
| | | 2. COGS | 18,126.21 | 19,682.10 | 17,927.53 | 17,922.83 | 19,086.06 | 23,389.91 | 19,070.58 | 19,039.62 | 24,125.28 | 18,373.91 | 19,434.40 | 23,010.61 | 251,065.44 |
| | | 3. Labor | 24,174.86 | 25,635.23 | 38,746.32 | 23,988.38 | 25,075.79 | 30,730.46 | 25,061.26 | 25,032.19 | 31,420.69 | 24,007.36 | 25,402.73 | 30,374.45 | 328,049.72 |
| | | 4. Other Controllables | 7,544.99 | 7,876.59 | 10,032.87 | 7,502.64 | 7,749.56 | 8,666.84 | 7,746.26 | 7,739.66 | 8,823.57 | 7,597.78 | 8,586.00 | 8,586.00 | 97,690.56 |
| | | 5. Below COI | 12,893.13 | 13,338.95 | 16,205.52 | 12,841.85 | 13,170.08 | 14,389.44 | 13,165.70 | 13,156.93 | 14,597.79 | 12,968.31 | 13,268.77 | 14,281.98 | 164,283.25 |
| | Smash-WF Total | | (7,552.98) | (9,798.34) | (22,783.80) | (7,266.25) | (8,938.17) | (13,534.21) | (8,915.82) | (8,871.19) | (14,595.41) | (7,910.45) | (12,986.83) | (12,968.83) | (132,594.31) |
| | Smash-THd | 1. Sales | 60,884.20 | 62,515.05 | 104,010.81 | 66,114.00 | 66,847.17 | 75,844.48 | 58,998.13 | 58,844.93 | 70,194.85 | 92,907.60 | 59,541.55 | 70,851.07 | (807,333.10) |
| | | 2. COGS | 17,516.45 | 17,319.80 | 26,010.07 | 17,452.69 | 17,955.25 | 20,822.15 | 19,729.44 | 19,705.93 | 19,995.82 | 23,183.43 | 20,731.33 | 20,127.13 | 237,273.38 |
| | | 3. Labor | 25,461.43 | 25,534.06 | 39,633.23 | 30,271.56 | 27,117.10 | 31,569.20 | 24,927.15 | 24,883.13 | 24,883.13 | 23,183.43 | 19,895.99 | 30,135.90 | 587,456.00 |
| | | 4. Other Controllables | 7,086.66 | 7,180.99 | 9,541.71 | 7,385.36 | 7,415.71 | 7,939.04 | 6,980.47 | 6,971.72 | 7,617.58 | 6,633.92 | 7,011.39 | 7,654.91 | 89,419.06 |
| | | 5. Below COI | 11,640.49 | 11,760.87 | 14,786.79 | 12,023.31 | 12,062.20 | 12,732.87 | 11,504.41 | 11,493.20 | 12,320.89 | 11,060.28 | 11,544.04 | 12,368.74 | 145,298.09 |
| | Smash-Troy Total | | 450.76 | (48.58) | (10,781.60) | (1,137.24) | (1,298.48) | (2,281.86) | 1,015.22 | 1,061.77 | (552.74) | 2,857.09 | 850.88 | (751.25) | (10,595.40) |
| | Bennigan's | 1. Sales | 151,360.45 | 134,028.18 | 190,000.60 | 116,781.97 | 121,790.60 | 170,327.84 | 139,140.08 | 147,986.94 | 161,704.74 | 130,826.79 | 150,534.29 | 173,890.68 | (1,788,373.47) |
| | | 2. COGS | 48,843.98 | 43,250.86 | 61,313.25 | 37,685.52 | 39,301.80 | 54,964.76 | 44,900.47 | 47,755.35 | 52,182.08 | 42,217.78 | 48,577.38 | 56,114.48 | 577,107.71 |
| | | 3. Labor | 48,601.14 | 44,425.98 | 60,645.38 | 40,271.56 | 41,478.08 | 55,506.34 | 45,657.38 | 47,788.50 | 53,829.13 | 43,654.81 | 48,402.13 | 56,764.59 | 587,456.02 |
| | | 4. Other Controllables | 16,582.35 | 15,089.03 | 18,557.86 | 14,800.23 | 15,058.34 | 17,559.92 | 15,952.52 | 16,408.48 | 17,115.99 | 15,524.06 | 16,558.77 | 17,743.55 | 197,547.59 |
| | | 5. Below COI | 19,888.79 | 18,905.03 | 21,888.82 | 18,122.05 | 18,381.38 | 20,855.72 | 19,265.83 | 19,776.82 | 20,416.12 | 18,840.03 | 19,846.69 | 21,003.73 | 237,240.84 |
| | Bennigan's Total | | (17,444.19) | (18,993.63) | (27,608.80) | (5,933.64) | (7,571.00) | (21,041.10) | (13,353.83) | (16,317.79) | (18,161.91) | (10,528.11) | (17,186.32) | (22,230.71) | (180,052.51) |
| | Nodi-Md | 1. Sales | 91,795.80 | 85,834.92 | 110,791.93 | 72,174.03 | 71,020.97 | 102,114.63 | 90,290.83 | 91,815.22 | 118,198.90 | 90,271.29 | 99,144.02 | 118,179.36 | (1,141,631.78) |
| | | 2. COGS | 22,837.39 | 21,354.44 | 27,563.37 | 17,955.82 | 17,668.95 | 25,404.59 | 22,463.01 | 22,842.25 | 23,149.05 | 22,458.15 | 24,665.55 | 29,401.26 | 284,020.90 |
| | | 3. Labor | 23,145.15 | 21,947.94 | 27,830.65 | 19,204.24 | 18,972.66 | 28,087.87 | 22,842.89 | 23,149.05 | 29,318.30 | 22,838.96 | 24,620.99 | 29,314.37 | 289,273.05 |
| | | 4. Other Controllables | 10,039.28 | 9,755.99 | 10,942.07 | 9,106.76 | 9,051.97 | 10,529.68 | 9,667.76 | 10,040.20 | 11,294.08 | 9,966.83 | 10,388.50 | 11,293.15 | 122,376.27 |
| | | 5. Below COI | 14,140.64 | 13,782.92 | 15,280.72 | 12,963.05 | 12,833.85 | 14,759.94 | 14,050.33 | 14,141.82 | 15,725.25 | 14,049.16 | 14,581.66 | 15,724.08 | 172,093.42 |
| | Nodi-Md Total | | (21,633.24) | (18,260.91) | (29,175.12) | (12,944.14) | (12,433.54) | (25,332.55) | (20,066.84) | (21,641.90) | (32,455.15) | (20,508.19) | (12,593.36) | (32,446.50) | (273,668.14) |
| | Nodi-MP | 1. Sales | 61,759.08 | 76,158.60 | 98,244.32 | 60,902.35 | 62,973.98 | 95,786.46 | 79,037.87 | 64,009.70 | 72,155.85 | 57,180.44 | 73,683.24 | 99,771.71 | (921,663.75) |
| | | 2. COGS | 20,959.44 | 21,898.81 | 25,702.06 | 18,057.85 | 18,099.46 | 26,074.74 | 26,270.55 | 18,570.97 | 20,735.92 | 18,936.34 | 20,315.97 | 25,348.42 | 235,482.27 |
| | | 3. Labor | 22,451.31 | 21,258.45 | 26,793.66 | 18,480.14 | 18,450.14 | 26,270.15 | 21,871.70 | 18,570.97 | 21,560.57 | 17,216.14 | 19,187.18 | 27,119.89 | 235,782.06 |
| | | 4. Other Controllables | 8,020.62 | 7,752.33 | 8,810.33 | 7,021.48 | 7,120.72 | 8,692.59 | 7,890.25 | 7,170.34 | 7,560.57 | 6,843.18 | 7,633.74 | 8,883.50 | 93,399.85 |
| | | 5. Below COI | 14,385.37 | 14,047.88 | 15,378.82 | 13,128.50 | 13,253.34 | 15,230.70 | 14,221.39 | 13,315.76 | 13,866.66 | 12,904.21 | 13,898.71 | 15,470.86 | 169,042.20 |
| | Nodi-MP Total | | (16,012.14) | (6,203.56) | (17,960.63) | (5,055.50) | (7,492.00) | (11,124.04) | (10,428.12) | (10,746.96) | (14,076.14) | (8,309.12) | (9,312.19) | (13,097.44) | (127,307.65) |
| | BABs-Md | 1. Sales | 57,625.09 | 52,011.33 | 78,307.37 | 44,563.68 | 50,167.25 | 62,617.37 | 56,922.10 | 57,655.60 | 69,300.90 | 53,427.51 | 54,354.65 | 67,049.28 | (704,002.19) |
| | | 2. COGS | 13,144.77 | 11,864.23 | 17,862.57 | 10,165.35 | 11,443.57 | 14,283.55 | 12,984.41 | 13,151.74 | 15,808.12 | 12,187.27 | 12,398.76 | 15,294.51 | 160,568.85 |
| | | 3. Labor | 19,888.14 | 18,684.92 | 26,053.69 | 17,088.64 | 18,289.67 | 22,690.79 | 19,737.46 | 19,894.70 | 24,123.30 | 18,988.46 | 19,187.18 | 23,640.70 | 248,267.65 |
| | | 4. Other Controllables | 6,218.81 | 5,982.19 | 7,090.05 | 5,668.28 | 5,904.46 | 6,429.22 | 6,189.17 | 6,220.10 | 6,710.94 | 6,041.88 | 6,080.96 | 6,616.03 | 75,152.59 |
| | | 5. Below COI | 8,534.07 | 8,080.81 | 10,203.97 | 7,479.49 | 7,931.93 | 8,937.15 | 8,477.32 | 8,536.54 | 9,476.78 | 8,195.16 | 8,270.01 | 9,294.98 | 103,418.21 |
| | BABs-Md Total | | (10,153.53) | (7,399.18) | (17,900.82) | (6,055.50) | (7,642.00) | (11,151.04) | (11,551.28) | (9,852.58) | (5,779.26) | (8,014.74) | (8,417.74) | (12,203.06) | (116,574.89) |
| | BABs-New | 2. COGS | 7,648.28 | 9,261.23 | 9,261.23 | 7,648.28 | 7,648.28 | 3,261.23 | 7,648.28 | 7,648.28 | 7,648.28 | 7,648.28 | 7,648.28 | 9,261.23 | 98,231.16 |
| | | 4. Other Controllables | 3,839.18 | 3,755.51 | 5,398.50 | 3,746.71 | 3,248.86 | 4,678.03 | 3,696.17 | 3,462.33 | 4,454.11 | 3,864.26 | 3,588.30 | 4,459.57 | 48,291.53 |
| | | 5. Below COI | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 7,502.47 | 90,029.64 |
| | | PPP Interest Only | | | | | | | | | | | | | |

| KJ | KJ Office | Owner/Opr Comp | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $15,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $15,000.00 | $130,000.00 |
| | | Planned Taxes | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $120,000.00 |
| | | Loan Principal | $11,873.55 | $11,873.55 | $11,873.55 | $11,873.55 | $11,873.55 | $11,873.55 | $11,873.55 | $11,873.55 | $11,873.55 | $11,873.55 | $11,873.55 | $11,873.55 | $11,873.55 | $142,482.60 |
| | KJ Office Total | | $50,873.26 | $50,771.07 | $50,712.60 | $53,316.26 | $50,720.47 | $50,086.61 | | | | | | | | $529,034.33 |
| | OC-Okemc | 1. Sales | $172,191.04 | $169,071.74 | $282,191.88 | $163,896.22 | $149,278.86 | $147,306.57 | $142,214.97 | $171,141.95 | $158,315.04 | $2,085,260.07 | | | |
| | | 2. COGS | $43,988.25 | $48,081.17 | $80,250.64 | $46,609.34 | $36,962.87 | $42,452.41 | $41,891.52 | $48,669.90 | $45,022.14 | $593,013.01 | | | |
| | | 3. Labor | $53,327.96 | $52,581.50 | $82,293.52 | $51,342.98 | $43,225.67 | $47,846.01 | $54,718.88 | $55,718.98 | $50,000.39 | $655,042.75 | | | |
| | | 4. Other Controllables | $24,199.72 | $24,018.40 | $30,594.03 | $23,717.55 | $21,745.76 | $22,887.85 | $46,154.60 | $54,138.75 | $22,433.12 | $291,499.29 | | | |
| | | 5. Below COI | $26,698.18 | $26,536.93 | $32,384.65 | $26,269.38 | $24,515.87 | $27,967.95 | $25,513.74 | $26,643.95 | $25,980.86 | $321,358.70 | | | |
| | OC-Okemos Total | | $(18,996.33) | $(17,853.74) | $(45,669.04) | $(15,956.97) | $(3,525.39) | $(10,599.85) | $(9,877.03) | $(8,011.01) | $(13,911.53) | $(27,617.61) | $(224,346.32) | | |
| | OC-KW | 1. Sales | $103,055.02 | $114,797.91 | $162,423.50 | $109,119.16 | $93,809.35 | $164,014.00 | $105,017.12 | $120,818.00 | $113,445.24 | $117,547.82 | $1,418,570.96 | | |
| | | 2. COGS | $27,529.75 | $30,666.71 | $43,389.24 | $29,165.73 | $25,059.90 | $32,374.16 | $28,053.90 | $32,274.89 | $30,305.36 | $31,401.31 | $378,952.02 | | |
| | | 3. Labor | $29,525.01 | $32,205.65 | $44,151.64 | $30,923.02 | $27,414.42 | $44,514.72 | $33,664.74 | $34,653.99 | $31,896.87 | $33,907.49 | $400,122.72 | | |
| | | 4. Other Controllables | $15,182.77 | $15,828.26 | $18,446.17 | $15,519.40 | $14,674.55 | $18,533.64 | $16,179.60 | $15,290.63 | $15,753.91 | $15,979.42 | $192,192.61 | | |
| | | 5. Below COI | $19,219.38 | $19,814.36 | $22,227.44 | $19,529.68 | $18,750.92 | $22,308.03 | $20,138.22 | $19,318.80 | $20,119.39 | $19,953.69 | $239,849.55 | | |
| | OC-KW Total | | $(11,598.11) | $(16,282.93) | $(34,209.01) | $(14,049.13) | $(7,009.56) | $(34,643.53) | $(18,322.86) | $(17,610.56) | $(17,698.08) | $(16,305.91) | $(207,454.06) | | |
| | OC-SG | 1. Sales | $147,478.54 | $140,903.25 | $232,912.95 | $155,560.37 | $120,601.12 | $168,268.27 | $127,043.43 | $145,734.98 | $145,409.91 | $169,982.27 | $1,807,347.18 | | |
| | | 2. COGS | $42,381.80 | $40,492.22 | $66,933.60 | $44,704.49 | $34,657.87 | $48,356.27 | $36,509.24 | $41,880.74 | $41,787.32 | $48,848.83 | $519,388.26 | | |
| | | 3. Labor | $49,737.55 | $48,152.03 | $73,419.75 | $51,686.50 | $43,256.51 | $57,831.77 | $44,809.97 | $52,398.24 | $49,238.74 | $58,245.07 | $618,242.86 | | |
| | | 4. Other Controllables | $22,038.86 | $21,608.17 | $28,634.89 | $22,558.27 | $20,278.37 | $24,400.60 | $20,700.34 | $22,924.66 | $21,903.36 | $24,512.87 | $270,929.46 | | |
| | | 5. Below COI | $22,916.25 | $22,573.36 | $27,371.35 | $23,337.71 | $21,514.68 | $24,000.35 | $21,850.63 | $22,825.33 | $22,147.28 | $24,089.73 | $276,955.89 | | |
| | OC-SG Total | | $(10,404.08) | $(8,077.47) | $(36,553.36) | $(13,264.00) | $(893.89) | $(13,679.28) | $(3,173.25) | $(835.52) | $(5,706.01) | $(14,285.77) | $(121,830.71) | | |
| | OC-Md | 1. Sales | $162,744.47 | $145,940.57 | $183,038.23 | $140,562.36 | $136,664.94 | $162,744.47 | $145,940.57 | $256,253.52 | $188,882.54 | $204,455.44 | $2,106,499.31 | | |
| | | 2. COGS | $44,985.28 | $40,259.69 | $50,493.58 | $38,776.04 | $37,783.64 | $56,401.81 | $40,259.69 | $70,691.02 | $52,105.82 | $48,142.82 | $581,106.48 | | |
| | | 3. Labor | $53,972.27 | $49,748.65 | $61,903.29 | $48,396.85 | $47,492.65 | $67,286.44 | $53,972.27 | $80,305.75 | $64,542.00 | $67,286.44 | $697,586.45 | | |
| | | 4. Other Controllables | $24,410.82 | $22,928.91 | $26,200.49 | $22,454.63 | $22,137.57 | $28,088.24 | $22,928.91 | $32,857.21 | $26,771.89 | $28,089.24 | $306,472.53 | | |
| | | 5. Below COI | $19,039.43 | $18,001.98 | $20,292.32 | $17,669.94 | $17,447.85 | $21,614.58 | $19,039.43 | $18,001.98 | $20,653.14 | $21,614.58 | $237,953.94 | | |
| | OC-Md Total | | $(20,426.87) | $(15,001.34) | $(24,148.55) | $(12,104.43) | $(31,083.37) | $(20,426.87) | $(15,001.34) | $(47,787.05) | $(28,865.69) | $(31,063.37) | $(283,379.91) | | |
| | KJ Total | | $(10,562.31) | $(6,435.67) | $(97,544.21) | $(5,756.19) | $(25,841.09) | $(62,582.75) | $(22,312.19) | $(13,924.99) | $(33,962.65) | $(31,155.84) | $(283,976.07) | | |
| | CC (Income)/Loss | | $6,027.59 | $15,271.15 | $(162,358.50) | $12,828.07 | $55,456.38 | $(73,360.35) | $(13,363.47) | $7,012.60 | $(7,512.66) | $(70,531.82) | $(297,692.51) | | |
| | CC Payments | | $12,828.07 | $12,828.07 | $12,828.07 | $12,828.07 | $12,828.07 | $12,828.07 | $12,828.07 | $12,828.07 | $12,828.07 | $12,828.07 | $192,357.62 | | |
| | | | | | | | | | | | | | | | | |
| | Cash | | $12,828.07 | | | | | | | | | | | $192,357.62 | | |
| | Balance | | | | | | | | | | | | | | | |
| | Beginning IC | | $286,905.59 | $297,467.90 | $303,903.57 | $401,447.78 | $407,203.97 | $381,362.88 | $427,990.63 | $430,302.82 | $418,010.96 | $427,990.63 | $463,705.82 | | |
| | EOP IC w/ Creditors | | $297,467.90 | $303,903.57 | $401,447.78 | $407,203.97 | $381,362.88 | $427,990.63 | $430,302.82 | $418,010.96 | $451,993.59 | $463,397.11 | $494,861.66 | | |
| | Beginning KJ | | | | | | | | | | | | | | | |
| | EOP KJ w/ Creditors | | | | | | | | | | | | | | | |
| | Combined EOP w/ Cre | | $106,252.88 | $78,153.66 | $227,684.09 | $167,757.34 | $99,472.89 | $160,005.17 | $161,140.57 | $141,299.90 | $205,355.68 | $200,040.27 | $199,105.28 | $218,378.25 | |

EXHIBIT E

to Debtor's Disclosure Statement


Committee's Letter in Support of

the Plan of Reorganization

The Official Committee of Unsecured Creditors of Inspired Concepts, LLC
c/o Schafer and Weiner, PLLC
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI 48304

August 27, 2020

To:     All Unsecured Creditors of Inspired Concepts, LLC

Re:     Inspired Concepts, LLC, Chapter 11 Case No 20-20034 (Bankr. E.D. Mich.)

**Committee Support of Proposed First Amended Combined
Plan of Reorganization and Disclosure Statement [DN __]**

Dear Unsecured Creditors:

On January 10, 2020 (the "Petition Date"), Inspired Concepts, LLC (the "Debtor") commenced its chapter 11 bankruptcy case in the Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") commencing Case No. 20-20034 (the "Case").

On January 27, 2020, the Official Committee of Unsecured Creditors of Inspired Concepts, LLC (the "Committee) was formed by the Office of the United States Trustee. The Committee's members are:

LaBelle Management, et al.;
Gordon Food Service, Inc.; and
Bennigan's Franchising Co., LLC.

The Committee engaged Schafer and Weiner, PLLC as counsel.

On the Petition Date, the Debtor operated 12 restaurants includes Noodles & Co., Cracked, Ponderosa, among others. Since the Petition Date, the Debtor has endeavored to right-size its organization and now operates 8 restaurants. Under the Debtor's *First Amended Combined Plan of Reorganization and Disclosure Statement* (the "Plan"), the Debtor intends to fund the payments to the Unsecured Creditors through operation of its restaurants.

In summary, the Plan provides that the class of Unsecured Creditors (Class IV) will receive a promissory note in the amount of $625,000, bearing 5% interest, (the "Plan Note") which will be paid monthly to a creditors' trust for the benefit of Unsecured Creditors. Distributions from the creditors trust will be made bi-annually to the Unsecured Creditors. The Plan Note will be secured by a junior lien on all of the assets of the Debtor, including the equity in its subsidiaries. In addition, the Unsecured Creditors will receive 60% of the proceeds, if any, of certain litigation brought by the Debtor against its insurer for harm sustained as a result of the Coronavirus outbreak. For more details regarding the Plan's treatment of Unsecured Creditors, please see the Plan, its disclosure statement, and the exhibits attached thereto or contained in the forthcoming Plan Supplement. **The Committee recommends that you vote in favor of the Plan. This letter explains why.**

First, the Committee negotiated what it concluded was the best deal it could for the Unsecured Creditors under the circumstances. That deal is embodied in the proposed Plan that accompanies this letter. The negotiations between the Committee and the Debtor included three (3) days of mediation over a two week period. As a result of the negotiations, the treatment for Unsecured Creditors under the Plan significantly improved. Among other things, the total Plan payments increased from $500,000 to $625,000 and the Debtor's Plan obligations to the Unsecured Creditors will be secured by the Debtor's assets. The negotiated treatment provides an estimated 17.5% return to the Unsecured Creditors' Claims.[1]

Second, the Committee believes that the Plan represents the best chance for the Unsecured Creditors to receive money on their Claims. Unsecured Creditors would likely not receive any payment on their Claims in a liquidation. Pursuant to the Debtor's liquidation analysis, the value of the Debtor's assets at liquidation are insufficient to satisfy (i) the secured debt owing to Fifth Third Bank, N.A. and Mercantile Bank and (ii) the administrative expenses – each of which are paid before any payment is made to Unsecured Creditors. As a result, the Unsecured Creditors would not receive any money on account of their Claims in a liquidation of the Debtor.

Third, the Committee believes that if the Plan is not confirmed by the creditors, the Debtor will liquidate and go out of business. In order for the Plan to be accepted by the Unsecured Creditors, the Unsecured Creditors class must vote in favor of the Plan by at least 66.6% of the dollar amount of the Claims that vote and by more than 50% of the number of votes. Thus, the Committee urges the Unsecured Creditors to cast their ballots in favor of the Plan to ensure some recovery rather than a complete loss on their claims.

**DISCLAIMER: THE COMMITTEE REPRESENTS THE INTERESTS OF THE HOLDERS OF GENERAL UNSECURED CLAIMS AS A WHOLE AND DOES NOT REPRESENT THE INDIVIDUAL INTERESTS OF ANY PARTICULAR HOLDER OF A GENEAL UNSECURED CLAIM AGAINST THE DEBTOR. THE COMMITTEE RECOMMENDS THAT YOU CONSULT WITH YOUR OWN COUNSEL CONCERNING THE IMPACT OF THE TERMS OF THE PLAN ON ANY INDIVIDUAL CLAIMS OR CAUSES OF ACTION YOU BELIEVE YOU MAY HAVE AGAINST THE DEBTOR, ANY OFFICER, DIRECTOR, OR EMPLOYEE OF THE DEBTOR, OR OTHER THIRD PARTY. THE COMMITTEE CANNOT ADVISE HOLDERS OF UNSECURED CLAIMS REGARDING THE IMPACT OF THE PLAN ON POTENTIAL CLAIMS OR CAUSES OF ACTION, IF ANY, AN INDIVIDUAL HOLDER OF USNSECURED CLAIMS MAY HAVE. PLEASE CONTACT YOU OWN INDIVIDUAL COUNSEL TO ASSESS WHETHER ACCEPTANCE OF THE PLAN IS IN YOUR BEST INTERESTS.**

The forgoing is not intended as a substitute for the disclosure statement. Holders of Claims should read the Plan and its accompanying disclosure statement in their entirety, and then make their own respective independent decision as to whether the Plan is acceptable. This letter is not intended or offered as legal advice as to any specific claim or the treatment of such specific claim under the Plan. It has been prepared for informational purposes only.

---

[1] Based on the value of the Plan Note and the total reported unsecured claim on Debtor's schedules (exclusive of any deficiency claims of secured creditors or taxing authorities). *See* DN 157. Actual recoveries may be higher or lower depending on the results of claim objections and deficiency claims.

By this letter, the Committee is expressing its support for the Plan; however, this letter does not necessarily reflect the view of any individual Committee member, each of which reserves any and all of its rights.

If you have any questions regarding voting procedures or otherwise, please contact counsel for the Committee, John J. Stockdale, Jr. at (248) 571-1530.

Best Regards,


OFFICAL COMMITTEE OF
UNSECURED CREDITORS OF
INSPIRED CONCEPTS, LLC